```
 1                  UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2        -------------------------X
          SAIFULLAH PARACHA, ET AL       Docket No. CA 04-2022
 3                         Plaintiffs,

 4             v.                        Washington, D.C.
                                         October 30, 2009
 5                                       10:10 a.m.

 6        BARACK H. OBAMA, ET AL
                           Defendant.
 7        -------------------------X

 8                          MOTION HEARING
                  BEFORE THE HONORABLE PAUL L. FRIEDMAN
 9                  UNITED STATES DISTRICT JUDGE

10        APPEARANCES:

11        For the Plaintiffs:   LAW OFFICES OF GAILLARD T. HUNT
                                By:  Mr. Gaillard T. Hunt
12                              10705 Tenbrook Drive
                                Silver Spring, MD  20901
13                              301.530.2807
                                gthunt@mdo.net
14
          For the Defendant:    U.S. DEPARTMENT OF JUSTICE
15                              By:  Mr. Joseph C. Folio, III
                                     Mr. Stephen M. Elliott
16                              20 Massachusetts Avenue, N.W.
                                Washington, D.C.  20530
17                              202.305.4968
                                joseph.folio@usdoj.gov
18                              stephen.elliott@usdoj.gov

19        Court Reporter:       Catalina Kerr, RPR, CRR
                                U.S. District Courthouse
20                              Room 6716
                                Washington, D.C.  20001
21                              202.354.3258
                                catykerr@msn.com
22
          Proceedings recorded by mechanical stenography, transcript
23        produced by computer.

24

25
```

1          P-R-O-C-E-E-D-I-N-G-S

2          (10:10 A.M.; OPEN COURT.)

3          THE DEPUTY CLERK:  Civil Action 04-2022, Saifullah

4   Paracha, et al versus Barack H. Obama, et al.  Counsel, please

5   identify yourselves for the record.

6          MR. HUNT:  Good morning, Your Honor.  I'm G.T. Hunt

7   appearing for Petitioner, Saifullah Paracha.

8          THE COURT:  Mr. Hunt, good morning.

9          MR. FOLIO:  Good morning, Your Honor.  Joseph Folio,

10  and joining me at counsel table is Stephen Elliott on behalf

11  of the Respondents.

12         THE COURT:  Okay.  So my recollection of things is

13  that the last time we were here I denied Mr. Hunt's motion for

14  discovery, but there was an agreement that the Government

15  would be providing medical records, Task Force discovery, as I

16  recall it, consistent with Judge Hogan's case management order

17  as I amended it, and I guess I'd like to know, you know, where

18  we stand and what we ought to do next with respect to

19  discovery and moving the case forward.

20         And then in addition, there's a motion for bail that

21  we need to talk about, so I issued a short little opinion and

22  order on I guess it was the end of August, so where are we?

23         MR. FOLIO:  Your Honor, regarding the status of the

24  discovery, we did agree at the end of the last hearing to do

25  the Task Force discovery.  And just to remind the Court,

1    during that hearing, there were two options.  One option was

2    to search the sub-folders specific to Mr. Paracha and the

3    other was to search a broader scope of documents, basically

4    the entire Task Force database, which is more voluminous.

5         Mr. Hunt chose the latter option, and we suggested

6    to the Court that we would require at least 60 to 90 days,

7    which the Court reflected in its order.  At this point we

8    completed our searches of the information.  We are currently

9    in the process of reviewing the documents.  Many of the

10   documents have already been submitted for clearance; however,

11   at this point we anticipate to complete the review of

12   documents and to submit any remaining responsive documents for

13   clearance that we will require the full 90 days, and we may

14   require additional time, depending upon the clearance process

15   and how quickly that is moving, but we will be able to

16   identify that to Mr. Hunt and let him know exactly how much

17   time is needed.

18        THE COURT:  Be able to identify what to Mr. Hunt?

19        MR. FOLIO:  As soon as we understand that we will

20   need more time than the 90 days, what we would do is we would

21   notify Mr. Hunt and then we will seek such relief from the

22   Court, we would request additional time to let him know if

23   that process is going to take longer than the 90 days.

24        THE COURT:  Is there a way at this point, now that

25   you've completed the broader search, to -- if Mr. Hunt wanted

1   you to, to now go back and narrow it to the -- in terms of --

2   or to prioritize things so that -- so that he doesn't have to

3   wait for you to submit everything to clearance if he wanted

4   you to now narrow the categories in some way?  I don't know if

5   he does, but...

6           MR. FOLIO:  I think at this point, Your Honor, we're

7   so far along such that it wouldn't be helpful.  We, as I said,

8   have completed the searching, and the review of documents is

9   actually limited to just the last group of documents, so we

10   are in the process of completing that now, so any further

11   narrowing is not probably something that would be helpful at

12   this point.

13           THE COURT:  Okay.

14           MR. FOLIO:  And also, just to let the Court know,

15   that was the second aspect of your amendment to the case

16   management order.  I think the first aspect was the medical

17   records.  We did disclose those medical records to Mr. Hunt, I

18   believe a few weeks after the status conference.  Yesterday

19   Mr. Hunt raised an issue with me about whether those medical

20   records included certain things, and I'm not sure exactly

21   where that stands, but if Mr. Hunt believes that something

22   might be missing, we told him we were more than willing to

23   check with the folks to make sure that it includes all the

24   medical records that are responsive under Your Honor's order.

25           THE COURT:  Okay.  Mr. Hunt.

1          MR. HUNT:  Yes, Your Honor.  The only thing I have

2    seen so far is the medical records.  They consisted of 800

3    pages, approximately, of medical charts, that is day-to-day

4    entries by nurses and doctors.  My impression is that they

5    stop at the beginning of the year 2008, so there's clearly

6    about two years' worth of stuff that has not been produced and

7    the most relevant two years.

8          Mr. Folio says he will look into that and try to

9    find out why that is, and if there's another several hundred

10   pages I should get, I suppose I'll be getting it.  I don't see

11   any -- anything we can do to speed things up other than what

12   we have done.  Mr. Folio assures us that the discovery will be

13   available sometime in the future, and I guess we just have to

14   wait for it.  I do have my motion for bail.

15         THE COURT:  And have you been in touch with your

16   client recently in terms of why this is taking awhile and --

17   you know, I mean, there are a lot of other cases where judges

18   have actually had hearings already and I guess I don't know

19   whether that's because the petitioners in those cases have

20   been willing to limit themselves to a narrower universe of

21   potentially discoverable material so that they can move

22   forward, but I'm certainly willing to find the time when we

23   can have the hearing with respect to Mr. Paracha, if that's

24   what you want and if that's what he wants, but if the

25   discovery is important or portions of it may be important or

1   even crucial to presenting his case, then you may be right

2   that assuming you believe that the Government's operating in

3   good faith and Mr. Folio and Mr. Elliott and their colleagues

4   are trying to get this stuff, maybe we have no choice but to

5   wait.

6        MR. HUNT:  Yes, Your Honor.  I think we have no

7   choice but to wait.  Paracha's position is that he is totally

8   innocent and we believe the documents will eventually bear

9   that out.  We have been in touch with him.  I have not been

10  down to Cuba myself, but David Remes has been there just

11  recently and he's -- the client is aware of what's going on.

12       And as I say, we do have our motion for bail because

13  we are accustomed to giving the Government lots of time, and

14  rightly so.  It's big, it has to coordinate and it represents

15  the public interest, but here we're talking about six years.

16  They've had the man in custody for six years.  His son was

17  tried, convicted, sentenced and sent off two or three years

18  ago.  The people in the Southern District of New York that did

19  that are well aware of Saifullah's Paracha's case, the

20  father's case.  The decision not to go ahead is not a matter

21  of bureaucratic delay.  It's a matter of they have no case

22  against him.  He was not part of the conspiracy, and they know

23  that.  The evidence shows that.  This is the reason behind the

24  motion for bail.  That's a perfectly reasonable and proper

25  disposition of his case.

1       I quote in the bail papers what the Supreme Court

2   said, "The people who are imprisoned can no longer bear the

3   burden of this delay."  They said that, what, 18 months ago.

4   Well, it's time we relieved him of the burden of delay.  I

5   submitted papers that show he has numerous relatives in the

6   New York area.  He can stay with them.  We feel it is time for

7   bail.  There's no question for -- of the Court's authority to

8   issue bail.  Bail is traditional in habeas corpus.

9       The *Boumediene* decision indicated we were back to

10  traditional 1789 habeas corpus.  Bail is frequently granted in

11  immigration cases.  The *Zadvydas* case says that it makes a six

12  months presumption that people should not languish in jail

13  without bail longer than that.  Of course, a lot of the other

14  cases are tied up with this problem of the *Kiyemba* problem in

15  which the Supreme Court has just granted certiorari.  That's

16  the problem of people who have no place to go.

17      Well, of course, Saifullah Paracha is exactly the

18  opposite of that problem.  His own country Pakistan has asked

19  for and demanded his return.  He is the only person at

20  Guantanamo, I believe, who has a U.S. green card and is free

21  to come anywhere in the United States any time he wants.  We

22  have our motion for bail, Your Honor.

23      THE COURT:  *Kiyemba* is the *Uighurs* case, right?

24      MR. HUNT:  Yes.  Where a judge of this court ordered

25  habeas to go forward in the traditional way; namely, that they

 1  be brought into court and walk out the door.

 2          THE COURT:  Right.  I mean, what Judge Urbina

 3  did was he -- this was after a full hearing, which is what we

 4  can't have yet in your case because discovery isn't complete.

 5          MR. HUNT:  Yes.

 6          THE COURT:  But Judge Urbina had a full hearing and

 7  basically said there's no reason to hold them, and therefore,

 8  they should be released, and if they can't go back to China

 9  for reasons of safety and if they can't -- if there's no other

10  country that will take them, then they should be released to

11  the United States, and they all have lots of relatives here

12  and so forth and so on, and he was reversed by the Court of

13  Appeals and now we'll see what the Supreme Court says.

14          That was after a full hearing.  We haven't had a

15  full hearing yet.  Now, in the case of your client, I

16  suppose -- the Government always takes the view in these

17  cases, I guess, that when -- even if a judge of this court

18  were to order somebody released, find that he's not an enemy

19  combatant or whatever the right term is these days, that it's

20  still up to the Executive to move the person somewhere, to

21  find a place, and you're saying that in Mr. Paracha's case,

22  that's not going to be a problem.  If we get to the end of the

23  road, he can go to Pakistan, and I don't know whether the

24  Government would have any objection to him going to Pakistan,

25  but it's not like certain other people where they do have an

1  objection to them going to their home country or the *Uighurs*

2  where I think nobody had an objection except for everybody

3  knew they'd be persecuted and so it was in their own interest

4  that they couldn't go to their own home country.

5          But that's at the end of the process after we've had

6  a hearing.  We haven't done that yet.

7          MR. HUNT:  Well, six years is a long time to wait

8  for the process to get going.

9          THE COURT:  Sure is.

10          MR. HUNT:  It hasn't even been formally commenced in

11  the sense of any criminal trial or charges before a military

12  commission or anything like that.  They've had six years to do

13  it.  The present administration has had, what, ten months to

14  do it and here we still are.  It's time for bail, Your Honor.

15          THE COURT:  Okay.

16          MR. FOLIO:  Regarding the motion for bail, Your

17  Honor described the prohibition in *Kiyemba* as it currently

18  stands in the Court of Appeals and the Supreme Court is

19  addressing the issue, that is an impediment.  Your Honor also

20  noted the procedural posture is much different in this case

21  compared to the matter in *Kiyemba*, and we also noted in our

22  brief, in our opposition to this motion, that bail is not

23  something provided for either expressly in the CMO or in

24  *Boumediene* but also not something that is necessarily given as

25  a right and is not appropriate here when by the end of this

1    litigation, Respondents seek to continue the detention of

2    Mr. Paracha.

3            THE COURT:  Say that again, your last point.

4            MR. FOLIO:  My last point, I was just referring to

5    the first argument in our opposition brief, which just set

6    forth that the right to bail, so to speak, is not something

7    that's provided for expressly in the CMO, not something

8    discussed by the Supreme Court's decision in *Boumediene.*

9            The delay that Mr. Hunt cited to was, in fact,

10   talking about a delay that would be caused by an

11   administrative procedure that the Supreme Court then struck

12   down, but furthermore, even the cases that discuss the right

13   to bail discuss certain instances such as detention of enemy

14   aliens in which bail is not appropriate in this instance here.

15           So, in addition to the prohibition set forth in

16   *Kiyemba*, as noted in our opposition brief, there is generally

17   no right to bail provided for in this habeas litigation.

18           THE COURT:  Okay.  With respect to Mr. Paracha,

19   specifically, I take it he was in this country with a green

20   card, from what Mr. Hunt has said, or was he somewhere else?

21   I'm failing to remember where was he found, picked up, how did

22   he get to Guantanamo?

23           MR. FOLIO:  Your Honor, this was briefed previously

24   back in February 2005, so it has been a little while, but the

25   argument was that Mr. Paracha previously lived in the United

1   States, and the briefing in February 2005 describes how

2   Mr. Paracha abandoned his legal permanent resident status, so

3   that is no longer an issue.

4           THE COURT:  Where was he when he was -- was in

5   Pakistan or was he in Afghanistan, where was he?

6           MR. FOLIO:  Your Honor, I'm not sure we can discuss

7   that in an open court setting.

8           THE COURT:  But he had had a green card years

9   before, and you've argued in the earlier brief that he left

10  the United States or he abandoned his --

11          MR. FOLIO:  He abandoned his legal permanent

12  resident status, and that was set forth.  I believe it's

13  Docket No. 41 is the Government's opposition filed in

14  February 2005 when we addressed that.  That was Mr. Hunt's

15  initial motion for summary judgment, which was renewed in

16  March and Your Honor denied both of those motions in an order

17  in August.

18          THE COURT:  Is there anything -- there are things

19  you say we can't discuss in open court, but is there anything

20  you want to hand up to me to look at that will refresh my

21  recollection?

22          MR. FOLIO:  Your Honor, would you like to see the

23  brief from -- that we filed in response?

24          THE COURT:  If you've got it with you.  I don't have

25  it in my file.

1          MR. FOLIO:  I have a highlighted version.  You have

2     a clean version?

3          THE COURT:  You've got it.

4          MR. FOLIO:  This is the relevant portion on the

5     motion for summary judgment.  Pardon my highlighting, Your

6     Honor.

7          THE COURT:  Okay.  I was looking for Document 41,

8     and the earliest number I have is 160-something.

9          (PAUSE.)

10          THE COURT:  Was this under seal?

11          MR. FOLIO:  No, Your Honor.  That's on the public

12     docket.

13          THE COURT:  Okay.  So whatever's in here can be

14     mentioned?

15          MR. FOLIO:  Yes, Your Honor.

16          THE COURT:  And what I take away from that, in

17     response to Mr. Hunt's green card argument, is that basically

18     Mr. Paracha left the United States 20 years ago and moved to

19     Pakistan and may have had some periodic visits back and forth,

20     but basically that's what you mean when you say he abandoned

21     his legal permanent resident status over 20 years ago.

22          MR. FOLIO:  Yes, Your Honor.  And the controlling

23     law, the factual situation of Mr. Paracha fits squarely under

24     the controlling law, which demonstrates that there doesn't

25     need to be a formal finding but something like abandoning and

1  moving for two decades would certainly qualify as abandonment

2  of LPR status.

3      THE COURT:  So basically your argument is, for that

4  reason among others, is he's not entitled to bond.

5      MR. FOLIO:  Among others.  This argument, as I said,

6  this was something that Mr. Hunt raised from his reply, so

7  referring back to our argument from February 2005.

8      THE COURT:  And that in addition, the -- having

9  relatives in the United States does not provide any assurance

10  of anything in a situation like that.

11      MR. FOLIO:  No, Your Honor.

12      THE COURT:  Okay.  Anything else, Mr. Hunt, you want

13  to say?

14      MR. HUNT:  I wasn't aware we were going to get into

15  this, which is really a collateral issue.  Saifullah Paracha

16  came here around 1980 and he lived in New York for about 16

17  years or so.  He has a green card.  As a matter of fact, I

18  have the actual green card.  No one has ever made any effort

19  to take it away from him.

20      In the -- we've discussed this extensively in some

21  of the early parts of this litigation.  In the *Yakou* case, the

22  Government argued very vigorously that you can't lose your

23  permanent resident status without formalities.

24      THE COURT:  But the *Yakou* case is also one of the

25  cases the Government relies upon to say that if he's an alien,

1  he's not entitled to bail.

2          MR. HUNT:  The Defendant in that case argued that he

3  had abandoned his -- all connections with the United States

4  and thereby he did avoid prosecution for arm's trading as a

5  U.S. person.  Quite a different issue than the question of

6  whether or not a green card is still valid when no one has

7  made any motion to take it away, and I still have it sitting

8  in my files, and Paracha has sworn that he had no intention of

9  abandoning his status.

10          Yes, he was the -- I think they call it a chain

11  immigration.  He was the leader of a chain immigration.  A

12  whole lot of his relatives came here after he did.  They live

13  around New York and that's where he was intending to retire

14  to, all really neither here nor there.  If he's entitled to

15  bail, it's bail, period.  It would be a surety sufficient to

16  secure his reappearance, and where he goes from then is

17  another question.

18          And we are, in fact, asking for bail, or at least

19  for a -- perhaps delay the motion to the next status hearing

20  when we will have the discovery, perhaps.

21          THE COURT:  Perhaps.

22          (PAUSE.)

23          THE COURT:  Anything else anybody wants to say?

24          Okay.  All right.  Basically it seems to me that,

25  first of all, if I were applying traditional principles of

1   when to release somebody on bail in a criminal case under 18

2   U.S.C. 3143, I would probably find that there are no

3   conditions or combinations of conditions that would assure --

4   that could be imposed that would assure that Mr. Paracha would

5   appear for his habeas corpus proceeding if he were released.

6          And we do that all the time in criminal cases where

7   somebody is pending a criminal trial, facing a long sentence

8   or even not such a long sentence, and if they have no

9   community ties and a series of passports, I recently did this

10  with respect to a woman who's been charged with export control

11  violation who even though she's a U.S. citizen because she

12  married a U.S. citizen, most of her property and most of her

13  relatives and most of her ties are in China, not in the United

14  States and her -- and I held her in the D.C. jail for a very

15  long period of time because I was not convinced that we could

16  come up with any condition or combination of conditions that

17  would -- that would assure her appearance for trial,

18  including -- including a money bond, including putting up her

19  half of a piece of property that she and her husband owned in

20  California.

21         Ultimately, I was persuaded that there were

22  conditions.  She now is on release.  She's electronically

23  monitored with a GPS device.  She can't leave her home.  She

24  can't walk out the front door without the device going off,

25  and the only way that she can do anything is to go visit a

1   doctor or her lawyers with prior approval, and the device

2   tracks her to the doctor's office or to the lawyer's office.

3   I don't think we could even come up with a plan comparable to

4   that for Mr. Paracha.

5          More importantly, the whole purpose here is to

6   challenge the legality of the detention, and there are a

7   series of cases cited on page 3 of the Government's filing

8   that suggests that holding somebody without bail until we get

9   to the ultimate decision of habeas corpus is appropriate.

10  Even in the -- as I just suggested, even in the criminal

11  context, the right to bail is not absolute, and there are

12  cases cited on pages 2 and 3 from the D.C. Circuit, not in the

13  current context, *Salerno* and *Baker* versus *Sard* and so forth

14  that suggest the limits on granting bail.

15         I think that *Kiyemba*, or however it's pronounced,

16  K-i-y-e-m-b-a, is only analogously relevant in terms of

17  authorizing a release into the United States.  It's not a bail

18  case.  It's a case where there's an ultimate determination,

19  and I know it gets into the Executive Branch prerogatives

20  versus the Judicial Branch prerogatives.  I think that's

21  really at the heart of the case, but in a case like this where

22  ultimately the Judicial Branch is going to make a decision,

23  habeas corpus or not, I think it's -- I don't know, I think by

24  analogy it may be relevant.  I don't think it's directly

25  relevant.

1          But I do think that there's something inherently

2    difficult about releasing somebody in this situation on bail

3    while we're waiting to decide a habeas corpus, which is to

4    decide whether to release the person.  The -- in the cases

5    cited by the Government on pages, I guess I said 2 and 3 or 3

6    and 4 of Document 327 make that argument pretty well.

7          In addition, Document 61, which we looked at before

8    in the *Yakou* case, in a case of somebody like Mr. Paracha who

9    has abandoned his resident alien status over 20 years ago and

10   has much closer ties to Pakistan than to the United States, I

11   think it makes very little sense to release him and there are

12   no conditions that I could come up with that would make sure

13   he's here for the ultimate hearing.

14         This is all complicated, obviously, just as all of

15   the proceedings are before my colleagues and me, by the fact

16   that these people have been held at Guantanamo for so long.

17   And, you know, if the law of habeas were clear earlier, if the

18   *Boumediene* litigation and some of the other cases had moved

19   more quickly for -- through the D.C. Circuit and through the

20   Supreme Court, we would all be dealing with people that have

21   been held for two or three years rather than for six or seven

22   years, and it's something very uncomfortable for all of us

23   that people have been held that long without some sort of

24   determination.

25         That's sort of not the way we generally operate as

1  judges and as lawyers, and that's the uncomfortable feeling

2  that we all have.  But that having been said, we are now

3  moving towards a process that will get an ultimate

4  determination, and as long as -- and Mr. Hunt himself said,

5  you know, we have no choice but to wait for the ultimate

6  hearing because the discovery is taking a long time, and the

7  discovery is taking a long time because so much information is

8  desired by the Petitioner in order to present it to me at a

9  habeas proceeding and because everything has to be searched,

10  found, reviewed and in some cases declassified or redacted,

11  and that all takes time.

12        So -- but I don't think that should change the legal

13  framework under *Yakou* and *Salerno* and *Baker versus Sard* and

14  all those cases, as well as the practical fact that I don't

15  think there's any conditions or combination of conditions that

16  would assure his appearance with habeas corpus proceedings

17  even if the law clearly permitted release on bail in a

18  situation like this.

19        So, that's where I am.  So, I'm going to deny the

20  motion for bail -- the current motion for bail, and you know,

21  if Mr. Hunt wants to appeal this decision to the Court of

22  Appeals, he can do that.  He can get a transcript from the

23  court reporter and do that, or if the situation should change,

24  I'm certainly not precluding Mr. Hunt from filing another

25  motion for bail at another point in these proceedings if he

1  thinks it makes sense and that he might persuade me in view of

2  circumstances at that time.

3          So, do we want to set another status conference or

4  what do we want to do?

5          MR. FOLIO:  Your Honor, if I might suggest perhaps

6  just at this point allowing the discovery to continue so when

7  we get closer to the 90 days, perhaps the parties can submit a

8  joint status report indicating how long it will take to

9  complete discovery, and I believe that once we complete

10 discovery, we can then make the determination whether or not

11 this case is ready for a merits hearing or whether or not

12 Mr. Hunt wants to pursue other matters regarding discovery.

13         THE COURT:  So, do you want to -- why don't -- you

14 want to submit a joint report on February 1st, you said 90

15 days?

16         MR. FOLIO:  Your Honor, I was suggesting the end of

17 the 90 days for discovery, so I think that by the end of

18 November.

19         THE COURT:  Pardon me?

20         MR. FOLIO:  The end of November would be the end of

21 the original 90 days.

22         THE COURT:  Oh, the original 90 days.  Okay.  I

23 thought you meant 90 days from today.

24         MR. FOLIO:  No, I think by the end of November we

25 should have a good idea of how much longer, if at all, it will

1  require us to complete the discovery process, and at that

2  point, as I said, I can --

3          THE COURT:  Mr. Hunt seems to be nodding in

4  agreement.  So you'll submit a joint report to me on November

5  the 30th, and we'll see where we are, and if at any time

6  either side feels we should come together again and have a

7  status conference, just file a joint motion or a separate

8  motion, ask for a status conference, and I'll set one.

9          MR. FOLIO:  Yes, Your Honor.

10          MR. HUNT:  Yes, Your Honor.

11          THE COURT:  Good.  Thank you.

12          MR. FOLIO:  Thank you, Your Honor.

13          MR. HUNT:  Thank you, Your Honor.

14          THE DEPUTY CLERK:  All rise.  This honorable court

15  is in recess until 1:45.

16          (PROCEEDINGS END AT 10:45 A.M.)

17                          *-*-*-*-*

18                  **CERTIFICATE OF REPORTER**

19          I, Catalina Kerr, certify that the foregoing is a

20  correct transcript from the record of proceedings in the

21  above-entitled matter.

22

23

24  _____    _____

    Catalina Kerr                  Date

25