UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA Filed with Classified
Information Security Officer

CISO _____

Date ___1/24/2020___

SAIFULLAH ABDULLAH )
PARACHA, )
)
    Petitioner, )
)
v. )    Civil Action No. 04-2022 (PLF)
)
DONALD J. TRUMP, et al., )
)
    Respondents. )
_____ )

## OPINION

In July 2003, the United States apprehended petitioner Saifullah Paracha, a
successful Pakistani businessman, on the belief that he had provided financial and other support
to members of the Taliban and Al-Qaeda over the course of several years immediately before
and after the terrorist attacks of September 11, 2001. Mr. Paracha was taken to Bagram Air
Force Base in Afghanistan for interrogation and then to the United States Naval Base at
Guantanamo Bay, Cuba, where he remains to this day. More than sixteen years after his capture,
Mr. Paracha has never been charged before a military commission or any other tribunal.

In November 2004, Mr. Paracha filed a petition for a writ of habeas corpus
challenging the government's legal authority to detain him. See Dkt. No. 1. He amended the
petition in December of that year. Dkt. No. 11. The parties have vigorously and capably
litigated that petition, and the Court ultimately held a two-week long classified evidentiary
hearing in October 2019, at which counsel presented hundreds of exhibits and made extensive
argument on five disputed issues of material fact. Upon thorough consideration of the amended
factual return, the amended traverse, the pre-hearing merits and opposition briefs, the arguments

and exhibits presented by counsel at the evidentiary hearing, the relevant legal authorities, and the entire record in this case, the Court will deny Mr. Paracha's amended petition for habeas corpus.

Congress has granted the President expansive legal authority to detain individuals associated with the Taliban and Al-Qaeda, even those who have not directly participated in hostilities against the United States. In earlier Guantanamo Bay habeas corpus litigation, the United States Court of Appeals for the District of Columbia Circuit has held that the government bears a low burden of proof to establish its detention authority. Petitioner's objections to the prevailing standards for detention authority and the burden of proof are noted and preserved for appeal. As the law stands, however, the Court concludes that respondents possess the legal authority to detain Mr. Paracha because they have established by a preponderance of the evidence that he provided substantial support to the Taliban and to Al-Qaeda. The Court takes no position as to whether Mr. Paracha was a part of either the Taliban or Al-Qaeda.

Part I of this opinion sets forth the factual and procedural background of this case. Part II presents the legal framework under which the Court analyzes habeas corpus petitions from alleged alien unprivileged enemy combatants detained at Guantanamo Bay. Under this framework, determining whether the government has the authority to detain Mr. Paracha is "a mixed question of law and fact." Barhoumi v. Obama, 609 F.3d 416, 423 (D.C. Cir. 2010). "Whether a detainee's alleged conduct . . . justifies his detention . . . is a legal question[, and] whether the government has proven that [a detainee did engage in that] conduct . . . is a factual question." Id. Part III discusses certain evidentiary issues raised by the parties. The Court's Findings of Fact appear in Part IV, while Part V contains the Court's Conclusions of Law.

## I. BACKGROUND

### A. *Factual Overview*

Saifullah Paracha is a western-educated businessman. He was born in a rural village in Pakistan and, though raised in poverty, successfully pursued an education. Mr. Paracha received a student visa to travel to the United States, where he graduated from the New York Institute of Technology in 1974. Thereafter, he launched a travel agency in New York City, the first of his many business ventures. Mr. Paracha received a permanent resident visa from the United States consulate in Pakistan; over the next several decades, Mr. Paracha travelled frequently between Pakistan and the United States. Several of Mr. Paracha's eleven siblings emigrated to the United States, and many of his extended family live in the United States to this day. Mr. Paracha is a practicing Muslim, and his counsel introduced evidence to demonstrate that Mr. Paracha has cosmopolitan and moderate sympathies. Mr. Paracha and his wife, Farhat, sent their children to private Catholic schools in Pakistan. The family travelled frequently, to the United States and elsewhere, and "enjoyed a comfortable life similar to that of many westerners." Petitioner's Classified Amended Traverse ("P. Am. Traverse"), at 4. He took business trips to Malaysia, Saudi Arabia, Iran, Iraq, Sweden, the United Kingdom, China, and India; he traveled for leisure to Japan, Yugoslavia, the Philippines, and the United Arab Emirates. FBI Electronic Communication ("EC") 7/16/03, JE 70-16, at 894.[1]

---

[1]     In citing to exhibits, the Court observes the following conventions. Unless otherwise indicated in the citation, a particular report or set of notes concerns the petitioner. The date given in the citation is conveyed in MM/DD/YYYY format; the date listed is the date appearing on the title page of the exhibit or, if not available, the date on which an interview took place. Some of the FBI documents in this case refer to petitioner with the identifier "ISN 1094," while Department of Defense documents often use        "JE" refers to a Joint Exhibit, "PE" refers to a Petitioner's Exhibit, and "RE" refers to a Respondents' Exhibit. Numbered attachments to exhibits are appended to the name of the exhibit: JE 70-12, for example, indicates Joint Exhibit 70, Attachment 12. Page numbers in the citations refer to the continuous Bates

,

Several of Mr. Paracha's business and charitable ventures are relevant to the
conduct at issue in this case. See Part IV.A, infra. First, in the early 1990s, Mr. Paracha and
Charles Anteby launched International Merchandise, Pvt. Ltd, which operated as a buying and
selling agent coordinating garment purchasers in New York and textile manufacturers in
Pakistan. "Mr. Paracha and Mr. Anteby did not ship merchandise; rather, the business facilitated
connections between suppliers and purchasers." P. Am. Traverse at 4. The company had 30 to
40 employees, and the petitioner managed its accounting and administrative functions. Uzair
Paracha FD-302, 03/30/03, JE 55, at 415. Second, Mr. Paracha founded and ran Universal
Broadcasting, a media company in Pakistan that "produced programming on current affairs,
politics, and religion, as well as entertainment." P. Am. Traverse at 4. The studio aimed to sell
its programs for distribution to cable outlets around the world; it employed about 20 people.
Uzair Paracha FD-302 05/01/03, JE 57, at 430. Third, Petitioner owned an industrial company,
Abson Industries, which manufactured polypropylene bags for packaging heavy items like
cement. Uzair Paracha FD-302 05/05/2003, at 435. Fourth, petitioner launched a real estate
company, SS Associates, to manage the redevelopment, construction, and sale of a beachfront
apartment complex called Cliftonia. FBI EC 10/23/04, JE 70-32, at 964. The government does
not dispute that International Merchandise, Universal Broadcasting, Abson Industries, and SS
Associates were bona fide companies.

In addition to these business ventures, it is undisputed that Mr. Paracha was an
active philanthropist who was particularly interested in building schools and hospitals in Pakistan
and, later, in Afghanistan. Mr. Paracha was an active member of the Council of Welfare

---

numbers the parties have assigned to the joint exhibits, where available, or to internal pagination
of the documents, where Bates stamps are unavailable.

4

Organizations ("CWO"), a charitable organization "made up of successful Pakistani businessmen and political leaders," who shared a goal of "provid[ing] support in Pakistan and the region regarding education, health, justice, and food support." P. Am. Traverse at 4. As "a respected man in his community," Mr. Paracha had substantial social status and political connections. See id. For example, he travelled with or maintained relationships with Saudi Arabia's minister of petroleum, the President of Afghanistan, the President of Pakistan, the head of Pakistan's intelligence service, the mayor of Karachi, and various other political and educational leaders in Pakistan. See Respondents' Classified Merits Brief ("R. Merits Br.") at 15; FBI EC 10/26/2004, JE 70-33, at 974.

In the course of managing his business and philanthropic affairs, Mr. Paracha interacted with members and leaders of various extremist groups, including Al-Qaeda and the Taliban, the latter of which governed Afghanistan for several years of the period relevant to this case. Mr. Paracha's connection to three Al-Qaeda figures, in particular, lie at the heart of this case: Khaleid Sheikh Mohammed ("KSM") (the alleged planner of the 9/11 attacks), Ammar Al-Baluchi (an alleged Al-Qaeda financier and logistician), and Majid Khan (who has admitted to serving as an operational agent attempting to set up an Al-Qaeda cell in the United States). All three individuals were captured in 2003 and subjected to the CIA's since-discredited enhanced interrogation techniques ("EITs"). Each of these men provided information indicating that petitioner and his son, Uzair Paracha, had provided assistance to Al-Qaeda.

The FBI interrogated Uzair Paracha in the United States in March 2003, first during voluntary interviews and later – after his arrest as a material witness in another investigation – at proffer sessions with prosecutors, during which Uzair was assisted by counsel. See Part III.C.2, infra. Uzair Paracha provided substantial information, independent of the

5

statements extracted from KSM, Al-Baluchi, and Khan, that linked Saifullah Paracha to Al-Qaeda.

On the basis of the information gathered from the Al-Qaeda sources and Uzair Paracha, the United States decided to apprehend Saifullah Paracha in 2003.

So the United States turned to Charles Anteby, Mr. Paracha's U.S.-based business partner, to execute a scheme that lured Mr. Paracha            under the pretense of a business opportunity. P. Am. Traverse at 5. The United States captured Mr. Paracha            in June 2003. DoD Interrogator Notes 07/08/03, JE 7, at 79. Mr. Paracha was transported first to Bagram Air Force Base in Afghanistan, where he was held for 15 months, and then to Guantanamo Bay, where he has remained. United States military, intelligence, and law enforcement personnel have visited or interrogated Mr. Paracha hundreds of times. Unlike some of the other detainees remaining at Guantanamo Bay, however, Mr. Paracha has not been charged before a military commission or transferred for trial before another competent tribunal. Nor has he ever been cleared for release to Pakistan or any other country.

Petitioner's statements during these interrogations – as supplemented and corroborated by statements made by his son, Uzair Paracha – provide most of the evidence with which the parties have litigated this case. Mr. Paracha and the respondents broadly agree about what the petitioner did in Afghanistan and Pakistan from 1999 to 2003. As discussed in the Court's Findings of Fact, see Part IV, infra, neither Mr. Paracha nor his counsel dispute that Mr. Paracha met Osama Bin Laden on two separate trips to Afghanistan, or that Mr. Paracha undertook a variety of tasks at the request of several of Bin Laden's lieutenants. He distributed a

press release, produced a video message, temporarily held substantial funds belonging to Al-Qaeda, and provided various other advice and assistance at the request of individuals who have since been confirmed to be KSM and Al-Baluchi. It is likewise beyond dispute that Mr. Paracha knew senior leaders of the Taliban and provided certain assistance to its members: Mr. Paracha helped raise thousands of dollars to purchase a vehicle that Taliban fighters used in combat and provided other financial support at the request of jihadists.

### B. Procedural History

Mr. Paracha filed his petition for habeas corpus in November 2004, see Dkt. No. 1, and filed the amended petition for habeas corpus that is now before the Court, see Dkt. No. 11, in December 2004. Mr. Paracha does not dispute many of the facts alleged concerning what he is alleged to have done for KSM and Al-Baluchi. Rather, at the current phase of this litigation Mr. Paracha claims that he did not know that KSM and Al-Baluchi were members of Al-Qaeda, and did not intend to provide substantial assistance to any hostilities against the United States. Accordingly, he argues that the government does not have the legal authority to detain him as a substantial supporter of Al-Qaeda or the Taliban.

This Court has declined several previous requests to reach the merits of the petition. The Court denied Mr. Paracha's petition for a temporary restraining order in December 2004, see Dkt. No. 10, and denied a petition for preliminary injunction in November 2006, see Minute Order of November 20, 2006. And the Court has three times denied motions for summary judgment from Mr. Paracha. The Court denied Mr. Paracha's first motion for summary judgment in November 2006 because the case was stayed at the time, a decision summarily affirmed by the court of appeals in February 2007. See Mandate, Dkt. No. 135. After the stay was lifted, the Court denied summary judgment in March 2009. See Dkt. No. 267. The

7

Court denied Mr. Paracha's third motion for summary judgment in June 2016, finding no jurisdiction to consider Mr. Paracha's claims that statutes concerning detainees constituted unlawful bills of attainder. See Dkt. No. 439. The court of appeals affirmed in April 2017. See Dkt. No. 468.

In addition to these potentially dispositive motions, the parties have litigated procedural matters before this Court and before Judge Thomas Hogan, before whom many of the Guantanamo cases were consolidated for case management. Specifically, the parties have contested several matters of discovery, see, e.g., Dkt. Nos. 68, 70, 281, 282, 285, 286, 296; aspects of the case management order, see, e.g., Dkt. Nos. 204, 212; and procedures for access to information, see, e.g., Dkt. Nos. 257, 268, 279, 289, 301.

Despite these disputes, proceedings in this matter have been stayed at the request of the parties for a substantial portion of the fifteen years since Mr. Paracha filed his petition before this Court. From March 2005 to July 2008, the case was stayed on respondents' motion while the parties litigated whether federal district courts have jurisdiction to decide Guantanamo habeas petitions. See Dkt. Nos. 161, 175. And, from May 2011 to April 2016, the case was stayed on Mr. Paracha's own motion while he sought additional counsel and otherwise considered his approach to the case. See Dkt. Nos. 367, 423.

The current phase of these proceedings began in March 2016, when Mr. Paracha moved to lift the stay, see Dkt. No. 423, so that this Court could consider his second motion for summary judgment, see Dkt. No. 401 (a motion the Court has since denied, see Dkt. No. 439). After the Court lifted this five-year stay, during which time respondents' discovery obligations under the case management order had also been stayed by order of the Court, see Dkt. No. 367, the parties conducted additional discovery and prepared revised briefing. See, e.g., Dkt.

Nos. 426, 427, 429. In July 2017, respondents filed an amended factual return setting out the evidence of the petitioner's alleged support for and affiliation with Al-Qaeda and the Taliban. See Dkt. No. 469. In December 2018, after seeking a number of extensions, Mr. Paracha filed his amended traverse to explain why the government lacks the legal authority to continue to detain him. See Dkt. No. 505.

In May 2019, the Court granted Mr. Paracha's request to schedule an evidentiary hearing on his amended petition for habeas corpus. See Dkt. No. 515. In 2019, in preparation for the hearing, the parties concluded discovery, see Dkt. Nos. 515, 517; the Court ruled on an evidentiary motion, see Dkt. No. 545, the Court resolved several requests from respondents to exclude certain classified material from their discovery obligations, see Dkt. Nos. 524, 544, 548; and the parties filed simultaneous classified prehearing merits briefs and briefs in opposition.

The Court held an evidentiary hearing from October 21 to 30, 2019. The hearing began with unclassified opening statements, which were transmitted via a live audio connection to the Naval Base at Guantanamo Bay. This enabled Mr. Paracha to listen to the unclassified opening statements in real time. The remainder of the proceedings were classified and, therefore, conducted in a sealed courtroom that was closed to Mr. Paracha and to the public. Mr. Paracha did not testify at the hearing, and neither party called any live witnesses. Instead, the parties presented evidence and made arguments from hundreds of joint exhibits, consisting largely of interview reports and other documents concerning Mr. Paracha's interrogations prepared by the FBI       and Department of Defense. The parties also discussed evidence connected with the interrogation and trial of Mr. Paracha's son, Uzair Paracha. Petitioner also submitted expert reports on certain aspects of Pakistani culture and on the physical and psychological effects of certain interrogation techniques. Respondents submitted a declaration

9

from Special Agent Janelle Miller, Mr. Paracha's primary FBI interrogator and the author of

many of the interrogation reports in the record, and declarations from a number of military

officials with responsibility for fighting terrorism and supervising detention at Guantanamo Bay.

The parties made classified closing arguments on November 19, 2019, and the amended habeas

corpus petition is now ripe for the Court's decision.

## II. LEGAL STANDARDS

### *A. The Detention Standard*

1. Statutory framework for detention: the AUMF and the NDAA

Respondents' legal authority to detain petitioner derives from the 2001

Authorization for the Use of Military Force, 50 U.S.C. § 1541, (the "AUMF"). The present

controlling detention standard, clarifying the scope of authority under the AUMF, appears in the

National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, 125 Stat. 1298,

1562 (the "NDAA"). The NDAA allows the President to detain those who are part of – or

provide substantial support to – the Taliban, Al-Qaeda, or their associated forces at the time of

capture. Id. at § 1021(b).

Within a week of the terrorist attacks of September 11, 2001, the United States

Congress passed the AUMF, which authorized the President "to prevent any future acts of

international terrorism against the United States" by using

> all necessary and appropriate force against those nations,
> organizations, or persons he determines planned, authorized,
> committed or aided the terrorist attacks that occurred on September
> 11, 2001, or harbored such organizations or persons

AUMF Sec. 2(a). With respect to the AUMF's authorization of "force," the Supreme Court has

held that the "*detention* of individuals . . . is so fundamental and accepted an incident to war as to

be an exercise of the 'necessary and appropriate force' Congress has authorized the President to

10

use." Hamdi v. Rumsfeld, 542 U.S. 507, 518 (2004) (O'Connor, J., plurality opinion) (emphasis added).

Several years after Mr. Paracha filed the instant petition, the Supreme Court confirmed that the President's authority to detain individuals pursuant to the AUMF can be challenged by filing a habeas corpus petition, and that the United States District Court for the District of Columbia has jurisdiction over habeas corpus petitions filed by detainees held at Guantanamo Bay under authority of the AUMF. Boumediene v. Bush, 553 U.S. 723 (2008) (invalidating a statutory provision which purported to withdraw jurisdiction over such habeas claims from the federal courts). See also Rasul v. Bush, 542 U.S. 466, 483-84 (2003). Indeed, "the writ of habeas corpus remains the sole means by which Guantanamo detainees may challenge the legality of their detention." Ahjam v. Obama, 37 F. Supp. 3d 273, 278 (D.D.C. 2014), appeal dismissed, No. 14-5116 (D.C. Cir. Jan. 16, 2015).

Boumediene confirmed this Court's jurisdiction, but did little to establish the procedural framework for considering Guantanamo detainees' habeas petitions and left open the scope of the government's detention authority. Boumediene v. Bush, 553 U.S. at 796 ("We make no attempt to anticipate all of the evidentiary and access-to-counsel issues . . . and the other remaining questions [that] are within the expertise and competence of the District Court to address in the first instance."). See also Almerfedi v. Obama, 725 F. Supp. 2d 18, 20 (D.D.C. 2010), rev'd on other grounds 654 F.3d 1 (D.C. Cir. 2011). After Boumediene, judges in this district adopted a range of approaches to assess the government's detention authority. See, e.g., Gherebi v. Obama, 609 F. Supp. 2d 43, 62-71 (D.D.C. 2009); Hamlily v. Obama, 616 F. Supp. 2d 63, 68-77 (D.D.C. 2009).

In 2010, the United States Court of Appeals for the District of Columbia Circuit responded to this diversity of approaches by attempting "to narrow the legal uncertainty that clouds military detention." Al-Bihani v. Obama, 590 F.3d 866, 870 (D.C. Cir. 2010). The court of appeals looked to the jurisdictional provisions of the Military Commissions Acts of 2006 and 2009 to construe the scope of detention authority under the AUMF. Id. at 871-72. The Military Commissions Act of 2006 authorized trial by military commission of anyone who is an "unlawful enemy combatant," which the statute defines as a person who has "engaged in hostilities or who has purposefully and materially supported hostilities against the United States," but "who is not a *lawful* enemy combatant." Pub. L. No. 109-366, sec. 3, § 948(a)(1) (emphasis added). This definition explicitly includes any "person who is part of the Taliban, al Qaeda, or associated forces." Id.

Similarly, the Military Commissions Act of 2009 authorizes trial by military commission of an "alien unprivileged enemy belligerent," which it defines, among other things, as a person who "purposefully and materially supported hostilities against the United States and its coalition partners." Pub. L. No. 111-84, § 1802. Accordingly, our court of appeals noted in Al-Bihani that "the government's *detention* authority logically covers a category of persons no narrower than is covered by its military *commission* authority," but explained that the government's "[d]etention authority in fact sweeps wider." Al-Bihani v. Obama, 590 F.3d at 872 (emphasis added). The court concluded that the "class of persons subject to detention" includes at least those who "purposefully and materially support such forces in hostilities against U.S. Coalition partners." Id.[2]

---

[2]     Petitioner's initial merits brief cites the purpose and materiality requirements with apparent approval. See P. Merits Br. at 2-6.

The most current and precise statement of the government's detention authority,
however, is the National Defense Authorization Act of 2012 ("NDAA"), which codifies and
arguably expands Al-Bihani's statement of the AUMF detention authority. In the NDAA,
Congress confirmed that "the authority of the President to use all necessary and appropriate force
pursuant to [the AUMF] includes the authority for the Armed Forces of the United States to
detain *covered persons* . . . pending disposition under the law of war." NDAA Sec. 1021(a)
(emphasis added). As relevant to this case, the NDAA defines a covered person as "any person"
who "was a *part of* or *substantially supported* al-Qaeda, the Taliban, or associated forces that are
engaged in hostilities against the United States or its coalition partners, *including* any person
who has committed a belligerent act or has directly supported such hostilities in aid of such
enemy forces." NDAA Sect. 1021(b) (emphases added).

In short, the NDAA authorizes detention for all those who rendered "substantial
support" to Al-Qaeda or the Taliban, as opposed to only those who gave "purposeful and
material support," under the terms of the Military Commissions Acts that formed the basis of the
court of appeals' analysis in Al-Bihani. See Al-Hela v. Trump, No. 05-cv-01048, 2019 U.S.
Dist. Lexis. 42717 at *14 (D.D.C. Mar. 15, 2019). The NDAA's "part of" and "substantial[]
support" prongs are each "valid criteria that are independently sufficient to satisfy the standard."
Al-Bihani v. Obama, 590 F.3d at 874.[3] Determining whether a detainee was part of or
substantially supported Al Qaeda or the Taliban is "a mixed question of law and fact."
Barhoumi v. Obama, 609 F.3d at 423. "Whether a detainee's alleged conduct . . . justifies his

---

[3]     As relevant to Mr. Paracha's petition, the "disposition under the law of war"
authorized for such persons may include, inter alia, "detention under the law of war without trial
until the end of the hostilities authorized by the AUMF." NDAA at Sec. 1021(c).

detention under the AUMF is a legal question[, and] whether the government has proven that conduct is a factual question." Id.

In the instant case, the government alleges three bases for detaining Mr. Paracha, each of which is independently sufficient under the AUMF and NDAA: (i) that petitioner gave *substantial support* to the Taliban; (ii) that petitioner gave *substantial support* to Al-Qaeda; and (iii) that petitioner was *part of* Al-Qaeda. R. Opp. Merits Br. at 20. Accordingly, assessment of the habeas petition requires the Court to interpret the scope of the detention authority conferred by the "substantial support" prong of the NDAA. The Court has determined that it need not interpret the scope of the detention authority conferred by the "part of" prong of the NDAA because the Court concludes that Mr. Paracha *has* rendered substantial support to Al-Qaeda and the Taliban. See Part V, infra. That finding alone requires denial of Mr. Paracha's habeas petition.

### 2. Detention based on "substantial support"

There is not yet binding authority in this circuit on the precise limits of detention authority under the current "substantial support" standard, likely because most Guantanamo habeas petitioners have been detained under the "part of" prong, and few cases have relied primarily on allegations of "substantial support" since enactment of the 2012 NDAA. See Al-Hela v. Trump, 2019 U.S. Lexis 42717 at *7-8. The earlier cases nevertheless offer important guidance.

In Al-Bihani, the court of appeals did confirm that the scope of the government's AUMF detention authority for "substantial support" can be understood by reference to the "material support" jurisdictional provisions of the Military Commissions Act of 2009. As Judge Lamberth has observed, the Military Commissions Act of 2009 elsewhere incorporates by

14

reference a definition for material support of terrorism that appears in a criminal statute,

18 U.S.C. § 2339A(b). Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *11-12. That statute

establishes criminal liability for providing the following kinds of "material support:"

> any property, tangible or intangible, or service, including currency
> or monetary instruments or financial securities, financial services,
> lodging, training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel (one or
> more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b). Relying on the presumption of consistent usage, Judge Lamberth

persuasively argued that "this definition should guide . . . interpretation of the types of conduct

that the Al-Bihani court envisioned would constitute 'purposeful and material support' to Al-

Qaeda, the Taliban, or associated forces such as to subject an individual to detention under the

AUMF." See Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *13.

The D.C. Circuit's 2010 interpretation of detention authority in Al-Bihani

predated the NDAA standard. Even so, for the reasons described in Judge Lamberth's thorough

opinion, the Court finds that the definition of material support contained in 18 U.S.C.

§ 2339A(b) offers a useful guide for assessing the types of conduct and assistance that may

constitute "substantial support" under the current NDAA detention standard. See Al-Hela v.

Trump, 2019 U.S. Dist. Lexis 42717 at *11-15.

Ultimately, this Court's assessment of the government's detention authority under

the AUMF "must be made on a case-by-case basis by using a functional rather than a formal

approach and by focusing upon the actions of the individual in relation to the organization." Al-

Madhwani v. Obama, 642 F. 3d 1071, 1074 (D.C. Cir. 2011), see also Uthman v. Obama, 637

F.3d 400, 402 (D.C. Cir. 2011); Salahi v. Obama, 625 F.3d 745, 751-52 (D.C. Cir. 2010). Mr.

Paracha attempts to place three limitations on the scope of detention authority under the "substantial support" prong, each of which merit examination.

        a. Substantial support does not require specific knowledge or intent

        First, Mr. Paracha argues that, to establish substantial support for Al-Qaeda or the Taliban, the government must establish that the petitioner "knew and intended that . . . his actions [would] support hostilities against the United States." Petitioner's Classified Merits Brief ("P. Merits Br."), at 3-4. This is not an accurate statement of the NDAA detention standard. Petitioner emphasizes the D.C. Circuit's reliance on analogous provisions of the Military Commissions Acts of 2006 and 2009 – which do contain language requiring purposeful and material support – to define the scope of detention authority under the AUMF. But this language merely defines those who may be *tried* by a military commission; it does not create a heightened intent requirement for who may be *detained*. As noted above, "the government's detention authority logically covers a category of persons no narrower than is covered by its military commission authority," but its "[d]etention authority in fact sweeps wider . . . ." Al-Bihani v. Obama, 590 F.3d at 872.

        Petitioner also emphasizes that, under the criminal material support of terrorism statute, on which Judge Lamberth relied to interpret the substantial support standard under the AUMF and NDAA, conviction requires that a defendant knew or intended that the material support would be used for terrorism. P. Merits Br. at 5. But Al-Hela cited the material support statute to address the *types of conduct* that might amount to material support, not to consider intent. See Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *10-13. Guantanamo habeas petitions are civil cases assessing military detention authority; they are not criminal cases determining criminal culpability. Al-Hela offers little basis for importing criminal *mens rea*

analysis into this civil litigation. Our court of appeals has generally declined to impose

limitations on the government's detention authority that do not appear in the statute itself:

> [The detainee] argues that the government must show that he was
> involved in the "command structure" of al Qaeda or the Taliban,
> rather than [being] merely "part of" those organizations. But
> "nowhere in the AUMF is there mention of a command structure."
> While such a showing would be enough to sustain [the detainee's]
> detention, it is not necessary.

Hussain v. Obama, 718 F.3d 964, 967 (D.C. Cir. 2013) (internal citations omitted).

What the government *is* required to prove, with respect to knowledge, is that

petitioner knew whom he was supporting. The court of appeals has held that the "purely

independent conduct of a freelancer is not enough" to justify detention. Bensayah v. Obama, 610

F.3d 718, 725 (D.C. Cir. 2010). As the respondents acknowledged at the evidentiary hearing in

this matter, the government must prove that Mr. Paracha knew that KSM, Al-Baluchi, and Majid

Khan were part of Al-Qaeda in order to establish that assistance given to those individuals

amounts to substantial support.[4] Similarly, the government must prove that Mr. Paracha knew he

was dealing with the Taliban or its fighters in order for that assistance to support a claim of

substantial support.

b. Substantial support does not require any nexus with active hostilities

Second, Mr. Paracha makes the closely related claim that detention authority

exists only where the government can show that a detainee's alleged substantial support did, in

fact, provide aid to acts of hostilities against the United States. R. Merits Br. at 3-6. Such

support can only be proven, the petitioner argues, if the government can "establish that Mr.

---

[4]     As described below, it is immaterial that Mr. Paracha knew KSM, Al-Baluchi,
and Majid Khan under false names. What matters is that Mr. Paracha knew that these
individuals were Al-Qaeda.

Paracha either *committed* a belligerent act against the United States or coalition forces" or that the assistance he provided "directly (and not just tangentially) supported such hostilities." Id. These proposed limitations on the government's detention authority have no statutory basis and 'are at odds with the law of this circuit.

The NDAA makes clear that the government does not need to establish any nexus between petitioner and hostilities against the United States. The statute authorizes detention of a person who "was a part of or substantially supported al-Qaeda, the Taliban, or *associated forces that are engaged in hostilities against the United States or its coalition partners*, including any person who has committed a belligerent act or has directly supported such hostilities." 2012 NDAA §1021(b)(2) (emphasis added). This text shows two things. First, the "engaged in hostilities against the United States" language is part of the definition of an associated force, not of the person who is "part of or substantially supported" the proscribed organizations. Second, detainable conduct is not *limited* to the commission of a belligerent act or direct support for a belligerent act. The use of the word "including" confirms that these are examples of, rather than requirements for, detainable conduct. See also Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *23 ("[I]ndividuals may be detained despite remote or non-existent linkages to the traditional battlefield.")

This statutory scheme accords with longstanding precedent. Courts have long held that enemy belligerents can be detained even if "they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations." Ex Parte Quirin, 317 U.S. 1, 38 (1942). In the modern context, the D.C. Circuit has rejected the notion that a detainee must have engaged in hostilities to be subject to detention under the AUMF or NDAA. Hussain v. Obama, 718 F.3d at 968. And "[p]roof that [a detainee]

18

. . . actively engaged in combat against the United States and its allies is unnecessary" to detain individuals as "*part of* the Taliban or Al-Qaeda." Khairkhwa v. Obama, 703 F.3d 547, 550 (D.C. Cir. 2012). Accordingly, the Court holds that proof that a detainee supported combat or other hostilities against the United States is also unnecessary to detain an individual as a *substantial supporter* of Al-Qaeda, the Taliban, or their associated forces. Requiring a nexus with hostilities, as petitioner proposes for substantial support, would be "inconsistent with the realities of modern warfare," in which

> [c]ommanding officers rarely engage in hand-to-hand combat; supporting troops behind the front lines do not confront enemy combatants face to face; supply-line forces, critical to military operations, may never encounter their opposition.

Khairkhwa v. Obama, 703 F.3d at 550. See also Hussain v. Obama, 718 F.3d at 967-68. The question is whether the petitioner supported one of the *organizations* that is engaged in hostilities against the United States, not whether the *petitioner* supported or participated in the hostilities.

    c. Detention based on substantial support does not require proof of future dangerousness

        The third limitation that the petitioner asks the Court to place on detention authority is a requirement that the government must prove "that Mr. Paracha continues to present a threat to security, and that his detention is absolutely necessary for security reasons." P. Merits Br. At 6. The claim appears to derive from Al-Hela's consideration of the law of war and the Fourth Geneva Convention, under which internment is permitted only where "absolutely necessary" for "imperative reasons of security." See P. Merits Br. At 6. (citing 6 U.S.T. 3516).

        But our court of appeals has already held that "the United States' authority to detain an enemy combatant is not dependent on whether an individual would pose a threat to the United States or its allies if released." Awad v. Obama, 608 F.3d 1, 11 (D.C. Cir. 2010). Nor do the relevant statutes impose any future dangerousness limitation. As Mr. Paracha points out, the

AUMF *does* confer authority in connection with a particular purpose: "to prevent any future acts of international terrorism against the United States." AUMF Sec. 2(a). While it is possible to read this language as imposing a limit on what can be deemed "necessary and appropriate," the NDAA clarifies the meaning of the AUMF, and explicitly authorizes detention "without trial until the end of the hostilities authorized by the AUMF." NDAA § 1021(b). See also Al-Alwi v. Trump, 901 F.3d 294, 298 (D.C. Cir. 2018). And the court of appeals has said that this question – "the determination of when hostilities have ceased" – is irreducibly "a political decision, [in which the courts] defer to the Executive's opinion on the matter, at least in the absence of an authoritative congressional declaration purporting to terminate the war." Al-Bihani v. Obama, 590 F.3d at 874.

A caveat applies to the Court's view of each of petitioner's three contentions about the meaning of the "substantial support" prong of the NDAA. The Court notes that the United States Court of Appeals for the District of Columbia Circuit has not yet conclusively interpreted the scope of this "substantial support" detention authority with respect to petitioner's knowledge, his participation in or support for belligerent acts against the United States, or his future dangerousness. Indeed, several of these questions are now before the D.C. Circuit on appeal. See Al-Hela v. Trump, Civ. No. 19-5079, Brief of Petitioner-Appellant, (D.C. Cir. Oct. 16, 2019) (Dkt. No. 181196). Petitioner's objections to this Court's interpretations of the provision are noted, and are preserved for appeal, where they will be entitled to *de novo* review.

## B. Burden of Proof

In arguing that petitioner was "part of" or "substantially supported" a terrorist organization under the detention standard just described, the government bears the burden of proof. Specifically, the case management order governing the Guantanamo habeas petitions

consolidated in this district – including Mr. Paracha's petition – states that the government must prove by a preponderance of the evidence that petitioner's detention is lawful. See Case Management Order, Dkt. No. 204, Sec. II.A. See also Awad v. Obama, 608 F.3d at 10 (finding the preponderance standard to be constitutionally sufficient). The preponderance standard requires this Court "to make a comparative judgment about the evidence to determine whether a proposition is more likely true than not true based on all the evidence in the record." Almerfedi v. Obama, 654 F.3d at 5 (internal citations and quotations omitted).

In the context of the detention authority conferred by the AUMF and the NDAA, then, this preponderance standard requires the government to establish that it was more likely than not that the petitioner was "part of" or "substantially supported" Al-Qaeda, the Taliban, or one of their associated forces. Al-Hela v. Trump, 2019 U.S. Dist. Lexis. 42717 at *25. Mr. Paracha recognizes that controlling case law requires this Court to evaluate his petition under the preponderance of the evidence standard, but he maintains that the higher "clear and convincing" standard should be applied instead. Petitioner's Classified Opposition Merits Brief ("P. Opp. Merits Br."), at 2-3. That objection is preserved for any appeal.

### III. EVIDENTIARY DETERMINATIONS

Before turning to analyze the substance of the petitioner's claim that the government lacks the legal authority to detain Mr. Paracha, the Court first addresses several threshold evidentiary matters. See Alsabri v. Obama, 764 F. Supp. 2d. 60, 66-67 (D.D.C. 2011). First, as the Court held in an October 2019 memorandum opinion, see Dkt. No. 545, government records containing hearsay are admissible in this matter. And, with respect to one such disputed record, the Court now confirms that it will admit and consider the stipulation of facts that Majid Khan entered before his military commission. See Part III.A, infra. Second, as the Court held in

October 2019, the records of hearsay admitted in evidence are entitled to a rebuttable presumption of regularity – that is, the presumption that the records accurately record the statements made by the objects of the reports – subject to rebuttal by clear evidence. See Dkt. No. 545 at 1-3. Following extensive argument on this matter during the evidentiary hearing, the Court now finds that petitioner has not provided clear evidence to rebut the presumption of regularity with respect to any category of the government's evidence. See Part III.B, infra. Third, the Court must independently determine the substantive truth or reliability of the witness statements contained in the hearsay records. See Dkt. No. 545 at 4. With respect to particular categories of evidence challenged by the petitioner, the Court now finds (i) that Mr. Paracha's statements to his interrogators were not the products of undue coercion; and (ii) that the statements of Uzair Paracha on which the government relies are generally reliable. See Part III.C, infra.

### A. The Admissibility of Hearsay Evidence

No witnesses have appeared to testify and be cross-examined in this matter. Although there are matters on which Mr. Paracha's live testimony would have been illuminating, the Court has drawn no inference, adverse or otherwise, from Mr. Paracha's decision not to testify at his evidentiary hearing. See P. Opp. Merits Br. at 13-14. The evidence consists largely of documents reflecting the statements of petitioner, his son, and several other individuals. For example, the case features Intelligence Information Reports ("IIRs") and Summary Interrogation Reports ("SIRs") prepared by agents of the Department of Defense ("DoD"); FD-302s, FM40s, and Electronic Communications ("ECs") prepared by the Federal Bureau of Investigation ("FBI")

▮▮▮▮ among other documents. See P. Am. Traverse at 14-15.[5] In addition to the reports themselves, other evidence includes a declaration to the Court provided by FBI Special Agent Janelle Miller, who conducted many of Mr. Paracha's interrogations, and Special Agent Miller's handwritten notes for some of the interrogations she conducted. The parties provided much of this evidence in the form of Joint Exhibits, which were admitted into evidence en masse during the evidentiary hearing.

The witness statements in these Joint Exhibits, which the government uses to establish Mr. Paracha's conduct and knowledge with reference to Al-Qaeda and the Taliban, plainly constitute hearsay. See FED. R. EVID. 801(c). But the D.C. Circuit has confirmed, and petitioner does not dispute, that hearsay evidence like this is "always admissible" in Guantanamo habeas petitions. Al-Bihani v. Obama, 590 F.3d at 879. Accordingly, in October 2019 the Court granted respondents' motion to admit hearsay statements in this matter. See Dkt. No. 545.

In addition, the Court must now rule on the use of one piece of hearsay evidence that remains in dispute: the stipulation of facts that Majid Khan submitted as part of his guilty plea before a military commission. See Khan Stipulation, JE 103. In contrast with Mr. Paracha's other evidentiary arguments, the petitioner's request to exclude the stipulation is a prudential argument about the fairness of the discovery process. P. Opp. Merits. Br. at 11-12.[6]

---

[5]    An IIR is a DoD document that records information derived from human sources. An SIR is a summary of a DoD interrogation, and which includes information about the circumstances of an interrogation itself. FD-302s are FBI forms that summarize interviews, as is an EC. An FM40 is a record of investigative activities. See P. Am. Traverse at 14. Many of these documents contain a summary of a particular witness or subject's interview, based on the interviewer's understanding of the statements made by the witness. The subjects of the interrogation did not prepare or review the reports used in this case, nor do the reports offer a verbatim account of interrogations. P. Merits Br. at 9.

[6]    That is, Mr. Paracha has not argued that the Khan stipulation is irregular or inaccurate, in contrast to the arguments he makes about the records concerning his own

Much earlier in this case, the petitioner lodged discovery requests seeking to interview Majid Khan and to obtain other documents associated with Khan's interrogations or statements to interrogators. The government opposed the request, explaining that it did not intend to rely on any statements from Khan, and that it was only required to provide documents it used to justify detention. See Notice of Respondents' 10/14/16 Classified Opposition to Discovery Motions, Dkt. 455, at 8. Respondents repeated this claim in July 2018. See Notice of Respondents' Response to Petitioner's Supplement to July 23, 2018 Joint Status Report, Dkt. No. 498, at 3-4. Respondents' prehearing merits brief, however, does cite several portions of Majid Khan's stipulation of fact. See, e.g., R. Merits Br. at 54. Mr. Paracha decries this "eleventh hour . . . change [of] course," and asks the court to exclude the stipulation from consideration. P. Opp. Merits Br. at 12.

The Court will not do so. It is true that respondents objected to providing additional discovery concerning Majid Khan earlier in the discovery process, and then later relied on a statement from Majid Khan. As amended, the Case Management Order does require the government to produce, upon request, "documents and objects in the government's possession that the government relies on to justify detention." See Case Management Order, Dkt. No. 204, at Part I.E.1; Amended Case Management Order, Dkt. 219, at 2-3. Here, the only Majid Khan document in question is his stipulation, and respondents *have* provided that document to the petitioner. See JE 103.[7]

---

statements. And, although petitioner challenges the power dynamics of the guilty plea process, there is no formal claim that the stipulation – which was prepared with the benefit of counsel – is coerced or otherwise unreliable.

[7]      Of course, respondents have long had an obligation to produce exculpatory evidence, which in this case includes all "reasonably available evidence in the government's possession that tends materially to undermine the evidence that the government intends to rely on

Whether petitioner should also have been able to interview Majid Khan or seek additional discovery on his background is not a question now before the Court.[8] In fact, the petitioner waived all but three outstanding discovery requests – including any requests to interview Majid Khan – at a status conference in May 2019. See Memorandum Opinion and Order, Dkt. No. 517, at 3. Although this waiver predated respondents' merits briefing citation to the Khan stipulation, petitioner has nevertheless been clear in his desire to proceed to adjudicating the merits without further delay. See id. Mr. Paracha's petition is fully briefed, discovery has concluded, and the parties proceeded by mutual consent to a merits hearing without opting to file any further formal discovery motion.

In the context of the broad admissibility that the court of appeals has established for these civil Guantanamo proceedings, see Al-Bihani v. Obama, 590 F.3d at 879, the Court will not decline to consider relevant evidence that is properly before it. Notably, the Khan stipulation bears substantial indicia of regularity and reliability: it is a government document from a formal adjudicative proceeding, and all parties to the document were advised by counsel. The parties to this habeas proceeding, moreover, had the opportunity to address the reliability of the stipulation during the evidentiary hearing. The stipulation was part of the parties' joint exhibits, and it has already been admitted into evidence. For these reasons and the reasons stated on the record during the evidentiary hearing, the Court will consider the Khan stipulation.

---

. . . including any evidence or information that undercuts the reliability of the government's evidence." Amended Case Management Order, Dkt. 308, at 2. There is no reason to suspect that respondents have not attended to these obligations, including with respect to their reliance on the statements of Majid Khan.

[8]    The Court notes, however, that discretionary discovery in Guantanamo habeas petitions is limited. See Case Management Order, Dkt. No. 204. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." Bracy v. Gramley, 520 U.S. 899, 904 (1997).

## B. The Presumption of Regularity for Hearsay Evidence

Respondents' evidentiary motion also requested this Court to accord each piece of hearsay evidence a rebuttable presumption of regularity: that it is both an *authentic* government document and an *accurate* summary or record of a statement made by a non-government person to the government official who produced the document. The D.C. Circuit has held that "in Guantanamo habeas proceedings, a rebuttable presumption of regularity applies to official government records, including intelligence reports likes the [ones] at issue here." Latif v. Obama, 677 F.3d 1175, 1185 (D.C. Cir. 2011). Accordingly, in October 2019 the Court granted respondents' motion to accord their evidence the presumption of regularity (with Mr. Paracha's objection to the presumption preserved for any appeal). Memorandum Opinion and Order, Dkt. No. 545. In so doing, the Court determined that the presumption of regularity could only be rebutted by "clear evidence of irregularity – a standard higher than preponderance of the evidence but lower than beyond a reasonable doubt." See id. at 4 (citing Addington v. Texas, 441 U.S. 418, 423-35 (1979)). See also People for the Ethical Treatment of Animals v. United States Dep't of Agric., 918 F.3d 151, 157 (D.C. Cir. 2019). But "the presumption has an important limitation: it only permits a court to conclude that the statements in the government record were actually made; it says nothing about whether those statements are true." Dkt. No. 545 at 2. This Court retains the responsibility to determine the probative weight to which any piece of hearsay evidence is entitled.

At the evidentiary hearing, counsel for Mr. Paracha attempted to rebut the presumption of regularity by demonstrating that the interrogation reports – as a group and with respect to several individual reports – should not be regarded as accurate accounts of Mr.

Paracha's statements during interrogations.[9] Upon careful consideration of the arguments, the briefing, and the evidence in question, the Court now finds that Mr. Paracha has not rebutted the presumption of regularity with respect to any category of evidence at large.

Petitioner presents several broad arguments in an attempt to undermine the accuracy of the reports, none of which ultimately is persuasive. Counsel identify several discrepancies between the handwritten notes prepared contemporaneously with an interrogation and the formal report, prepared after the fact, that the interrogator ultimately submitted. Petitioner suggests that different cultural understandings might have caused report writers to omit portions of the interview that were, in fact, significant.[10] Petitioner's counsel also imply that some of the reports elide the distinction between the interrogators' own views and what Mr. Paracha actually said during the interviews.

Many of these arguments relate to the question of whether Mr. Paracha knew that KSM and Al-Baluchi were Al-Qaeda, which the Court addresses in Part IV, infra. Other arguments along these lines invite the Court to parse the sequencing, spacing, and alignment of various handwritten notes and, on that basis, to draw various conclusions about the corresponding official report. See, e.g., Miller Notes 07/10/03, JE 70-4, at 794. The Court appreciates Mr. Paracha's counsel's ingenuity, and has carefully examined the handwritten notes

---

[9]    Mr. Paracha's counsel also made the separate argument that statements in several categories of evidence are not reliable. See Part III.C, infra.

[10]    For example, Mr. Paracha told Special Agent Miller that "Mir" – later revealed to be KSM – did not have a beard and did not wear traditional clothing. See Miller Notes 07/11/03, JE 70-6, at 820. That fact was omitted from the report, see FBI EC 07/11/03, JE 70-7, though someone with a closer cultural understanding might have appreciated that "Mir" did not have the usual appearance of an extremist. And one EC omitted the fact, present in Special Agent Miller's handwritten notes, that petitioner believed radio stations would pay him money for "UBL's word," suggesting a profit motive. See Miller Notes 07/08/03, JE 70-1, at 768.

in question. This speculative graphology, however, does not undermine the presumption of regularity with respect to any of the notes or corresponding reports at issue here.

Mr. Paracha has established to the Court's satisfaction that there are some disparities between the handwritten notes and the final reports for particular interrogations, and that that final reports do not reflect every nuance of the underlying interrogations. With a single exception, however, Mr. Paracha has *not* undermined the presumption that the reports are accurate summaries of Mr. Paracha's statements to interrogators.[11] Some of the reports are more detailed than others, and some were prepared more quickly after the conclusion of their interviews. But these differences go to the probative weight the Court accords each report, not to the question of whether the reports generally contain an accurate account of Mr. Paracha's statements during interrogations.

In fact, there is also substantial affirmative evidence to bolster the accuracy of the reports. For one, the interrogations took place entirely in English, in which Mr. Paracha is fluent. This removes a communication barrier that has plagued interrogations of other Guantanamo detainees and has affected other courts' assessments of the accuracy of intelligence reports. See Alsabri v. Obama, 764 F. Supp. 2d at 68. And interrogators from the agencies or departments who interviewed Mr. Paracha – FBI███ and DoD – were each bound by policies requiring them to write reports that accurately reflected the statements of an interviewee. See R. Merits Br. Exhibits 3, 98, 99, 101. Of particular note, FBI agents are trained in the timely,

---

[11]     In comparing multiple reports of the same interrogation, Mr. Paracha argued persuasively that his comments about how he would smuggle chemicals into the United States were offered as a response to an interrogator's hypothetical. See Part IV.D, infra. To the extent that the reports suggest that Mr. Paracha disclosed any concrete plan to smuggle explosives in this way, the reports are inaccurate in that respect.

28

complete, and accurate reporting of interviews. See Decl. of Jimmy H. Hammock, Jr., FBI

Training Division, JE 101, at 1175-76. Special Agent Miller confirms that she was careful to

differentiate her own analysis from her summary of Mr. Paracha's statements, clearly labelling

any of her own opinions and usually placing them at the end of her reports. Decl. of Janelle

Miller ("Miller Decl."), JE 70, at ¶¶ 5, 11, 20.

      Mr. Paracha's counsel also attempt to rebut the presumption of regularity with

reference to the government reports by noting the general climate in which the interrogations

took place and the interagency dynamics that shaped some of the interrogations.[12] Special Agent

Miller explained that the FBI's goal during interrogations was to get truthful information from

Mr. Paracha, to gather intelligence, and to prevent future attacks. Miller Decl., JE 70, at 753.

But petitioner's counsel speculate, without direct evidence that one of these goals predominated:

there was a bias to understand information provided by petitioner in terms of whether it provided

information that could be used to prevent a future attack. See Oct. 25, 2019 Tr. at 61:22-62:2

("Their focus was to stop imminent terror attacks. . . . That's what's being brought into these

interrogations. So this strong motive and intense bias and the lack of understanding of cultural

differences is what we submit led to the inaccurate reporting . . . .").[13]

      Mr. Paracha's counsel appear to suggest that a blend of patriotism, bias, and

inexperience caused multiple interrogators – across the DoD, FBI        – to accidentally or

---

[12]    Petitioner's briefing does not request an explicit evidentiary ruling on this matter, which was expressed for the first time at the evidentiary hearing.

[13]    See also P. Merits Br. at 12-13 (indicating that the interrogators were "looking to confirm false statements made by [petitioner's son Uzair Paracha] when interrogating Saifullah Paracha")

29

intentionally misrepresent what Mr. Paracha actually said during the interviews. But petitioner does not carry this argument. What petitioner has identified are the inevitable dynamics of interrogation, and not evidence that the products of those interrogations were systematically inaccurate. For one matter, with minor differences, other reports – prepared by different authors from different agencies participating in the same interrogations – tend to corroborate each other. They also contain a fair amount of information that Mr. Paracha identifies as exculpatory: his repeated disavowals of violent extremism and his purportedly innocent business motivations, for example, are reflected in the interrogation reports. Interrogators deliberately trying to frame Mr. Paracha – or even biased interrogators – are unlikely to have included such exculpatory details in their reports.



In summary, Mr. Paracha has not overcome the presumption of regularity to which the government's records are entitled. He has failed to provide clear evidence that the records are inauthentic or do not accurately capture the substance of the statements he made to interrogators. Mr. Paracha has not marshaled clear evidence of any such defects with respect to any broader category of the respondents' evidence. As to the reliability of individual reports, the Court's Findings of Fact and Conclusions of Law cite and rely only on reports that the Court finds to be accurate.

## C. *The Reliability of Certain Hearsay Evidence*

In addition to presenting several arguments attempting to rebut the presumption of regularity with respect to some of respondents' evidence, see Part III.B, supra, Mr. Paracha's counsel also have argued that several categories of evidence – even if they are *accurate* records of what a witness said – should nevertheless be regarded as unreliable and given little or no probative weight as to the truth of the statements they contain. Before relying on any piece of evidence in these Guantanamo habeas proceedings, the court "must examine that information and determine whether the evidence is in fact sufficiently reliable to be used as a justification for detention." Khan v. Obama, 646 F. Supp. 2d 6, 12 (D.D.C. 2009). In Guantanamo habeas cases, individual pieces of evidence "should be evaluated based on the evidence as a whole." See Mohammed v. Obama, 704 F. Supp. 2d 1, 7 (D.D.C. 2009). Reliability may be assessed "by the intrinsic characteristics of the evidence, such as the nature and consistency of the details contained in the hearsay, as well as through corroboration by other evidence in the record." Alsabri v. Obama, 764 F. Supp. 2d. at 67-68 (internal citations omitted).

Upon careful consideration of the arguments, the briefing, and the evidence in question, the Court now finds that (i) Mr. Paracha's own statements are not undermined by the

conditions of his interrogation and confinement, see Part III.C.1, infra; and (ii) statements made by Mr. Paracha's son Uzair are not undermined by the conditions of Uzair's interrogation see Part III.C.2, infra.

### 1. Saifullah Paracha's statements are not undermined by the conditions of his confinement or interrogation

Although the government first learned about Mr. Paracha's alleged support to Al-Qaeda and the Taliban from statements extracted from other detainees by torture, respondents do not now rely on any of those statements in attempting to carry their burden of proof in opposition to the instant habeas petition. See R. Merits Br. 18-60.; R. Opp. Merits Br. 20-45; Oct. 25, 2019 Tr. at 5:19-23 ("[W]e do not rely on any interrogation statements of Khalid Sheikh Mohammed or Ammar al-Baluchi, . . . and we also do not rely on any interrogation statements of Majid Khan."). Instead, the government presents its case primarily through Mr. Paracha's own statements, as reflected primarily in reports of his interrogations. Mr. Paracha's counsel, however, "respectfully request[] this Court critically examine the intelligence reports alleged to be Mr. Paracha's statements for accuracy and reliability," in light of the conditions of Mr. Paracha's confinement and the nature of his interrogation. P. Merits Br. at 11-12.

Having considered the accuracy of the reports, see Part III.B, supra, the Court turns now to assess the reliability of this evidence through the lens suggested by Mr. Paracha's counsel. Mr. Paracha attempts to illustrate the allegedly coercive conditions of his confinement and interrogations through the report of an expert, excerpts from a report of the Senate Select Committee on Intelligence, and his own personal declaration. Each of these arguments relies more on implication than on evidence. The Court considers the reports and the declaration in turn.

### a. The Reports

The petitioner has provided the Court with two reports about certain "Enhanced Interrogation Techniques" ("EITs") including sleep and sensory deprivation, stress positions, sexual humiliation, and waterboarding – now widely recognized as torture – that the CIA used in tandem with interrogation to induce psychological breakdown and severe physical pain in certain detainees at Guantanamo and other sites. See Report of Dr. Stephen N. Xenakis ("Xenakis Report"), JE 209, at 1545. The first report is an expert report from Dr. Stephen Xenakis, a retired Army General and medical doctor who is board certified in psychiatry and neurology. See id. at 1542. Dr. Xenakis has personally examined a number of Guantanamo detainees who have filed habeas corpus petitions in this District, and has testified on their behalf. His expertise is substantial and unchallenged. He did not, however, examine Mr. Paracha or his medical records. See id. at 1543, 1547. The Xenakis Report discusses the nefarious consequences of the EITs and other conditions at Guantanamo, and how they "can induce not only feelings of helplessness, but also [result in] manipulation into compliance, and exploitation to confessions of activity that was untrue and unfounded." P. Am. Traverse at 15 (quoting Xenakis Report, JE 209, at 1544).

In addition to the Xenakis Report, Mr. Paracha also relies on the Executive Summary of the Report of the Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency, (the "Senate Report"), excerpts of which petitioner introduced into evidence. See PE A. Like Dr. Xenakis, the authors of the Senate Report conclude that the CIA's EITs were "not an effective means of acquiring intelligence or gaining cooperation from detainees." P. Am. Traverse at 16. Mr. Paracha's counsel argue generically that that the Senate Report "offers insight into the interrogation techniques used by intelligence agencies," P. Merits

33

Br. at 11-12, and that it "supports Dr. Xenakis' conclusions," P. Am. Traverse at 16. Mr. Paracha's counsel also point to a footnote – an unredacted version of which was produced by order of this Court – indicating that, when the CIA first sought custody of the petitioner, the CIA contemplated deploying the EITs to interrogate Mr. Paracha. PE A at 357; see also P. Am. Traverse at 17.

If Mr. Paracha had been the victim of the kind of interrogation techniques described in the Xenakis Report and the Senate Report, the Court would have serious doubts as to the reliability of his statements to interrogators. Neither report, however, furnishes any concrete evidence that respondents actually applied EITs to Mr. Paracha, or otherwise coerced him impermissibly during his interrogations.

On this score, the Xenakis Report has a pronounced flaw that severely constrains its relevance to this Court's assessment of the reliability of the interrogation reports and other evidence. Although Dr. Xenakis opines in a convincing and harrowing manner about the problems that other Guantanamo detainees have experienced, Dr. Xenakis never met or examined Mr. Paracha, nor has he examined any of the documents in this case. As a result, he does not attempt – he cannot attempt – to discuss whether Mr. Paracha himself has been the victim of EITs, or whether he has otherwise suffered from any of the physical or mental injuries that can produce unreliable interrogation responses. See JE 209 at 1542-47. Absent this information, the Xenakis Report cannot, as Mr. Paracha's counsel claim, provide "a framework for understanding the impact of [EITs] *on Mr. Paracha*." Am. Traverse at 18 (emphasis added).

The Senate Report is similarly unavailing. Although it reveals that the CIA contemplated torturing Mr. Paracha, it also explicitly confirms that Mr. Paracha was *not* himself subjected to the EITs with which the CIA mistreated many other detainees at Guantanamo.

Importantly, Appendix 2 of the unclassified Executive Summary of the Senate Report contains an apparently comprehensive list of all detainees whom the CIA subjected to the EITs discussed within the Senate Report. Petitioner's name does not appear on the list, so the Senate Report has no relevance as to the treatment Mr. Paracha himself received. See CIA Detainees from 2002-2008, Appendix 2 of the SSCI Executive Summary, JE 105, at 1210-13.

b. Mr. Paracha's Declaration

Mr. Paracha also attempts to undermine the reliability of the government's evidence with his own declaration and with descriptions of the interrogations from a number of the government's reports. The declaration was prepared with the assistance of Mr. Paracha's able counsel in November 2018. It was drafted in connection with the Amended Traverse with the specific goal of attacking the government's authority to detain Mr. Paracha. As a result, the Court believes the Paracha Declaration to be the best and most direct evidence available to assess the petitioner's claims of coercion. Ultimately, however, the allegations in Mr. Paracha's declaration and the government records of the interrogations do not establish that the kind of coercive techniques described in the Xenakis Report and the Senate Report were applied to the petitioner.

**Capture and Transportation:** The first component of Mr. Paracha's declaration concerns a broad group of allegations about Mr. Paracha's capture and transportation. During Mr. Paracha's initial arrest ██████ he was hooded and shackled in a manner that he avers made it difficult for him to breathe, though the hood was adjusted upon request. He was transported in a vehicle without access to food, water, or a bathroom. Later, he was taken on a plane to Bagram Air Force Base in Afghanistan. See Decl. of Saifullah Paracha ("Paracha Decl."), JE 201, at ¶¶ 2-4. His transport from Bagram to Guantanamo was similarly harsh: █

35

███████████████████████████████████████████████████████

████████████████████████████████████ Id. at ¶¶ 18-21. But there is no indication that the

government interrogated Mr. Paracha while transporting him in this manner, or that these

conditions persisted beyond the time in transit. And the earliest of the interrogations on which

the government now relies were conducted in July 2003, roughly a month after Mr. Paracha was

first captured.

**Conditions of Confinement:** The second component of Mr. Paracha's

declaration concerns the conditions of his confinement at Bagram and at Guantanamo. The

petitioner describes the challenges and discomfort of daily living in military custody:

inconsistent and uncomfortable temperatures, unclean and pest-plagued conditions, low-quality

sleeping and recreation facilities, social isolation, challenges in meeting religious obligations,

and occasional clashes with personnel. See, e.g., Paracha Decl. at ¶¶ 6-8. Mr. Paracha also notes

the discomfort imposed by his medical conditions, see id. at ¶¶ 9, 13, 21, treatment of which the

parties have separately litigated before this Court. See Dkt. Nos. 124, 126.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

███████ For example, interrogators did not interview Mr. Paracha for a few weeks in December

2004, and he "became much more agitated when . . . being interviewed and has stated that he

doesn't get much sleep because he is sleeping on a very thin mattress." Miller Decl., JE 70, at

763 (discussing FBI ERC 12/10/04, JE 70-39, at 107).

Petitioner's counsel argue that these are coercive conditions that undermine the reliability of Mr. Paracha's statements. P. Merits Br. at 11-12. But the description of these conditions and disciplinary tactics do not show, by a preponderance of the evidence, an unduly coercive environment. And the evidence does not approach the abusive circumstances described in the Senate Report.

**Sleep Deprivation and Stress Positions:** The third component of Mr. Paracha's declaration contains more serious allegations of mistreatment: the use of sleep deprivation and stress positions during his initial detention at Bagram Air Force Base. Mr. Paracha explains that "in the first approximately 14 months . . . I was regularly denied water and access to bathroom facilities. Music was played at a high volume 24 hours a day to prevent me from sleeping." Paracha Decl. ¶ 5. While troubling, Mr. Paracha is vague as to the details, and he says nothing specific about the duration of this tactic and its impact on him. The implication is that music was played at high volume all day, every day, for 14 months. This appears to be hyperbole: if nothing else, such a practice would not leave time for interrogations. Mr. Paracha does not actually indicate the extent to which he lost sleep, but he was obviously able to get some sleep during the 14 months he was at Bagram.

Moreover, this account also does not show the severity of the sleep deprivation described in the Senate Report. As discussed, the CIA practiced sleep deprivation by means of active physical interventions and strategically paired it with interrogation sessions. Dr. Xenakis' Report confirms that, as an EIT used by the CIA, this tactic entailed extended sleep deprivation and altered sleep cycles for periods exceeding 96 hours to induce hallucination, delusions, and confusion. Mr. Paracha does not allege use of these tactics or claim this kind of psychological

37

symptoms, nor has he identified anything from the medical records produced by the government that reflect these psychological symptoms.

Janelle Miller, the FBI Agent who conducted many of petitioner's interrogations at Bagram and at Guantanamo, also contradicts specific aspects of Mr. Paracha's claims. Although she saw Mr. Paracha primarily during interrogations, her declaration explains that she does not recall loud music being played, that she would not have wanted temperature extremes, and that she allowed breaks for petitioner to pray and use the restroom. Miller Decl., JE 70, at ¶¶ 7-10.

While Special Agent Miller "had no role in Saifullah Paracha's conditions of confinement at Bagram outside of the interview room for the interviews [she] conducted," Miller Decl. at ¶ 4, her observations are nevertheless useful to assessing Mr. Paracha's general health and whether he was the victim of the kinds of coercive tactics that his counsel now mention. Notably, Special Agent Miller did not recall "Saifullah ever falling asleep or nodding off during interviews," at Bagram, the only place he complains of sleep deprivation occurring. See id. at ¶ 6. This tends to undermine the idea that Mr. Paracha was the victim of substantial sleep deprivation. And Special Agent Miller noted that "Saifullah was pretty friendly in the beginning of these interviews" – the interviews on which the government most relies. "He was never mean and did not refuse to talk," even when he was "a little moody." Rather, he "liked to talk and was very talkative." Id. at ¶ 6. Special Agent Miller recalls that "Saifullah Paracha was happy to see me when I first saw him in Guantanamo, after having previously interviewed him at Bagram." Id. at ¶ 19.

The other potentially significant condition that Mr. Paracha's declaration describes is the use of stress positions. Mr. Paracha reports that, during his custody at Bagram,

"[i]f you talked to someone in another cell, you would be punished. The punishment was being forced to hold a stress position for hours. If the guards caught anyone whispering, all detainees would be punished for it with stress positions." Paracha Decl. at ¶10. For one, this discussion of whispering undermines his claim that loud music played constantly. More importantly, Mr. Paracha describes only one instance of actually being subjected to a stress position himself. He reports that on one occasion, while he was housed in a communal space, guards caught two other men talking and "made us all assume a stress position. I was very upset after this incident and stopped eating." Id. at ¶¶ 14-15.

This description contains no indication of what stress position was used, how long it was imposed, or whether it had any lasting physical effect. Other detainees – those who are the subject of the Senate Report on EITs – endured repeated and brutal stress positions in conjunction with the interrogations themselves. They were shackled with their hands above their heads for days at a time. Their heads were repeatedly slammed into the wall. Mr. Paracha's counsel rely on the freighted resonance of the "stress position" terminology. But there is nothing in Mr. Paracha's declaration or any of the other evidence to show that Mr. Paracha was subjected – even once – to the kind of torture revealed in the Xenakis Report and the Senate Report.

**Interrogation techniques:** The fourth and final component of Mr. Paracha's declaration – and most relevant to the Court's considerations of the reliability of Mr. Paracha's statements to the government – are allegations with respect to the interrogations themselves. The petitioner reports that at Bagram he was "frequently removed from [his] cell and interrogated . . . multiple times per day for hours at a time." Paracha Decl. at ¶ 11. Then, Mr. Paracha makes his most pointed claim about coercion:

> During those interrogations, the people asking questions would try
> to put words in my mouth and get me to agree with their answers. If

39

> I resisted and my answers did not agree with what they said, they
> would insist my answers were impossible. This happened over and
> over. Interrogators would tell me what they wanted me to say and
> then try to force me to agree with their words.

Id. Mr. Paracha also indicates that interrogators denied his requests for water and restroom

breaks. Id. at ¶ 12. With respect to his interrogations at Guantanamo, Mr. Paracha indicates that

he was "frequently interrogated and questioned during my first few years" in Cuba:

> The interrogators would try to put words in my mouth. They would
> also promise to protect me and make other offers if I would "tell
> them the truth." I was already telling them the truth, but they would
> insist that I was lying. It was common for interrogators to tell me
> that my situation was hopeless if I did not agree with them.

Id. at ¶ 26.

On this basis, Mr. Paracha's counsel urge the Court to conclude that Mr. Paracha

said things that were untrue, that his will was overborne, and that he was coerced into making

false statements. But Mr. Paracha himself claims no such thing: his declaration says that the

interrogators *tried* to put words in his mouth. He does not claim that the interrogators actually

*succeeded* in inducing him to say something that was not true, or that he ever falsely confessed.

In fact, he says the opposite: that he told the interrogators the truth. A number of the

government's reports show a person in control of his faculties, holding forth calmly and at

length, even during uncomfortable circumstances.                                    At one early

interrogation session at Bagram, an interrogator described Mr. Paracha as a "gentleman" who

was "very talkative. It seemed like he wanted to get a few things off his chest." DoD

Interrogator Notes 07/10/2003, JE 8, at 87. Later – even after years in confinement, Mr. Paracha

"recited some verses of Urdu poetry" for his interrogator, and "conversed about Urdu literature."

Interview Report 7/11/2007, JE 35, at 253.

The government provided petitioner with its Amended Factual Return setting out the details of its claims in April 2018, more than seven months before petitioner filed the Amended Traverse to which his declaration was appended. Even though Mr. Paracha has seen this account of the statements on which the government relies, Mr. Paracha's counsel have not identified a single specific example – not in the petitioner's declaration and not in several rounds of briefing – of a time in which Mr. Paracha lied, falsely confessed, or was coerced into making a statement. There is no specific example of an occasion that interrogators successfully "put words in [Mr. Paracha's] mouth." See Paracha Decl. at ¶ 26.

The declaration provided by FBI Special Agent Janelle Miller also undercuts Mr. Paracha's counsel's interpretation of the interrogations. Special Agent Miller, who interviewed petitioner more than thirty times at both Bagram and Guantanamo, describes her interviews as being "friendly and interactive," first building rapport using open-ended questions. Miller Decl., JE 70, at ¶ 5. She indicates that she did not make promises to the petitioner or threaten him, and that she "did not put words in Saifullah Paracha's mouth." Id. at ¶¶ 5-7. She admits that her question choices were informed by her prior experience interrogating Uzair Paracha. Id. at ¶ 5. And although she confronted Mr. Paracha when she identified inconsistencies in his story, see id. at ¶ 24, that is a customary component of all interrogations. When it came to producing her reports, however, Special Agent Miller faithfully "wrote down what Saifullah Paracha said in the interviews." Id. at ¶ 5. During this time, "it was the policy of the FBI that no attempt be made to obtain a statement by force, threats or promises," and "no interrogations were to be conducted using methods which could be interpreted as inherently coercive." See Decl. of Jimmy Hammock, FBI Training Division, JE 101, at ¶ 7.

**Consequences of confinement and interrogation:** Relying on all four of the subjects discussed by Mr. Paracha in his declaration, his counsel argue that Mr. Paracha was "frequently subjected" to the deplorable abuses summarized in the Senate Report and Dr. Xenakis' declaration, "bookended by repeated interrogations." P. Am. Traverse at 16. The declaration shows no such thing. Indeed, while the declaration and other evidence describe conditions that are deeply unpleasant, many of these are the near-inevitable concomitants of military detention and interrogation. Furthermore, it appears that interrogators assessed Mr. Paracha's health at the beginning of most interviews. See, e.g., DoD Interrogator Notes 07/08/03, JE 7, at 79; Report of Interview with ISN 1094, July 7-11, 2007, JE 35, at 250 (describing a course of interviews during which "in the beginning of each interview [Mr. Paracha] was asked about his health and comfort"). And the interrogators were attentive to Mr. Paracha's physical health and mood: they even asked doctors to examine Mr. Paracha before an interrogation if he appeared to be unwell. See FBI EC 07/14/03, JE 70-12, at 875. The reports do indicate that Mr. Paracha suffered from general health problems. See id. (noting that Mr. Paracha suffered from high blood pressure and that he "felt light-headed in the morning"). But the reports offer little support for the idea that Mr. Paracha was suffering grueling physical or emotional abuse.

Petitioner's position on the coercive conditions of his interrogations also entails a logical difficulty. Mr. Paracha admits the truth of the substantial majority of the facts on which the government relies, most of which emerge from petitioner's own statements during the interrogations he now challenges. See Respondents' Classified Opposition Merits Brief ("R. Opp. Merits. Br."), at 16-17 (summarizing conceded facts); see also Nov. 19, 2019 Tr. 12:11-48:12 (summarizing respondents' account of the "undisputed" facts). Indeed, he even

42

emphasizes a number of exculpatory details that also emerge from these interviews. Mr. Paracha appears to acknowledge that *these* statements were accurately recorded and were obtained free of coercion. Mr. Paracha's counsel now argue that some of the additional claims from these very same interviews – largely those pertaining to his knowledge and intent – should be regarded as unreliable. There is no explanation of how the conditions and tactics relating to a particular interrogation could be coercive as to some statements but not others, let alone any proposal for how the Court might decide which claims are which.

Finally, there is substantial *affirmative* evidence that Mr. Paracha's statements to interrogators are generally reliable. With few exceptions, they speak to matters within Mr. Paracha's direct experience or first-hand knowledge and are laden with substantial details. Although Mr. Paracha's grasp of the relative dates of certain events is less than perfect, the interrogation reports consistently demonstrate a remarkable command of the places, persons, and circumstances at the heart of the government's allegations. On the whole, the reports show that Mr. Paracha had an excellent memory and a willingness to speak frankly with interrogators, especially about the details of his own accomplishments. These characteristics underscore the reliability of the reports. See Alsabri v. Obama, 764 F. Supp. 2d. at 68. Although Mr. Paracha's explanation of the significance of his actions evolves over time, his account of his actions themselves remains generally consistent. What changes is Mr. Paracha's dawning realization of the consequences of his intimate relationship with members Al-Qaeda, and his previous statements acknowledging the relationship.

In summary, upon review of the Xenakis Report, the Senate Report, the Paracha Declaration, and other evidence on the conditions of Mr. Paracha's confinement and methods of interrogation, the Court finds that the conditions and methods do not systematically undermine

the reliability of Mr. Paracha's statements to his interrogators. Certain individual statements from Mr. Paracha are more credible – and are entitled to greater probative weight – than others. The Court's Findings of Fact and Conclusions of Law rely exclusively on reports and statements that the Court considers reliable. See Parts IV, V, infra.

### 2. Uzair Paracha's pretrial statements are reliable

Mr. Paracha has also placed at issue the reliability of a second set of records relied upon by the government: statements made by the petitioner's son, Uzair Paracha, at several phases of his investigation and trial on terrorism-related charges in the United States District Court for the Southern District of New York. Three categories of statements from Uzair are at issue in this case: Uzair's statements during the initial investigation, his statements to the government during proffer sessions, and his statements at his criminal trial. Petitioner now argues that Uzair's statements "corroborate nothing and are *wholly* unreliable," a claim that appears to apply to all of Uzair's statements. P. Am. Traverse at 59 (emphasis added).[16] The petitioner therefore "requests this Court [to] ascribe Uzair's statements *no* weight." P. Merits Br. at 11 (emphasis added). The Court finds, however, that the Uzair Paracha statements on which the government relies – the pretrial statements and the proffer sessions statements – are, as a group, generally reliable. It therefore denies the petitioner's request.

**Initial Interviews:** Acting on the basis of intelligence gathered from other detainees, the FBI approached Uzair Paracha at his New York office on the evening of March 28, 2003, about a year after Uzair arrived in the United States from Pakistan. Uzair agreed to speak

---

[16]     Petitioner supports these claims by reference to Judge Sidney Stein's 2018 decision, based on newly discovered evidence, to set aside Uzair Paracha's 2005 conviction. See P. Am. Traverse, Ex. G., United States v. Uzair Paracha, No. 1:03-CR-01197, 2018 WL 3238824 (S.D.N.Y. July 3, 2018) (appeal filed).

with the agents and accompanied them to the FBI offices, where he was interviewed until 4:00 AM the following morning, and then escorted to a hotel by the FBI so that he could rest and continue his interview later that day. United States v. Uzair Paracha, 2018 WL 3238824 at *3. In this second interview, the FBI advised Uzair of his Miranda rights, which he waived, and continued questioning him. In all, Uzair participated in three days of questioning without the aid of counsel. During these interviews, Uzair initially denied any knowledge of Al-Qaeda. He soon changed his account, however, and made a number of statements on which the government now relies in this case to support its detention of Saifullah Paracha. Among other things, Uzair admitted that he and his father had been affiliating with people they knew to be members of Al-Qaeda and had been offering them certain assistance.[17]

**Statements at Proffer Sessions:** On March 31, 2003, the FBI arrested Uzair Paracha on a material witness warrant. Over the next two months, Paracha continued to cooperate and answer questions for the FBI in a series of proffer sessions at the Office of the United States Attorney for the Southern District of New York, during which time he was accompanied and assisted by defense counsel. United States v. Uzair Paracha, 2018 WL 3238824 at *3. During these sessions, Uzair both elaborated on and contradicted portions of his earlier statements. Although he offered occasionally inconsistent details of the timing, financial

---

[17]    Among other things, Uzair confirmed (i) that he agreed to help Majid Khan enter the United States and had met with Al-Baluchi, whom he knew under a different name, about these plans; (ii) that he knew Khan and Al-Baluchi were Al-Qaeda, and learned this information from his father, the petitioner; (iii) that he "suspected [Saifullah Paracha] of being Al-Qaeda" and that he "'wouldn't be surprised' to learn that his father was involved in a terrorist plot, because 'his father had met [Bin Laden]' and 'expressed admiration for [him];'" and (iv) that Majid Khan gave him several tasks to facilitate Khan's re-entry into the United States. United States v. Uzair Paracha, 2018 WL 3238824 at *3. See also Uzair Paracha FD-302 03/30/03, JE 55; Uzair Paracha FD-302; Uzair Paracha FD-302 04/23/03, JE 56; Uzair Paracha FD-302 05/01/03, JE 57; Uzair Paracha FD-302 05/05/03, JE 58.

details, and motivation for certain interactions he and his father had with Al-Qaeda, Uzair did not

"ever disavow his admissions to knowing that [Majid] Khan and al-Baluchi were al Qaeda

members, that by assisting Khan he was helping al Qaeda, and that his father had business

dealings with the terrorist group." Id. at *3-4. It is these admissions on which the government

principally relies, primarily for the purpose of bolstering its claims about Saifullah Paracha's

knowledge of Al-Qaeda and his assistance to Majid Khan. On the strength of these admissions, a

federal grand jury charged Uzair with five felony counts on terrorism-related charges in October

2003.

**Statements at Trial:** At his criminal trial in 2005, Uzair changed his approach.

He acknowledged making the incriminating statements about himself and his father, but

"maintained that key portions of them constituted false confessions made out of a combination of

fear, intimidation, and exhaustion." United States v. Uzair Paracha, 2018 WL 3238824 at *5.

Although he admitted to his conduct, Uzair denied knowing that Al-Baluchi or Khan were

members of Al-Qaeda at the time he met them, and said that he took steps to help Majid Khan

out of respect for his father rather than from any extremist fervor.

Uzair explained that he decided to give the incriminating statements to the FBI

during his pre-arrest interviews because, after telling the truth, he had not been allowed to go

home. Uzair claimed that he felt pressured to admit affiliation with Al-Qaeda during his initial

interviews: that his cell phone was taken to prevent contact with his family, that he was subjected

to a strip search in a hotel room after his first night of interrogation, and that he was threatened

with arrest or jail if he invoked his right to counsel. United States v. Uzair Paracha, 2018 WL

3238824 at *6. The government denied each of these allegations. Id. At trial, Uzair said that he

decided to falsely implicate himself and his father during the first three days of interviews and

46

over the course of several months of proffer sessions "because I thought that is what they wanted to hear," and because he "hoped that by cooperating he would be allowed to return home to Pakistan." Id. at 5.

**Implications of the New Trial Order:** At the conclusions of Uzair Paracha's trial in 2005, the jury convicted him on all five counts, and Judge Stein sentenced him to thirty years' imprisonment. United States v. Uzair Paracha, 2018 WL 3238824 at *7. In 2018, however, Judge Stein set aside Uzair's conviction and granted him a new trial on the basis of new evidence: post-trial statements from Majid Khan, Al-Baluchi, and KSM that tend to exculpate Uzair Paracha by denying fundamental elements of the government's case – elements to which Uzair Paracha had stipulated at trial. The petitioner here argues that Judge Stein's Opinion raised "concerns of coercion and inconsistent statements" and that, therefore, this Court should give no weight to Uzair's admissions. P. Merits Br. at 9.

The Court reads Judge Stein's opinion differently, particularly when it is considered in combination with his pre-trial opinion denying Uzair Paracha's own motion to suppress those very admissions. "Although Judge Stein noted some inconsistencies among Uzair's statements, and that some lacked corroboration, he did not ground his decision [to grant a new trial] on those concerns." R. Opp. Merits Br. at 18. These are the same inconsistencies that were highlighted at trial, during post-trial briefing, and at sentencing – and they did not prevent a judgment of guilty and a sentence. Judge Stein simply concluded that, had the newly discovered exculpatory statements been available to Uzair Paracha, Uzair would have made different strategic decisions about whether to stipulate to his interlocutors' membership in Al-Qaeda. This is a judgment about the strength of the government's case for conviction. Judge Stein concluded that, on all of the evidence, there was a significant chance that the introduction of the new

evidence could have induced a reasonable doubt in the minds of enough jurors to prevent a conviction.

This question – whether a unanimous jury would have found Uzair Paracha guilty of five specific felony charges beyond a reasonable doubt – is not the question before this Court. In this civil matter, the only relevant question about Uzair Paracha is whether the statements he made during his pre-arrest interviews and his proffer sessions, and on which the government *now relies* in this proceeding, should be denied all probative weight.

They should not be, for several reasons. First, as Judge Stein found in his decision denying Uzair Paracha's motion to suppress the statements, the circumstances of Uzair Paracha's interviews were not coercive. It is quite reasonable for petitioner to highlight some of the unusual features of the interrogation, at least with respect to its initial phases. But Judge Stein thoroughly examined the circumstances of the initial interrogations during an evidentiary hearing on Uzair's motion to suppress these statements. Judge Stein denied the motion, noting that Uzair's statements were "not obtained involuntarily and that those statements were not obtained in violation of his Fifth Amendment privilege not to incriminate himself." United States v. Uzair Paracha, Crim. No. 03-1197, Op. & Order (S.D.N.Y. Aug. 24, 2004) (Dkt. No. 28). Judge Stein had the benefit of a full evidentiary hearing on this question, and this Court sees no cause to supplant his well-reasoned conclusion that Uzair's pre-arrest statements were voluntary.

Second, as to the purported contradictions between Uzair's pre-arrest statements and the trial testimony, some of the statements that Judge Stein identified are now corroborated by materials that were not available to Judge Stein. Most notably, Uzair's accounts of his assistance to Majid Khan match the essential details of the account given by the petitioner

48

himself, despite the fact that the two had no opportunity to coordinate. It is hard to imagine that Uzair could have concocted a story to tell FBI agents during his pre-trial interrogations and that, years later, without speaking to Uzair, Saifullah Paracha would offer much the same account. See Part IV, infra. Importantly, Uzair does not deny making the statements to the FBI; he just said at trial that he lied. During the initial interrogation, however, Uzair had not yet been charged and, perhaps, did not grasp the implications of his statements. At trial, however, Uzair was aware of the charges and saw the consequences of his affiliation with Al-Qaeda members – enabling him to target which of his admissions were especially problematic and should be retracted. The "inconsistencies" appear to be self-serving.

Third, petitioner asks the Court to believe a series of events and motivations that is nothing short of confounding. Uzair now claims that his initial denial of any knowledge of Al-Qaeda was the truth. Almost everything else he said – all of the incriminating statements linking himself and his father, everything he said over several days of interview sessions and several months of proffer sessions – was a lie designed to obtain his freedom. Uzair Paracha may have been young and "without any interactions with law enforcement either in Pakistan or in the United States." P. Opp. Merits Br. at 8. As Judge Stein observed, Uzair may have even displayed "Hamlet-like indecision on . . . whether to call a lawyer . . . among other odd behavior tending to show he may not have fully grasped the nature of the situation he was in." United States v. Uzair Paracha, 2018 WL3238824 at *16. But the Court cannot believe that Uzair decided that the best way to attain his release was to concoct stories for the FBI about extensive affiliations he and his father had with the world's most notorious terrorist organization. It is likewise difficult to credit the idea that Uzair would have fabricated this evidence while guided by counsel, who would surely have advised him of the perils of lying during a proffer session.

Accordingly, the Court finds that Uzair Paracha's pretrial statements were not coerced and are generally reliable. Nevertheless, the Court takes note of the fact that those statements themselves contain contradictions in certain details. In the Findings of Fact and Conclusions of Law that follow, the Court has primarily relied on statements from Uzair that are externally corroborated. The Court has assessed the relevant statements individually and accorded them the probative weight each deserves.

## IV. FINDINGS OF FACT

The instant petition turns both on what Paracha *did* for Al-Qaeda and the Taliban and – more vigorously disputed by the parties – what he *knew* at the time he interacted with Osama Bin Laden and other members of Al-Qaeda. Both questions are the focus of the Court's Findings of Fact.[18] The parties' presentations at the evidentiary hearing addressed five material issues in dispute. With respect to each of the material issues in dispute, the Court makes the following Findings of Fact by a preponderance of the evidence. As noted in Part II, supra, this standard entails "a comparative judgment about the evidence to determine whether a proposition is more likely true than not true based on all the evidence in the record." Almerfedi v. Obama, 654 F.3d at 5.

### A. Mr. Paracha Provided Assistance to Taliban Fighters

The government's evidence on the first disputed issue of material fact includes both specific claims about instances of support to the Taliban and Al-Qaeda and general claims about Mr. Paracha's status within the extremist community and his attitudes toward it.

---

[18]     Whether based on the conduct described in the Findings of Fact, respondents possess the legal authority to detain Mr. Paracha is discussed in the Court's Conclusions of Law. See Part V, infra.

1. Mr. Paracha was knowledgeable about the Taliban and endorsed the organization

Mr. Paracha has been open about his support for the Taliban. He admired the stabilizing role that it played in Afghanistan after that country's war with the Soviet Union, and he believed that the Taliban was the best choice for the Afghan people. FBI EC 10/14/04, JE 70-30, at 949; FM40 10/15/03, JE 26, at 201. Similarly, during early interrogations at Bagram, Mr. Paracha openly admitted that he "sympathizes with [Al-Qaeda]," FBI EC 07/11/03, JE 70-7, and said that he "felt it was a privilege to work with [Al-Qaeda]," FBI EC 07/13/03, JE 70-10, at 866.

Petitioner offers information on the Pakistani cultural context in an attempt to neutralize the implications of these attitudes. One of petitioner's experts, Dr. Sadia Saeed, is a native of Pakistan and a professor of Sociology at the University of San Francisco. In her report, Dr. Saeed surveys Pakistani news media and academic sources to opine on the attitudes that Pakistanis most likely had towards the Taliban and Al-Qaeda in the period immediately before and after 9/11. Dr. Saeed explains that, before 9/11, "expressing support for the Taliban regime . . . was the official state policy of Pakistan. Thus, expressing support for, and doing business or charitable work with, the Taliban during this time would not have been illegal or unusual . . . in Pakistan." Perceptions of Taliban, Al-Qaeda, and Osama Bin Laden in Pakistan ("Saeed Report"), JE 211, at 1560. Dr. Saeed writes that "pro-Taliban sentiments were widely shared by ordinary Pakistanis." See id. at 1562. Petitioner's counsel suggested during the evidentiary hearing that many people would have found it difficult even to distinguish between the numerous extremist groups active in the middle east at the time.

The Court assumes for the sake of argument that Dr. Saeed has reasonably described the attitudes of so-called "ordinary Pakistanis" before 9/11.[19] Mr. Paracha, however, was no ordinary Pakistani. He lived in the United States for fifteen years. In his education, his cosmopolitan world-view, his consumption of western news media, his political connections, and his resources, Mr. Paracha was unusual. See Part I.A, supra. Dr. Saeed's report itself distinguishes the views and the conduct of "the English-speaking elite" – like Mr. Paracha – and "the average non-English speaking Pakistani." JE 211 at 1578. See also id. at 1564 (noting that "the more liberal public" held "perceptions about the Taliban that were different" from the ordinary public).

Drawing on Dr. Saeed's findings, petitioner also argues that it would have been hard for any Pakistani to conduct charitable work in Afghanistan without having contact with the Taliban. P. Merits Br. at 15. But this case does not present a question of casual contact or glancing acquaintance. Mr. Paracha did not just *tolerate* the Taliban to the extent necessary to do his charitable work: his statements to interrogators confirm that he had substantial knowledge of the extremist landscape and that he endorsed the Taliban, in particular. FBI EC 10/14/04, JE 70-30, at 949.

Moreover, Mr. Paracha's engagement with the Taliban went beyond understanding and approval. Petitioner himself denied being an "Islamic militant," but the evidence shows that that he freely associated with many who were. See JE 8 at 84. For

---

[19]     The Report does contain an unsupported – and likely unsupportable – claim about Bin Laden's fatwa calling on all Muslims to kill Americans. Dr. Saeed writes that "the exact circulation of this fatwa cannot be ascertained although it can be reasonably surmised that it would have made the rounds *exclusively* among extremist groups." JE 211 at 1571-72. Other evidence in the record renders this supposition unlikely: the fatwa was discussed in the Pakistani press before and after 9/11.

example, Mr. Paracha knew members of the Taliban leadership personally. JE 70-30 at 949.

Accordingly, both Lashkar-e-Tayyibe, designated by the U.S. Department of State as a Foreign

Terrorist Organization ("FTO"), and Jamaat Islami, a Pakistani political-religious group, asked

Paracha to broker meetings with Taliban leadership. FBI EC 10/26/2004, JE 70-33 at 972. Mr.

Paracha frequently received solicitations of this kind. He knew Mufti Abdul Rasheed, head of

the Al-Rashid Trust in Pakistan, which provided "the most help" to the Taliban, including food

and shelter. FBI EC 12/03/04, JE 70-37, at 995. Rasheed frequently solicited money from

Paracha for jihadist causes. Id. Paracha declined to assist Rasheed – but only because his own

organization, the Council of Welfare Organizations, was already helping the fighters in other

ways.

Mr. Paracha also provided more direct assistance to certain non-Taliban fighters

in the region. He supported the mujahedeen fighting to "keep the Jihad alive in Kashmir," and

even helped the fighters to get out of jail when the Pakistani government arrested them. FBI EC

10/26/2004, JE 70-33, at 971.[20] He also claimed credit for assisting mujahedeen in Chechnya,

Kashmir, and Afghanistan. Id.

In short, these affiliations and acts of assistance show a comprehensive and

nuanced grasp of various Pakistani and Afghan jihad-oriented organizations, their leadership,

and their causes. The government does not allege that any of the foregoing attitudes or

affiliations show that Mr. Paracha was *part of* the Taliban or one of the other non-Al-Qaeda

jihadist organizations. And, as Mr. Paracha's counsel have pointed out, association and offers of

assistance may not themselves amount to the provision of substantial support. Even so, these

---

[20] Mujahedeen are Muslim guerilla fighters. Saeed Report, JE 211, at 1558.

substantial and longstanding affiliations with the Taliban and other jihadist organizations – and Mr. Paracha's knowledge of and admiration for them – are the context in which the Court considers the import of Mr. Paracha's more overt activities. The Court makes the following Findings of Fact with respect to the respondents' three specific claims of assistance.

2. Mr. Paracha helped Taliban fighters to procure military equipment

On four occasions between 1999 and 2002, Mr. Paracha travelled to Afghanistan as a member or leader of delegations representing Pakistani charitable organizations. See FBI EC 08/11/03, JE 71, at 1013-14; see also Part IV.B, infra. Petitioner went to Afghanistan for the second time about a year before the 9/11 terrorist attacks, in December of 1999 or early 2000. Mr. Paracha led a delegation that met with key Taliban leaders, including the Deputy Foreign Minister. The delegation stayed in a Taliban guest house in Kandahar. FBI EC 10/26/2004, JE70-33, at 972; FBI EC 01/22/2004, JE 73, at 1024.

During this trip, Mr. Paracha and the delegation met and provided aid to Taliban fighters who were battling the Northern Alliance.[21] Two of the fighters, Abdul Rahman and Abu Jabrail, asked for money to purchase a four-wheel drive vehicle. Mr. Paracha and the delegates raised roughly $7,000 to give to Rahman and Jabrail. See FBI EC 11/05/2004, JE 70-36, at 989. Mr. Paracha confirmed to interrogators that the money was used to purchase a used four-wheel drive vehicle. It appears that the vehicle was used in fighting against the United States during the war in Afghanistan. See JE 70-33 at 972 (indicating that, when the Taliban fighters spoke

---

[21]     The Northern Alliance was a group in the northern part of Afghanistan, including a number of those from Afghanistan's pre-Taliban government, who opposed the Taliban's takeover of the country. The Northern Alliance supported the United States invasion after 9/11. See P. Am. Factual Return at 6.

with Mr. Paracha shortly after the United States invaded, the vehicle had been "hit by a bomb during the fighting in Afghanistan").

Petitioner does not deny that he contributed to the purchase of a fighting vehicle for Taliban fighters. Rather, Mr. Paracha argues that the purpose of the trip was primarily charitable, that he made this financial contribution as part of a large delegation, and that it cannot be the basis for substantial support because the decision to contribute money was a collective one. But the evidence reveals that Mr. Paracha was a leader of the effort, not a passive participant. As the head of the delegation, Mr. Paracha "placed a Pakistani in charge of collecting all the money for the fighters." FBI EC 11/05/2004, JE 70-36, at 989. And, several weeks after the delegation returned to Pakistan, it was Mr. Paracha whom the fighters called to confirm receipt of the $7000 contribution, which offers further evidence of the petitioner's leading role. Id. at 990.[22] Accordingly, the Court finds by a preponderance of the evidence that Mr. Paracha led an effort to gather money that was used to purchase a vehicle for Taliban fighters, and the fighters used the vehicle in combat against the United States.

3. Mr. Paracha provided financial support to Taliban fighters

Mr. Paracha received many additional requests from Taliban fighters. In fact, Mr. Paracha told the FBI that, after the United States invaded Afghanistan in September 2001, jihadists fighting against American troops "would come to his office and ask for things because the jihadists knew Paracha could get things done." JE 70-30 at 950.[23] For example, Saud

---

[22]     In addition to challenging some of these facts, the petitioner also makes legal arguments that this contribution does not amount to "substantial support" of the Taliban for purposes of the NDAA. The Court addresses these arguments in Part V, infra.

[23]     Throughout this Opinion, quotations attributed to Paracha are taken from the government reports summarizing Paracha's interrogations. Unless otherwise noted, these reports

Ahmed, a Pakistani whom Mr. Paracha met on a trip to Afghanistan, served as a middleman between Dr. Naseem (of the CWO) and the Taliban. Saud Ahmed asked Mr. Paracha for "money for food and medicines for the fighters in [Afghanistan]." FBI EC 10/26/2004, JE70-33, at 971. Mr. Paracha confirmed that Ahmed gave money for such things to the fighters, but the report detailing Ahmed's request to Mr. Paracha is not clear as to whether Mr. Paracha himself contributed in response to the solicitation. Id.

Shortly after the start of the U.S.-Afghanistan war, Abdul Rahman and Abu Jabrail again contacted Mr. Paracha – this time to seek financial support for the Taliban's war against the United States. FBI EC 10/26/2004, JE70-33, at 972. Mr. Paracha declined – not because he did not support the cause, but because he was already sending medicine and other supplies to the fighters; and "he knew from living in the US that it was a waste to give the fighters money because they would not win." Id. at 973. The request establishes that Taliban fighters recognized Mr. Paracha, among the various members of the delegation, as a leader and potential source of aid.

The requests for assistance continued as the U.S.-Afghanistan war waged on. Pakistani and Afghan fighters "who were supporters of the Taliban" came to Mr. Paracha's office five or six times to ask for thousands of dollars to "buy weapons to fight in the war in [Afghanistan] against the [United States]." FBI EC 10/14/04, JE 70-30, at 951. Mr. Paracha agreed to assist, but told interrogators that he did so by providing them "money so the jihadists could buy cement to build a mosque in Pakistan near the [Afghanistan] border." Id. Mr. Paracha had one of his employees deliver the equivalent of $600 directly to a cement company. Id.

---

contain the interrogators' accounts of Paracha's direct statements but do not purport to be verbatim quotations.

With reference to all of the foregoing solicitations, petitioner's counsel point out that Mr. Paracha did not admit to providing direct financial support to the Taliban for weapons purchases, and that Mr. Paracha also rejected solicitations. Nevertheless, when Mr. Paracha agreed to provide $600 – allegedly to a cement company for mosque construction – he did so in direct response to an explicit request for weapons, and he indicated that the contribution was "to help" the war in Afghanistan. FBI EC 10/13/04, JE 70-30, at 951. It is not clear how such a mosque would be helpful in defeating the United States, or why the Taliban fighters would decide to organize and protect a construction project in the midst of a pitched battle with the world's largest military. Mr. Paracha never visited the mosque and was unable to provide any details about the mosque, including whether it had ever been built. Id. He acknowledged that it "was possible" that the jihadists could have used the money for another purpose. Id. On these facts, it is more likely than not that the money Mr. Paracha provided – ostensibly for construction of a mosque – was diverted to another use.

Mr. Paracha discussed his trips to Afghanistan in a 2005 Administrative Review Board proceeding, explaining that "I had no inclination toward the Taliban, the Taliban government, or the Northern Alliance. I am not a political man. I just wanted to help people. I am not an extremist." ARB Summary 12/07/05, JE 64, at 640. Mr. Paracha may well have desired to help people. Indeed, there is no necessary contradiction in being both a benevolent businessman and also a committed jihadist. In the context of his earlier admissions of aid and explicit engagement with the Taliban's political program, however, this statement appears to be an attempt to conceal the depth of his support for the Taliban.

The Court finds by a preponderance of the evidence (i) that petitioner provided medicine and other supplies to the fighters; and (ii) that he provided financial support to Taliban fighters on at least one occasion, in the form of a donation worth $600.

### 4. The government has not established by a preponderance of the evidence that Mr. Paracha provided direct support to Al-Qaeda fighters

In contrast to the numerous requests for assistance that Mr. Paracha admits he received from the Taliban, he claims that Al-Qaeda did *not* come to him with requests for money for the war in Afghanistan. FBI Intelligence Report 07/10, JE 40, at 298.[24] The government has identified one statement from Mr. Paracha that arguably reflects a request for direct aid to Al-Qaeda fighters.[25] Dr. Naseem, head of the Siddiqui Memorial Trust, asked Mr. Paracha for help providing gas masks during the Afghan-U.S. war, and Paracha initially told his interrogator that "the gas masks were for the Afghan people." FBI EC 10/13/2004, JE 70-30, at 950. When the interrogator challenged Mr. Paracha about the plausibility of providing gas masks to all Afghan people, the report indicates that "Paracha admitted that the gas masks were for the Taliban and AQ fighters." Id.

Respondents believe that this exchange reflects a request to furnish gas masks for Al-Qaeda fighters, but that is not the best reading of the interrogation report summarizing the conversation. Petitioner has persuasively argued that the report shows an after-the-fact

---

[24] Some of Uzair Paracha's early statements to the FBI, however, contradict this claim. Uzair claims that, in approximately the summer of 2002, members of Al-Qaeda came to Mr. Paracha to ask for money to purchase weapons for their war against the U.S. Uzair was not sure whether Mr. Paracha ever agreed. Uzair Paracha FD-302, JE 55, at 420. See also Uzair Paracha FD-302 05/01/03, JE 57, at 430 (indicating that "[b]etween August and December 2002, the Al-Qaeda people approached Saifullah . . . on a couple of occasions" to ask for money for weapons).

[25] As discussed below, however, petitioner received many requests for broader logistical and financial assistance to Al-Qaeda.

concession about a purpose that Dr. Naseem may have had in mind, rather than an expression of Mr. Paracha's understanding and intent at the time of his discussion with Dr. Naseem. Like Mr. Paracha, Dr. Naseem was part of the Council of Welfare Organizations, a group of Pakistani charities that was dedicated to health and other causes in Pakistan and Afghanistan. An attempt to procure gas masks – even if not enough for all Afghan people – is consistent with the humanitarian aims of that organization. Finally, as respondents concede, Mr. Paracha never actually took any concrete steps to provide gas masks.

Accordingly, the Court finds that the government has failed to prove by a preponderance of the evidence that Mr. Paracha's conversation about gas masks with Dr. Naseem establishes any direct support to Al-Qaeda *fighters*, or that Mr. Paracha provided any other direct support to Al-Qaeda fighters.

### B. Mr. Paracha's Meetings with Osama Bin Laden Demonstrate that he was Trusted by and Eager to Work with Al-Qaeda.

The government's evidence on the second disputed issue of material fact concerns Mr. Paracha's two meetings with Osama Bin Laden in Afghanistan.[26] The parties agree that the meetings took place, but they disagree about the nature of a conversation that occurred at one of the meetings and about what the meetings reveal about the intentions of Mr. Paracha and Al-Qaeda.

In December 1999 or January 2000, petitioner led a charitable delegation of Pakistanis to Afghanistan, his second visit to that country. He and his fellow travelers stayed at a Taliban guest house in Kandahar. FBI EC 11/05/04, JE 70-36, at 989. Mr. Paracha was one of a

---

[26]     The reports and other evidence frequently refer to Osama Bin Laden as "UBL," referring to the alternate spelling Usama, or as "the Sheikh." See Miller Decl., JE 70, at ¶ 12.

select group of the delegation – between six and fifteen of the roughly 100 travelers – who were invited to meet personally with Osama Bin Laden. The group travelled to the meeting site by car, arriving after dark and parking inside a building. FBI EC 07/11/03, JE 70-7, at 840; JE 70-36, at 989. Numerous bodyguards secured the building, but none of the visitors was searched or blindfolded. FBI EC 07/09/03, JE 70-3, at 787.

Inside the building, Osama Bin Laden shook the attendees' hands and spoke to the group for thirty to forty minutes. He read from the Koran and the sayings of the Prophet, and gave what Mr. Paracha described as "a speech . . . about jihad and fight against injustice." 07/11/04 DoD Interrogator Notes, JE 9, at 91. See also SIR 11/03/2004, JE 37, at 279 (indicating that the Koranic verses encouraged Muslims to help other Muslims). Special Agent Miller's handwritten notes of this interrogation contain Mr. Paracha's statement that the "UBL message" at this meeting was "jihad – stand up & fight against injustice." Miller notes 07/11/2003, JE 70-6, at 824 (emphasis in original). Another interrogation report relays Mr. Paracha's claim that Osama Bin Laden spoke on this occasion against the United States' policy in Israel and praised an Egyptian dictator. JE 70-3 at 787.

Toward the end of the meeting, Saifullah Paracha spoke directly with Osama Bin Laden. Mr. Paracha gave Osama Bin Laden his business card, "offering his media company to spread UBL message" [sic]. JE 9 at 91; see also JE 37 at 280. At another interrogation addressing the same meeting, Mr. Paracha elaborated that "he offered [Bin Laden] the use of [Paracha's] media company" by proposing that Bin Laden record his message in English, which would allow him to "get his message across to many more people." JE 70-3 at 787. The parties vigorously dispute what Mr. Paracha understood Bin Laden's "message" to be when he offered to disseminate it.

Petitioner's second meeting with Osama Bin Laden took place on his third trip to Afghanistan, which was likely in April or May 2001, just a few months before the 9/11 terrorist attacks. The second meeting followed a routine similar to the first: Mr. Paracha travelled with a charitable delegation and stayed at a Taliban compound on the outskirts of Kandahar. A Deputy Foreign Minister of the Taliban informed the group that a select subset of the delegation had been invited to meet with Osama Bin Laden. FBI EC 11/05/04, JE 70-36, at 991. Petitioner again travelled by car to visit Bin Laden; as before, Bin Laden's handlers imposed no security screening on the visitors. Bin Laden prayed with the group, and they shared a meal. SIR 11/03/04, JE 37, at 286. Mr. Paracha told interrogators that he did not speak personally with Bin Laden, about his business proposal or otherwise, during this second meeting. Id.; JE 70-36 at 91.

### 1. The meetings show that Al-Qaeda trusted Mr. Paracha

The circumstances of the meetings show that Al-Qaeda had some measure of trust in Saifullah Paracha. As an initial matter, it is clear that when Mr. Paracha met with Bin Laden, he was meeting with the man in his capacity as the head of Al-Qaeda: Bin Laden helped found the organization and, by the time of the meeting, was known as its unquestioned leader. See Respondents' Classified Amended Factual Return ("R. Am. Factual Return"), at 9 (citing The 9/11 Commission Report); Decl. of          Background Declaration – Al Qaida (          Decl."), JE 5, at 65. Moreover, as described above, the meeting for the Pakistani delegates was arranged by an Al-Qaeda ally, and Bin Laden's remarks touched on the ideological agenda of Al-Qaeda. There is no evidence that Bin Laden – by this time a fugitive – was engaged in some public or legitimate business that is separate from Al-Qaeda. Osama Bin Laden's work *was* Al-Qaeda's work.

The implications of the meetings, from Al-Qaeda's perspective, are similarly clear. By the time he met Mr. Paracha, Osama Bin Laden had not yet launched the 9/11 terrorist attacks but was already an internationally hunted terrorist.

Mr. Paracha mentioned the security arrangements during multiple interrogations – the meeting clearly made a distinct impression on Mr. Paracha about the stakes of dealing with Bin Laden.

The fact that petitioner was able to meet Bin Laden at all is notable. Only a select cohort of the larger Pakistani delegation was invited. As the government has represented, it is unusual for Guantanamo habeas petitioners, even those detained for their alleged affiliations with Al-Qaeda, to have met Bin Laden himself. Nov. 19, 2019 Tr. 20:16-22. It is even more notable that, having been permitted to meet Bin Laden, Mr. Paracha and his companions were allowed to observe the route of travel, enabling them to identify Bin Laden's location. They were allowed to enter his presence – and to make physical contact with him – without so much as a cursory search. The Court finds by a preponderance of the evidence that, in 2000 and 2001, Osama Bin Laden and Al-Qaeda trusted petitioner with important information respecting the organization.

2. Mr. Paracha knew about Al-Qaeda and was eager to work with the group

Petitioner does not dispute his eagerness to do some form of business with Osama Bin Laden. P. Merits Br. at 17. All of the reports indicate that Mr. Paracha offered his business card and made a business proposition concerning the use of his television studio. The Court

therefore finds by a preponderance of the evidence that Mr. Paracha was eager to do business with Osama Bin Laden.

The parties do dispute, however, what Mr. Paracha knew about Al-Qaeda at the time he met Bin Laden, the nature of the business arrangement that Mr. Paracha contemplated with Bin Laden, and whether or not the proposal embraced Al-Qaeda's extremist aims. The Court's analysis of Mr. Paracha's knowledge of Al-Qaeda is relevant both to its findings on the import of his meeting with Bin Laden and to its Findings of Fact respecting the assistance he gave to Bin Laden's emissaries. See Part IV.C, infra.

Mr. Paracha argues that his proposal to Bin Laden was motivated by a desire to make money and the thought that "[Bin Laden's] prestige in Islamic society could help bridge the gap between Islam and the western culture."                          01/24/04 Interview, JE 50, at 371. To that end, "he envisioned [Bin Laden] quoting verses from the Koran and then a translation being made into English immediately following each verse." FBI Information Report 01/24/04, JE 47, at 361. Mr. Paracha argues that he intended to write the script for any video and would not have allowed a message of violent jihad. FM40 10/15/04, JE 238, at 1810; SIR 02/26/04, JE 285, 2219.

Counsel for petitioner have provided some support for Mr. Paracha's explanation of his offer to Bin Laden. For example, Mr. Paracha had produced other news items about the Afghanistan-U.S. conflict to sell to Western media, and he had produced at least one other video with a Muslim cleric that espouses a peaceful vision of Islam. See Gaillard T. Hunt Decl., PE H. Petitioner's counsel argue that it was not unreasonable to suppose that Mr. Paracha would produce such a video, in light of Pakistani culture's view of Al-Qaeda. In the Saeed Report, petitioner's expert explains that, before 9/11, "Pakistanis who knew about Al-Qaeda may have

reasonably perceived it to be an organization engaged in the betterment of Muslims worldwide."
JE 211 at 1571. Mr. Paracha himself stated that "99% of Pakistanis like [Osama Bin Laden].
The younger generation thinks [Bin Laden] is a hero." DoD Interrogator Notes 07/10/2003,
JE 8, at 87. Dr. Saeed explains that, before 9/11, most jihad discussed in Pakistan referred to a
moral or rhetorical battle, rather than a violent physical conflict. JE 211 at 1569.[27] She
concludes that "ordinary Pakistanis" would not have been able to distinguish between Al-Qaeda
and the Taliban, and that "only a very keen follower of news emanating from the West about
terrorism, or someone very knowledgeable about Western sources" would have understood the
distinctions between Al-Qaeda, the Taliban, and other Islamic groups. Id. at 1572.

        Saifullah Paracha, however, was just the kind of "keen follower" of western news
that Dr. Saeed envisions. He lived in the United States for fifteen years, owned businesses here,
and displayed the American flag in the lobby of his office in Pakistan. Petitioner's Submission
for 03/21/17 Periodic Review Board, PE G, at 27. The evidence shows that he traveled
frequently, spoke and read English fluently, and consumed western media, including CNN, the
BBC, and Newsweek. See ARB Summary 12/07/05, JE 64, at 654. During one interrogation,
for example, Mr. Paracha engaged his interrogator in a conversation about the outcome of the
2004 presidential election in the United States, and the two discussed the possible outcomes
based on the results in Florida and Ohio. SIR 11/03/2004, JE 37, at 272. He also wrote letters to

---

[27]      Mr. Paracha explained that his own views on the propriety of jihad are at odds
with Al-Qaeda's message. He believes that "[i]n a sovereign state with an army there is no need
for group jihad by the civilians," that group jihad is not authorized against innocent civilians, and
that Bin Laden had no authority under Islamic law to proclaim jihad. FBI EC 05/05/04, JE 77,
at 1045. The Court has no reason to doubt petitioner's belief that "Islam forces no person to
change his religion" and that "Muslims have a responsibility to protect non-Muslims." Id. Mr.
Paracha's personal views are not incompatible with his knowledge of Al-Qaeda's views to the
contrary.

American Presidents which displayed an understanding of American politics and strategic priorities. See 05/12/2001 Letter from Saifullah Paracha to George H. W. Bush, JE 272, at 2131.

This background and familiarity with western sources is powerful evidence of what Mr. Paracha would have known. For years before the terrorist attacks of 9/11, the English-language media in Pakistan was writing about Bin Laden's affiliation with Al-Qaeda and his association with various violent terrorist attacks. See, e.g., *American Officials Take Threats Seriously*, THE DAWN (Feb. 26, 1998), JE 107, at 1331 (providing notice, in Pakistan's largest English language newspaper, that Bin Laden published an edict requiring Muslims to kill Americans and their allies in any country in the world); *Saudi Millionaire Tops List of Bombing Suspects*, THE DAWN (Aug. 9, 1998), JE 108, at 1334 (indicating that the United States suspected Osama Bin Laden of bombing American embassies in Kenya and Tanzania). Mr. Paracha himself confirmed to an interrogator that he consumed media reports concerning Al-Qaeda, indicating that he knew about the location of Al-Qaeda training camps "from watching television and reading the newspaper." TRRS-03-07-1485, JE 120, at 1451.

Ultimately, the evidence is clear that Mr. Paracha was aware that Osama Bin Laden and Al-Qaeda were regarded as terrorists, and that Bin Laden was inextricably linked with Al-Qaeda itself. Mr. Paracha confirmed as much to FBI interrogators in January 2004, explaining that "he was very interested [in meeting Bin Laden] because he admired UBL greatly. Even though UBL had already been implicated in terrorist[] attacks, [Mr.] Paracha felt he was being exploited by the media and other groups (Jews)." FBI EC 01/22/2004, JE 73, at 1025. He displayed similar knowledge of Al-Qaeda during another interview a few days later. Mr. Paracha told ███ interrogator that, at the time of his meeting with Bin Laden, he understood that Bin Laden "was a known terrorist who spouted the destruction of the United States and

65

western culture." ███████████████ JE 50, at 371. Even so, he said, he simply did

not believe that this presented a contradiction with his aims of using Bin Laden to spread "the

message that Islam is a peaceful religion." Id. Finally, during an Administrative Review Board

proceeding at Guantanamo, the presiding officer noted that "in 1999 when you met him, Usama

bin Ladin had already facilitated terrorist acts against the United States. [He] was a wanted

fugitive by the United States government." ARB Summary 12/07/05, JE 64, at 645. When the

presiding officer of the ARB asked Mr. Paracha to confirm that "you knew that at the time you

met him," Mr. Paracha responded in the affirmative: "I did know that." Id.

It is clear to the Court that Osama Bin Laden was never going to produce a video

extolling a peaceful and harmonious vision of Islam. By the time Mr. Paracha offered to spread

Bin Laden's message, Bin Laden and Al-Qaeda had declared a jihad calling for the murder of

United States military personnel on the Arabian Peninsula; had purported to issue a fatwa calling

on all Muslims to kill Americans anywhere in the world; and had been widely accused of

murderous bombings against U.S military and diplomatic facilities. See R. Am. Factual Return

at 4. Since the moment of its founding, Al-Qaeda's overarching goal has been "re-establishing

the Islamic Caliphate, unified by a common militant-Salafist ideology rooted in a violent

rejections of apostasy and characterized by fervent opposition to Western influence." ███████

Decl., JE 5, at 64.

In this context, Mr. Paracha's claim that he was hoping to use Bin Laden to

spread a message of intercultural harmony to bridge the Muslim-Christian divide, see FBI EC

01/24/04, JE 32, at 2, is not remotely credible. Nor is Mr. Paracha's claim that he did not know

the content of Bin Laden's message at all. See JE 36 at 2. Instead, Mr. Paracha's earlier

statement is far more consistent with the body of evidence: Mr. Paracha "admitted that [Osama

Bin Laden's] message would be to do a jihad against westerners and the US." FBI EC 07/10/03, JE70-5, at 816.

For the foregoing reasons, the Court makes the following Findings of Fact by a preponderance of the evidence: (i) when he met Osama Bin Laden, Mr. Paracha knew that Osama Bin Laden was the leader of Al-Qaeda and that Bin Laden and Al-Qaeda had been accused of violent terrorist attacks; (ii) Mr. Paracha was nevertheless eager to work with Bin Laden and Al-Qaeda; and (iii) when he offered to spread Bin Laden's message, Mr. Paracha knew that Bin Laden and Al-Qaeda's message was one of violent jihad.

### C. Mr. Paracha Supported Al-Qaeda by Knowingly Providing Assistance to Khalid Sheikh Mohammed and Ammar Al-Baluchi

The third material issue of disputed fact concerns the nature of the activities that Mr. Paracha conducted over a period of several years with two important Al-Qaeda figures: Khaleid Sheik Mohammed ("KSM") and Ammar Al-Baluchi ("Al-Baluchi"). In June or July of 2000, approximately six months after Mr. Paracha's second meeting with Osama Bin Laden, KSM came to Mr. Paracha's office bearing Mr. Paracha's business card, the exact card Mr. Paracha had given to Osama Bin Laden.[28] Mr. Paracha told interrogators that KSM "was sent by Osama Bin Laden to obtain further details on [Mr.] Paracha's broadcasting company, Universal Broadcasting Limited Organization, and what [Mr.] Paracha's intentions were concerning UBL." FBI EC 01/24/04, JE 32, at 232.

---

[28]     KSM introduced himself to Mr. Paracha as "Mir," and Mr. Paracha knew him by that name for the duration of their relationship. The parties now agree that "Mir" was an alias or Pakistani name for KSM. See            01/26/04, JE 89, at 1091.

After their first or second meeting, KSM introduced Mr. Paracha to his nephew Ammar Al-Baluchi, indicating that Al-Baluchi could help with the media project.[29] From the summer of 2000 until early 2003, when the United States captured Al-Baluchi and KSM, Mr. Paracha had frequent contact with the two men and collaborated with them on a number of projects. KSM, allegedly a senior Al-Qaeda planner and mastermind of the 9/11 attacks, and Al-Baluchi, allegedly an Al-Qaeda financier, are now facing charges before a military commission at Guantanamo for their alleged involvement in the 9/11 attacks.

1. Petitioner knew KSM and Al-Baluchi were part of Al-Qaeda when he assisted them

How much petitioner knew about KSM and Al-Baluchi during the time he interacted with them is the single most hotly contested factual issue before this Court. Mr. Paracha concedes that he knew KSM and Al-Baluchi and that he did business with them. And no party seriously contests, for the purposes of this litigation, that KSM and Al-Baluchi were, in fact, members of Al-Qaeda. But Mr. Paracha vigorously denies that, in doing business with KSM and Al-Baluchi, he "knowingly interacted with members of al-Qaeda or anti-Coalition forces." Nov. 19, 2019 Tr. at 125:13-15 (describing this as the "main issue at dispute in this case"). Rather, Mr. Paracha thought he was engaging with "Pakistani businessmen," not "members of[] a terrorist organization." Id. at 125:16-19. On this score, Mr. Paracha notes that KSM had the well-groomed appearance of a modern Pakistani businessman: he was clean-shaven and wore a white cap. See Janelle Miller Notes 07/11/03, JE 70-6, at 820. Nothing about KSM's appearance struck Mr. Paracha as resembling the usual radical Islamic extremist militant.

---

[29]    KSM introduced Al-Baluchi as "Mustafa," and Mr. Paracha knew him by that name for the duration of their relationship. The parties now agree that "Mustafa" was an alias for Ammar Al-Baluchi. See ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 01/26/04, JE 89, at 1090.

The cumulative weight of the evidence before the Court – Mr. Paracha's own admissions, in particular – render Mr. Paracha's denial of knowledge incredible and unpersuasive. First, the Court has already found by a preponderance of the evidence that Mr. Paracha knew at the time he first met Bin Laden that the he was widely regarded as a terrorist and Al-Qaeda a terrorist organization. See Part IV.2, supra. That is why it is so notable that, when Mr. Paracha met KSM and Al-Baluchi, he knew them to be "men of the sheikh" – that is, men who had been sent by Bin Laden. See FBI EC 11/05/04, JE 70-36, at 989 (When Mr. Paracha was asked "if he wanted to meet the Sheikh that evening," during a trip to Afghanistan, "Paracha knew the Sheikh to be Usama Bin Laden.").[30] Mr. Paracha knew that Bin Laden sent KSM and Al-Baluchi because they told Mr. Paracha as much: "When KSM and [Al-Baluchi] showed up [six] months later after meeting UBL – they said they were here for the Sheikh." Janelle Miller Notes, 07/10/03, JE 70-4, at 804; see also Miller Decl., JE 70, at 757 (reporting Special Agent miller's explanation that Mr. Paracha used "the sheikh" to refer to Bin Laden during his interviews). And when Mr. Paracha described his early meetings with KSM during another interview, he "admitted that when [KSM] showed up at Paracha's business, he knew KSM was part of UBL's media committee." FBI ECD 10/13/2004, JE70-30, 949.

---

[30]     Although the parties dispute whether "men of the sheik" or "the sheik's people" refers explicitly to membership in Al-Qaeda, ▮▮▮▮▮▮▮▮▮▮▮▮ there is no dispute that Mr. Paracha did refer to Bin Laden as "the Sheikh." See Miller Decl., JE 70, at 757 (reporting that Mr. Paracha referred to Bin Laden as "the Sheikh" during interviews).

In light of the evidence before the Court, it is highly unlikely that Bin-Laden was sending out emissaries as part of a media committee that was *not* associated with Al-Qaeda.[31] Moreover, Mr. Paracha was aware that Bin Laden was regarded as the leader of Al-Qaeda, see FM40 10/15/2003, JE 238, at 1810, and that Bin Laden sent KSM and Al-Baluchi to see him. Those facts, in combination, offer powerful evidence that Mr. Paracha knew that KSM and Al-Baluchi were also part of Al-Qaeda.

Second, and most notably, petitioner himself admitted to interrogators on several occasions that he was aware of KSM and Al-Baluchi's Al-Qaeda affiliations.

---

[31]     See        Decl., JE 5, at 65 ("Al-Qaida leadership is best analyzed from a functional perspective . . . [its] structure on multiple levels includes an overall emir-leader, a spiritual wing, [and] leaders for interdependent functional arms (i.e. media, finance, logistics, etc.)").



During an April 2004 interview, interrogators pressed Mr. Paracha on what he knew about his interlocutors. They write that "[a]fter a lengthy time, [Mr.] Paracha finally admitted that he knew all along that when he was dealing with [KSM] and Al-Baluchi . . . they were associated with Al-Qaeda." FBI EC 05/02/2004, JE 77, at 1044 (describing the interrogators' approach as "hostile" and "aggressive"). Mr. Paracha also told his son Uzair that KSM and Al-Baluchi were part of Al-Qaeda and observed to an interrogator that that "sometimes KSM had extremist views." DoD Interrogator Notes 07/11/04, JE 9, at 92. Uzair corroborated this information in one of his early interviews with the FBI, explaining that his father was doing business with individuals who "were Al-Qaeda and[] loyal to Usama." Uzair Paracha FD-302 03/30/2003, JE 55, at 419.

Mr. Paracha's counsel do not – cannot – debate the substantive import of Mr. Paracha's admissions that he knew KSM and Al-Baluchi were Al-Qaeda. Instead, counsel resort to arguments that the reports reflect the views of their authors, rather than the statements of Mr. Paracha.[33] But the Court has already concluded that petitioner has not rebutted the presumption of regularity with respect to these documents. See Part III.B, supra. The consistency of the admissions – from different discussions with different interviewers at different periods of time –

---

[33]             Mr. Paracha's counsel make this claim with reference to JE 77, in which Mr. Paracha "finally admitted" knowledge, and JE 70-4, in which Special Agent Miller note that "Saif knew these men to [be] men of the sheikh."

bolsters the conclusion that these documents report Mr. Paracha's statements, rather than the interrogators' characterizations. Petitioner's counsel also cite several interrogations in 2004 during which Mr. Paracha claimed not to know that KSM and Al-Baluchi were part of Al-Qaeda. See P. Merits Br. 20 (citing Traverse at 50-53). But these denials are not credible in light of Mr. Paracha's numerous other admissions of knowledge, both before and after 2004, and in light of the tremendous weight of the other evidence. In fact, the denials underscore Mr. Paracha's awareness that his Al-Qaeda affiliations were problematic. See Al-Adahi v. Obama, 613 F.3d 1102, 1107 (D.C. Cir. 2010) (indicating that false exculpatory statements are "evidence – often strong evidence – of guilt").

Third, even if the Court were to set aside these admissions from Mr. Paracha himself, certain aspects of KSM and Al-Baluchi's conduct would have alerted petitioner to the fact that his interlocutors were speaking on behalf of Al-Qaeda. For example, during a July 2003 interview, Mr. Paracha reported that Al-Baluchi gave him a CD containing a video of Al-Qaeda members using chemical weapons on dogs at an Al-Qaeda training camp. TRRS-03-07-1485, JE 120, at 1451. Al-Baluchi identified the video as an Al-Qaeda training video, and asked Mr. Paracha to use his media studio to dub the video into Urdu. Mr. Paracha found the content of the video abhorrent and refused. Although the petitioner did not provide direct assistance to Al-Qaeda on this occasion, the transaction illustrates his knowledge that Al-Baluchi was working on behalf of Al-Qaeda – and was enlisting him to help spread a violent message. Paracha's justification is itself revealing: he described the video as "just Al-Qa'ida propaganda" and explained that "just because [Al-Baluchi] delivered the CD *and is part of Al-Qa'ida* doesn't mean he had anything to do with the making of the video." Id. (emphasis added).

Similarly, Mr. Paracha's accounts of KSM's requests illustrate the petitioner's understanding that KSM, too, was working on behalf of Al-Qaeda. In June 2002, for example, KSM asked Mr. Paracha to help secure housing in Karachi for Al-Qaeda people and their widows and children. FBI EC 7/10/2003, JE 70-5, at 815. See also Part IV.C.2-4, infra (detailing Paracha's assistance to KSM and AL-Baluchi).

Mr. Paracha even directed KSM to identify himself by a false name when he called Paracha's office. Mr. Paracha could have chosen any false name, but he chose Uzair – the name of his son. DoD Interrogator Notes 07/12/03, JE 10, at 95. Mr. Paracha explained that the name was designed to ensure that he always accepted the call. If anything, that explanation indicates Mr. Paracha's eagerness to work with KSM and the high regard in which the two held each other. Id. ("[KSM] treated [Mr. Paracha] with the respect a son would show his father, so [Mr. Paracha] had [KSM] use his son's name."). And the most immediate impact of using a false name is more obvious: to ensure that no one listening to the call can identify the true identity of the caller. Mr. Paracha's caution about revealing his affiliation with KSM underscores his awareness that KSM was Al-Qaeda.

Some of the defensive comments that Paracha made to interrogators illuminate the origins of the position that Mr. Paracha has now taken, that he did not know KSM and Al-Baluchi were members of Al-Qaeda. In an early interview, Mr. Paracha told an interrogator that "he didn't think that meeting with AQ is a crime. It's just business." FBI EC 7/10/2003, JE 70-5, at 817. These statements

contain not a trace of shame or evasion. Accordingly, the statements appear highly reliable to the Court. These are not the statements of a man who merely tolerated Al-Qaeda. These are the

statements of a person who is sure he is right: collaboration is acceptable as long as it is for the sake of business.

Only later – after he learned that working with Al-Qaeda could, in fact, place him in legal jeopardy – did Mr. Paracha begin to deny that he knew he was meeting with Al-Qaeda in the first place. By May 2004, it appeared to interrogators that Mr. Paracha was "pranc[ing] around" the issue of Al-Qaeda. FBI EC 05/24/04, JE 33, at 237. He admitted that KSM and Al-Baluchi were supporters of and sympathetic to Bin Laden, but Mr. Paracha "fell short of saying they were definite members of AQ." IIR 05/24/04, JE 17, at 139. If there were nothing wrong with doing business with Al-Qaeda, that precise membership status would not have been a distinction that Mr. Paracha needed to make. These comments appear to be an after-the-fact justification of his involvement with KSM and Al-Baluchi.

Finally, by the time of his Annual Review Board in 2005, Mr. Paracha said of KSM and Al-Baluchi that "[t]hey have been labelled as terrorists. I don't know if they are terrorists or not, but associating with them is bad." And "[t]hese are controversial people and it would be better for me not to get involved with them." Unclassified Summary of ARB Proceedings, JE 64, at 652. This conversation shows Mr. Paracha adopting two strategies at once: denying that Mr. Al-Baluchi and KSM are all that bad, but distancing himself from them nevertheless. This evasive behavior only underscores the potency of Mr. Paracha's unvarnished early acknowledgements of KSM and Al-Baluchi's Al-Qaeda affiliation.

For the foregoing reasons, the Court finds by the preponderance of the evidence that Al-Baluchi and KSM were members of Al-Qaeda and that Mr. Paracha knew this throughout the course of their relationship. The Court now assesses the assistance that Mr. Paracha allegedly rendered to KSM and Al-Baluchi in light of this knowledge.

2. Petitioner assisted KSM and Al-Baluchi by promulgating Al-Qaeda's message

Mr. Paracha's original offer to Osama Bin Laden was to help spread his message, and the government claims that Mr. Paracha did just that on several occasions.

a. Production of a program with Bin Laden

During Mr. Paracha's first visit with KSM, the two discussed a variety of details for how Mr. Paracha might record a video of Bin Laden helping to spread his message: the types of cameras to be used, procurement of the necessary equipment, and the studio to be used, among other details. FBI EC 01/24/04, JE 32, at 231. See Interview Report 07/11/07, JE 35, at 258. Mr. Paracha told interrogators that KSM evinced a pronounced concern for Bin Laden's physical and operational security: he wanted to select the equipment, wanted to use his own crew for the recording, and did not want to record at Mr. Paracha's customary studio. See DoD Interrogator Notes 07/22/03, JE 13, at 109. Mr. Paracha acceded to these requests: he agreed to purchase the equipment for KSM, allow KSM to keep the equipment at the conclusion of the project, and provide all the needed technical support. FBI EC 01/24/04, JE 32, at 231.

Petitioner makes two arguments about these activities. First, he argues that Mr. Paracha's assistance cannot constitute substantial support of Al-Qaeda because Mr. Paracha intended to produce a video encouraging peace and harmony. For the reasons already described, this argument is unavailing. Moreover, petitioner knew that Bin Laden was not going to promote a video designed to attract western audiences, but proceeded with helping to plan for the video anyway. See DoD Interrogator Notes July 22, 2003, JE 13, at 109 (indicating that Mr. Paracha "advised UBL to speak in English when he recorded speeches, in order to expand his audience, but UBL wouldn't"). Second, petitioner argues that Mr. Paracha did not assist Al-Qaeda with these services because no video of Bin Laden was ultimately produced. Indeed, there is no

evidence that Mr. Paracha ever produced a recording featuring Bin Laden. Mr. Paracha did, however, take concrete – and costly – steps toward doing so. Petitioner purchased the equipment needed to produce the video and built a soundproof room in which it could be recorded; KSM inspected the arrangements. See SIR 10/11/2004, JE 36, at 270. And Mr. Paracha also provided a "detailed explanation . . . concerning the recording equipment to be used during the sessions." FBI EC 01/24/04, JE 32, at 231.

### b. Production of programs with Al-Baluchi

During Mr. Paracha's second or third meeting with KSM, KSM introduced his nephew, Al-Baluchi, to Mr. Paracha. ████████████████ JE 89, at 1090. Petitioner and Al-Baluchi met four or five times independently of KSM – continuing even after KSM was captured and Mr. Paracha learned of KSM's role in the 9/11 attacks – and Mr. Paracha added Al-Baluchi's number to his cell phone. Mr. Paracha told interrogators that, at some point after 9/11, Al-Baluchi himself decided he wanted to work with the petitioner to produce a video. FBI EC 07/11/03, JE 70-7, at 840. Petitioner directed his staff at Universal Broadcasting to assist Al-Baluchi. Al-Baluchi appeared with other Al Qaeda members to record several videos, and Abdul Raman, one of Al-Baluchi's employees, edited the programs. Id. at 840-41. Petitioner suspects that Al-Baluchi's tapes were sent to the Al-Jazeera network. Id. at 841.

Petitioner's counsel no longer appear to question that Mr. Paracha facilitated these recordings.[34] Rather, counsel claim that Mr. Paracha cannot have helped to spread Al-Qaeda's message ████████████████████████████████████████████

---

[34]     Petitioner's initial merits brief claimed that "no program was ever produced or aired," see P. Merits Br. at 25, which is not accurate. See FBI EC 07/11/03, JE 70-7, at 840-41.

77



the conclusion that Mr. Paracha knew he was producing a video for an Al-Qaeda

operative and was spreading Al-Qaeda's message.

it is manifestly clear – for all

of the reasons described earlier – that Mr. Paracha knew that these "men of the sheikh" were Al-Qaeda. And, in the context of the rest of the relationship and all of the other requests that KSM and Al-Baluchi were making of Al-Qaeda, it is more likely than not that the video Mr. Paracha's company produced starring an Al-Qaeda operative was, in fact, a video concerning Al-Qaeda's message. Indeed, when Mr. Paracha instructed his staff to assist Al-Baluchi, he told them that they "would be doing this on a regular basis *for UBL message*." Janelle Miller Notes 07/11/2003, JE 70-6, at 829 (emphasis added).

c. Distribution of a press release for Al-Qaeda

At some point between November 2002 to January 2003, Mr. Paracha told interrogators, "Al-Baluchi asked [Mr.] Paracha to get a message out to the people for UBL. Paracha sent it to a Pakistani newspaper. He did not read the message and did not know what the message was about." FBI EC 07/09/03, JE 70-3, at 788.

Again, petitioner's counsel do not dispute that Mr. Paracha's company had a hand in publishing the press release. They do, however, attempt to minimize Mr. Paracha's own role, noting that it was an employee, Tariq Shadab, whose direct work got the article published in a newspaper. P. Merits Br. at 26. But Shadab was Mr. Paracha's employee, and acted at Mr. Paracha's direction. And Mr. Paracha's company was credited with the press release in the newspaper. JE 70-30, FBI EC 10/13/04, at 951.

Petitioner's counsel also repeat the argument that Mr. Paracha was not aware of the specific contents of the press release and, therefore, cannot be said to have helped promulgate a message whose contents he did not know. There is evidence, however, that Mr. Paracha did understand the general thrust of the press release. He has explained that the release detailed "the Islamic spin on UBL's cause" and that it was "consistent with other AQ press releases."

JE 89, at 1090; JE 70-30 at 951. Whether or not Mr. Paracha had granular knowledge of the press release's content, he knew that an Al-Qaeda operative doing Al-Qaeda business asked him to distribute the document, and Mr. Paracha described it as containing UBL's message.

With respect to several different alleged acts of assistance, Mr. Paracha's counsel have argued that Mr. Paracha was motivated purely by business interests, and that Mr. Paracha never would have allowed production of a message with violent or anti-western content. This

position is undermined by Mr. Paracha's claim that he allowed his companies to produce and disseminate content for Al-Qaeda without Mr. Paracha's prior review. Mr. Paracha placed his companies and his professional networks at the disposal of a man he knew to be from Al-Qaeda – a man who, leaving no doubt about his intentions, had also asked Mr. Paracha's help to promulgate a decidedly violent Al-Qaeda training video. TRRS 07/21/2003, JE 120, at 1451. It is also notable that Mr. Paracha decided not to charge Al-Baluchi for the equipment, the studio time, or the editing services. This undermines the idea that Mr. Paracha's relationship with Al-Qaeda was motivated primarily by his business interests.

Accordingly, the Court makes the following Findings of Fact by a preponderance of the evidence: (i) Mr. Paracha knowingly helped Al-Qaeda spread its message by providing equipment and communications consulting services to Al-Qaeda in connection with a plan to film a video of Bin Laden; (ii) Mr. Paracha knowingly helped Al-Qaeda spread its message by providing equipment and technical expertise to record a video featuring Ammar Al-Baluchi; and (iii) Mr. Paracha knowingly helped Al-Qaeda spread its message by distributing a press release.

3. Petitioner assisted KSM and Al-Baluchi by retaining Al-Qaeda funds for safekeeping

Respondents' most substantial allegations – the core of their claims that petitioner provided substantial support to Al-Qaeda – concern two occasions on which Mr. Paracha accepted large sums of money from Al-Qaeda members. Respondents argue, and the Court agrees, that the money Mr. Paracha received belonged to Al-Qaeda, and that Mr. Paracha took the money to safeguard Al-Qaeda's assets during a time of great peril for the organization.

### a. $500,000 from KSM

In 2002 – not long after the 9/11 attacks – KSM gave Mr. Paracha $500,000 "to hold on to." DoD Interrogator Notes 07/09/03, JE 7, at 80. Paracha returned the money – giving it to Al-Baluchi, upon his request, six months later. Mr. Paracha alleges that he gave the interest he accrued from holding the money, about $20,000, to a hospital charity. Id. Mr. Paracha self-disclosed the $500,000 transaction during early interrogations. He has consistently characterized the transaction as an investment by KSM in Mr. Paracha's business.

Importantly, however, Petitioner has provided at least four different explanations about the purpose of this transaction. In interviews on July 8 and 9, 2003, Mr. Paracha explained that the money was an investment in procuring *rights* for TV shows in the United States and the United Kingdom. FBI EC 07/09/03, JE 70-3, at 787 (emphasis added). In October 2004, he told interviewers that he needed $500,000 to establish a *line of credit* to begin *transmitting* TV programs abroad. FBI EC 10/18/2004, JE 70-31, at 957 (emphasis added). In January 2004, and again in March 2006, Mr. Paracha explained that KSM provided the money in cash simply "to open an account, for future investment." ▮▮▮▮▮▮ 01/26/2004, JE 89, at 1090; see also FM40 03/22/06 PM, JE 28, at 209 ("Paracha stated that he took the money from KSM to invest it for a period of about six months."). Earlier that same day in March 2006, however, "[Mr.] Paracha claimed he used KSM as a private loan broker and used the $500,000 to restore his credit rating, because of an industrial business bankruptcy, and he told KSM he could give it back after approximately six months." FM40 03/22/06 AM, JE 27, at 206.

The diversity of these explanations offers substantial evidence that Mr. Paracha is concealing the true purpose and significance of his of the transaction. So, too, does the fact that Mr. Paracha never consummated any of the alleged business purposes of the "loan" or

"investment" (there is no evidence that he ever obtained a line of credit, purchased television rights, restored his own credit, or otherwise invested the money).

Moreover, in light of the circumstances and petitioner's own admissions, the business-related explanations are not plausible. In 2002, Al-Qaeda was on the run. The United States and its coalition partners were pursuing Al-Qaeda in Afghanistan and in the borderlands with Pakistan. As global attention and scrutiny focused on the organization, it likely would have been working to secure and preserve its financial resources. At a time when the group was fighting for its survival, it is difficult to imagine Al-Qaeda or its leaders investing in television programming; it is even more difficult to imagine one of Al-Qaeda's leaders issuing a personal loan to shore up the personal credit of a purportedly unaffiliated Pakistani businessman. Mr. Paracha himself confirmed the unlikelihood of such an event in an early interview, explaining that "AQ never give $ out – they always ask for $." DoD Interrogator Notes 07/08/03, JE 70-1, at 5.

A number of statements from the petitioner and from Uzair Paracha directly confirm that the $500,000 belonged to Al-Qaeda and that this was not a business investment. Mr. Paracha explained, during an early interview, that he took money belonging to Al-Qaeda for the purpose of "hiding $ so the 500k is not noticed." DoD Interrogator Handwritten Notes 07/08/03, JE 81, at 1061. See also DoD Interrogator Notes 07/08/03, JE 7, at 80 (indicating that Mr. Paracha told interrogators that "Al Qaida invested money in [Mr. Paracha's] company and he also held half a million dollars for them."). Mr. Paracha also took a precaution: he told his son that the money came from Al-Qaeda so that Uzair could return the money if petitioner died.

FBI EC 07/11/03, JE 70-7 at 841. And Mr. Paracha also told Special Agent Janelle Miller that he knew the money he received from KSM was Al-Qaeda money. Miller Decl., JE 70, at ¶ 13.[35]

Uzair Paracha corroborated his father's account of the source of the $500,000 in statements to FBI investigators. Specifically, according to Uzair, Mr. Paracha told him that that he had "met with guys from Al-Qaeda," and that the money Mr. Paracha had received "came from Al-Qaeda." Uzair Paracha FD-302 05/01/03, JE 57 at 432. Uzair understood the stakes of this conversation: he told investigators that "when you meet someone from Al-Qaeda, you choose sides. When you say hello, you're either with them or against them." Id. at 430.

Some of the mechanics of how the money was handled during and after the exchange further weaken Mr. Paracha's claim that the transaction was for legitimate business purposes. KSM and Al-Baluchi delivered $500,000 to Mr. Paracha on two successive days: first KSM brought $270,000 in cash, and the next day Al-Baluchi delivered $230,000 in cash, all bundled in $10,000 increments of $100 bills, wrapped in newspaper and conveyed in a shopping bag. FBI EC 10/18/04, JE 70-31, at 957. First, Mr. Paracha placed the money in his office safe. Then, he removed the money from his office, where it could have been associated with him, and placed it in a public storage facility under his wife's name. Id. After he had a broker exchange the dollars for rupees, he deposited them over a period of several days at the Metropolitan Bank in an account under a false name, Sharafuddin Shamim. FBI EC 07/18/03, JE 70-32, at 964.

35

Thereafter, petitioner allocated the money into several different accounts: one in the name of his son Uzair, one in the name of his daughter Muneeza, and one in the name of an employee, Azmat Ali.[36] JE 70-31 at 958. In short, at no point did the entire sum of money appear in an account under the name of petitioner or one of his businesses. The all-cash nature of the transaction, the frequency with which the money was moved from place-to-place, the division of the assets into multiple accounts, and the use of accounts under the names of others (some of them fictitious) collectively suggest that KSM, Al-Baluchi, and Mr. Paracha sought to conceal the source and ownership of the money.

Petitioner's counsel have posited an apparently innocuous explanation for some of this behavior: Mr. Paracha is merely a tax evader, not a terrorist. Although it appears odd in the context of the norms and rules of the American financial system, all-cash transactions – even significant transactions – are not uncommon in Pakistan. Report of Dr. Saeed on the Informal Economy, Banking System, and Tax Evasion in Pakistan, JE 211, at 1753-55. The use of alternative and false names for bank accounts is also a common tactic, designed to avoid income tax. Id. at 1755, 1758-59. Indeed, Mr. Paracha himself told his interrogators that it is not uncommon for banks to give people accounts under fake names, and Uzair Paracha told interrogators that his father had used Uzair's student bank account to avoid taxes. See P. Merits Brief at 23 (citing R. Am. Return Exhibits 42, 57; R. Factual Return Ex. 19). The Court takes note of this important context.

However customary these practices may have been in Pakistan, they are incompatible with several of the explanations Mr. Paracha has offered for the purpose of the

---

[36]     But see FBI EC 10/23/04, JE 70-32, at 964 (indicating that some of the money may have been returned to an account under Paracha's own name).

transaction. Petitioner has provided no explanation for how money held in accounts under other names, including false names, could be used to establish a line of credit to start transmitting television programs or used to restore his personal credit rating after an industrial bankruptcy. The fact that the money was returned so quickly also undermines these purportedly legitimate uses.

Finally, the circumstances of the money's return also undermine Mr. Paracha's claim that the transaction was for bona fide business purposes. For one thing, KSM himself did not appear to request or collect the money that, petitioner now alleges, were his personal funds. Instead, after Mr. Paracha had held the money for six months, Al-Baluchi called Mr. Paracha in January or February of 2003 and asked him to meet an associate named Mohammed at the Islamabad Airport. Mohammed guided Mr. Paracha to a car containing two men and, over the phone, Al-Baluchi directed Mr. Paracha to give the money to the men. FBI EC 07/15/03, JE 70-14, at 886. This exchange – coordinated by distance, and calculated to avoid notice – bears all the marks of evasion, none of which would be necessary if Mr. Paracha were returning money he borrowed to launch television programs or restore his credit.

Accordingly, the Court concludes that the most likely explanation for why KSM gave half a million dollars of Al-Qaeda money to Mr. Paracha is the one that Mr. Paracha offered during one of his early interviews: he was "hiding the [money] so that [$500,000] was not noticed." DoD Interrogator Handwritten Notes 07/08/03, JE 81, at 1061; see also DoD Interrogator Notes 07/08/03, JE 7, at 80 (indicating that Mr. Paracha told interrogators that "Al Qaida invested money in [Mr. Paracha's] company and he also held half a million dollars for them.").

### b. €240,000 from Al-Baluchi

In February 2003, Mr. Paracha received €240,000 from Al-Baluchi. Mr.

Paracha's account of these funds has been more consistent than his descriptions of the larger sum

from KSM: he has reliably described the funds as an investment in the Cliftonia Project, a

waterfront apartment complex that Mr. Paracha was developing.[37] When Mr. Paracha told Al-

Baluchi about the project, he "invested 240,000 Euros and received 10 ground floor apartments.

Al-Baluchi wanted to make money so he bought the apartments to re-sell at a later date." FBI

EC 10/23/2004, JE 70-2, at 965. See also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 01/26/04, JE 89,

at 1091 (confirming that Al-Baluchi "had the option of selling the apartments for a profit upon

completion of the project or keeping them for rental purposes"); FBI Report 03/10/05, JE 29,

at 213. Within a few days of telling interrogators that the apartments were to be used for

investment purposes, however, Mr. Paracha offered an alternative explanation for the

"investment:"

> [T]he houses he showed KSM and [Al-Baluchi], as well as the
> Cliftonia project, were probably going to be used to house associates
> involved with Al-Qaeda. [Mr.] Paracha stated that he believes this
> because the areas were not congested and very safe. [Mr.] Paracha
> further stated that he feels [Al-Baluchi] wanted the ground floor in
> the Cliftonia, because the ground floor is the only floor where
> someone can access the apartment with[out] passing through
> security.

---

[37]     As he did with the money he received from KSM, Al-Baluchi kept the money first
in his safe, and then moved it into the account at Metropolitan Bank under the falsely named
"Shamim" account, allegedly for the purpose of avoiding taxes levied on corporate accounts in
Pakistan. FBI EC 10/23/2004, JE 70-2, at 965. Although he later moved some of the funds to
the corporate account for Universal Broadcasting, he never moved any of the funds to the
account for SS Associates, the corporate entity actually associated with the Cliftonia project. See
id.

FBI EC 01/29/04, JE 75, at 1033. This is a revealing statement. Whether it describes Mr. Paracha's specific understanding at the time, or an after-the-fact analysis in response to an interrogator's question, the statement shows Mr. Paracha's understanding of likely goals of the project in the context of his relationships with KSM and Al-Baluchi.

As with the transfer of funds from KSM, it is more likely than not that the money from Al-Baluchi was Al-Qaeda money. Mr. Paracha's own statements are the best evidence of this. Special Agent Miller's declaration reports that "Saifullah Paracha admitted in the July 11, 2003 interview that he knew the money [KSM and Al-Baluchi] provided to him was Al-Qaeda money." Miller Decl., JE 70, at ¶ 13; see also Miller Notes. 07/11/03, JE 70-6 at 833 ("Saif admitted that the $240,000 Euro [sic] came from [Al-Baluchi] that's invested in there and he admitted that the sheikh[']s people have invested $ in Cliftonia"). As petitioner's counsel correctly note, Mr. Paracha has also denied that he took money from Al-Qaeda. He told Special Agent Miller that "investing [Al-Baluchi's] and KSM's money into [Paracha's own] business is not wrong even though he knows they are affiliated with AQ. d [Mr.] Paracha sees the money as [Al-Baluchi's] and KSM's, not AQ." See FBI EC 03/13/03, JE 70-10, 867. In that same conversation, though, Mr. Paracha also told Special Agent Miller that he was "concerned about his family b/c AQ has investments in Cliftonia and because KSM & [Al-Baluchi] are in jail." See Miller Notes 07/13/03, JE 70-9, at 856. This supports the conclusion that Al-Baluchi's transaction regarding Cliftonia was an investment of Al-Qaeda money.

Some of Uzair Paracha's early statements to the FBI provide additional detail and corroboration. He indicates that he knew Al-Baluchi was "in fact Al-Qaeda" and "loyal to Usama," and that Al-Baluchi and Kahn "wanted to give the [Parachas] between $180,000 – 200,000 US Dollars . . . to invest in their company as a loan. [Uzair] Paracha knew the money

was Al-Qaeda money and that Al-Qaida wanted to keep the money liquid, so that they could have it back at a moment[']s notice." Uzair Paracha FD-302 03/30/03, JE 55, at 419.

Petitioner's counsel have made several arguments as to why, in spite of these admissions, the €240,000 were not Al-Qaeda funds given to Mr. Paracha for safekeeping. First, they argue that an investment in a real estate construction project is not a liquid asset, because apartments – especially those not yet built – are not necessarily easy to buy and sell. But the money may not have immediately been spent on construction: it could have remained liquid. And the liquidity is not the only possible reason why Al-Qaeda may have wanted to give Mr. Paracha the money. Unlike the KSM transaction – in which Paracha offered conflicting business explanations, none of which ever came to pass – the parties do not dispute that the Cliftonia project was a bona fide business and that construction was underway. In that light, any of the other alternative explanations for Al-Qaeda's transfer of the funds is a viable explanation for how Mr. Paracha could have assisted Al-Qaeda. By February 2003, Al-Qaeda might reasonably have sought either an investment in a project that had a reasonable chance of increasing in value or housing for their personnel.

Petitioner's counsel also have emphasized that, unlike with the money he received from KSM, Mr. Paracha never returned the €240,000 to Al-Baluchi or was asked to do so. But this fact does not undermine the idea that the money belonged to Al-Qaeda: Al-Baluchi was captured by the United States only a month after he gave the money to Mr. Paracha, and Mr. Paracha himself was arrested several months after that.

Accordingly, the Court makes the following Findings of Fact by a preponderance of the evidence: (i) Mr. Paracha received roughly $500,000 from KSM, knowing the money to belong to Al-Qaeda; (ii) Mr. Paracha received roughly €240,000 from Al-Baluchi, knowing the

money to belong to Al-Qaeda; (iii) with respect to the $500,000, Mr. Paracha knowingly held Al-Qaeda's money for safekeeping and return, and did in fact return the money to Al-Qaeda, having safely protected it from detection and confiscation; and (iv) with respect to the €240,000, Mr. Paracha knowingly held Al-Qaeda's money, either as an investment or as a means of providing housing units, either of which would have provided valuable assistance to Al-Qaeda.

4. Petitioner assisted KSM and Al-Baluchi in other ways

In addition to providing financial and media services to Al-Qaeda, Mr. Paracha performed a number of smaller services for Al-Baluchi and KSM, both personally and for Al-Qaeda. Mr. Paracha helped KSM and Al-Baluchi search for personal residences, though they were not successful. FBI EC 01/24/04, JE 32, at 231. He advised KSM on financial arrangements, including sending an email containing information on off-shore companies, IIR 10/21/04, JE 18, at 145, and helping KSM to open a personal account at a bank in which Mr. Paracha was a member, DoD Interrogator Notes, 07/11/03, JE 9, at 90. Mr. Paracha even loaned his vehicle to KSM on a number of occasions. FBI EC 07/10/03, JE 70-5, at 815; FBI EC 12/08/04, JE 70-38, at 1003. In addition to these services to KSM, Mr. Paracha also attempted to find housing for the widows and children of Al-Qaeda fighters. See JE 70-5, at 815. KSM and Al-Baluchi also requested Mr. Paracha's assistance with providing Pakistani ID cards, although Mr. Paracha declined to do so. Id. at 816.

Mr. Paracha does not deny that he helped KSM and Al-Baluchi in an attempt to locate housing, but he disputes that the housing was for the benefit of Al-Qaeda. The alignment of Special Agent Miller's handwritten notes admits the possibility of several interpretations, but the EC summarizing the discussion of this matter is unambiguous:

> In December 2002, [KSM] wanted to buy housing for his people
> and their families and Paracha knew these people to be Al-Qaeda.
> KSM asked Paracha if he could help him in finding the housing in
> Karachi near Paracha's house. Paracha believed the families to be
> widows and children of AQ men. Paracha helped KSM look for a
> place for them but they couldn't find anything.

See FBI EC 07/10/2013, JE 70-5, at 815. See also Miller Decl., JE 70, at 757 (indicating that "I wrote this based on what Saifullah Paracha said. This was not my opinion.").

Other than this challenge to the housing assistance, Mr. Paracha does not meaningfully challenge the factual basis for these less significant instances of personal or other support to KSM and Al-Baluchi. Nor does any party appear to dispute the broader context in which Mr. Paracha provided these services: at a time when Al-Qaeda leadership was very busy planning the 9/11 attacks and, later, evading capture. Instead, Mr. Paracha argues that Mr. Paracha's provision of personal or other support is de minimis or do not otherwise amount to substantial support, arguments that the Court addresses in its Conclusions of Law, see Part V, infra.

Accordingly, the Court makes the following Findings of Fact by a preponderance of the evidence: (i) Mr. Paracha provided personal services to assist KSM with several important logistical tasks, including housing, financial arrangements, off-shoring, and transport; (ii) Mr. Paracha's services to KSM came at a time when he was otherwise engaged in planning 9/11 and then evading its consequences; and (iii) Mr. Paracha advised Al-Qaeda on procuring ID cards and assisted Al-Qaeda by attempting to locate housing for its members and the widows and children of its fighters.

*D. The Government has not Proven by a Preponderance of the Evidence that Petitioner Provided Assistance to Al-Qaeda's Chemical Weapons Program*

The government's evidence with respect to the fourth material issue of disputed fact is less compelling than with respect to the other issues. The government relies on three aspects of Mr. Paracha's conduct to argue that he assisted Al-Qaeda's weapons program: a conversation (or conversations) that Mr. Paracha had with Al-Baluchi, the content of several entries from Mr. Paracha's personal digital assistant ("PDA"), and Mr. Paracha's relationship with an alleged Al-Qaeda scientist.

### 1. Al-Baluchi's Solicitation

Respondents argue that Mr. Paracha "knowingly served as a source of advice and sounding board for [Al-Baluchi] as Al-Baluchi explored ways to smuggle chemicals and explosives into western countries." R. Merits Br. at 41. This account relies primarily on notes and reports of interviews conducted on July 8, 9, and 10, 2003 in which Mr. Paracha told interrogators about a conversation (or conversations) he had with Al-Baluchi. See Miller Interrogation Notes 07/08/03, JE 70-1, at 774; Miller Interrogation Notes 07/09/03, JE 70-2, at 780; FBI EC 07/09/03, JE 70-3, at 787; Miller Interrogation Notes 07/10/03, JE 70-4, at 806-07; FBI EC 07/10/03, JE 70-5, at 816.

In January 2003, "Al-Baluchi asks Paracha if he knows a forwarding agent for shipping cargo in Europe or England. He tells Al-Baluchi he does not know anyone. [Al-Baluchi] asks about shipping chemicals and explosives into England, if it can be done and Paracha tells him that he can't help him." FBI EC 07/09/03, JE 70-3, at 786-87. Mr. Paracha told interrogators that Al-Baluchi addressed this subject in coded language:

> Paracha explained that [Al-Baluchi] did not come out and say he wanted to smuggle explosives and chemicals into England. [Al-Baluchi] asked him how he could get garments and materials into

91

England and Paracha understood garments and materials to be explosives and chemicals. (Paracha could not explain why he thought this). However, Paracha knew [Al-Baluchi's] intention of trying to get 'garments and materials' into England was to harm the British people.

FBI EC 07/10/03, JE 70-5, at 816.

Mr. Paracha's counsel argue that Mr. Paracha told interrogators only that Al-Baluchi asked about garments and materials and that interrogators themselves substituted the phrase "chemicals and explosives" in drafting their report on the July 10, 2003 interview. This argument relies on apparent denials by Mr. Paracha in subsequent interviews.

see also

02/09/04, JE 91 at 1099 (relaying Mr. Paracha's "emphatic" denial that he made the connection between garments and materials and chemicals and explosives).

But these denials – self-serving, and growing more heated with time, as the significance of the exchange became clear – are unpersuasive. The language of the July 10, 2003 EC is quite clear, especially in context of Special Agent Miller's Notes from the corresponding interview in early July. The EC unambiguously confirms that, during his earliest discussions of Mr. Al-Baluchi's solicitation, Mr. Paracha told interrogators that he "understood garments and materials to be explosives and chemicals." FBI EC 07/10/03, JE 70-5, at 816. Indeed, Mr. Paracha must have understood "garments and materials" to mean something other than apparel, because he told interrogators that "[Al-Baluchi's] intention of trying to get 'garments and materials' into England was to harm the British people." Id; see also Miller Notes 07/10/03, JE 70-4 at 806-07 (indicating that Al-Baluchi "wanted to get garments & materials to England –

92

had plan but wanted to know how he could get it done," and that Mr. Paracha "knew Al-Baluchi's] intention was to harm the British people").

Furthermore, Special Agent Miller's record of the conversation is corroborated by the independent interview notes prepared by another U.S. government official. A DoD interrogator reports that Mr. Paracha discussed Al-Baluchi inquiring "if [Paracha] knows anyone in England that could let chemicals and explosives get into the country." DoD Interrogator Notes 07/10/03, JE 8, at 85. Mr. Paracha told the interrogator that "[Al-Baluchi] was serious and asked him how is it possible to smuggle it in." In short, two different interrogators who spoke to Mr. Paracha on July 10, 2003 noted that Mr. Paracha understood Mr. Al-Baluchi to be asking about how to smuggle chemicals and explosives.

Another aspect of Al-Baluchi and Mr. Paracha's conversation about smuggling is also in dispute. The DoD's record of the July 10, 2003 interview suggests that, although he declined to help ship chemicals into England, Mr. Paracha may have provided specific guidance on smuggling tactics:

> [Mr. Paracha] was asked about how he would go [sic] smuggling chemicals into another country.
>
> Also the more boxes there are the easier it would be to smuggle because not all boxes would be inspected and you would be playing an odds game.

DoD Interrogator Notes 07/10/03, JE 8, at 86. And an FBI interrogation report indicates the following:

> Paracha was asked if he knew how chemicals could be smuggled into the US, and he stated that you look for a similar looking chemical and put it in between the good chemicals and it would be very easy to get through customs.

FBI EC 07/09/03, JE 70-3, at 787.

The government initially argued that the reports show it was Al-Baluchi who asked Mr. Paracha how chemicals could be smuggled into the United States, and that Mr. Paracha "instructed Al-Baluchi" on how to proceed. R. Merits Br. at 44; see also R. Opp. Merits Br. at 34, n. 20. ("Respondents have read [the July 9 EC] to mean that Mr. Paracha "was asked" by Al-Baluchi how chemicals could be smuggled). It is clear to the Court that Mr. Al-Baluchi used coded language to discuss the possibility of shipping chemicals and explosives into the United Kingdom and was serious about doing harm there, and that Mr. Paracha understood Al-Baluchi's coded language. It is also apparent that Mr. Paracha had the ability to generate ideas for how chemicals might be smuggled into the United States. See R. Opp. Merits Br. at 34, n. 20 (emphasis added). But the fairest reading of the July 2003 interrogator notes and reports is that the petitioner opined on how it might be possible to smuggle chemicals to the United States only in response to an *interrogator's* hypothetical question, and not during Mr. Paracha's January 2003 conversation with Al-Baluchi. This reading is also consistent with Mr. Paracha's refusal to suggest a shipping agent or directly assist Al-Baluchi with smuggling chemicals and explosives into the United Kingdom.

A report from another interrogation, conducted seven months after Mr. Paracha's July 2003 statements about his smuggling conversation with Al-Baluchi, provides further support for this reading:

> Paracha stated that the *interviewers* asked him his opinion on how chemicals and weapons might be smuggled into the UK and he said that using a garment container would be stupid. He said *if he were to smuggle chemicals*, he would use legal chemical containers to smuggle illegal chemicals.

02/09/04, JE 91, at 1099 (emphases added).[38]

In summary, it is clear that Mr. Paracha had at least one conversation in which Al-Baluchi asked for help smuggling. The Court finds by a preponderance of the evidence that Mr. Paracha understood Al-Baluchi to be asking for helping smuggling chemicals and explosives to the United Kingdom. The Court also finds, however, that Mr. Paracha declined to identify a shipping agent and declined to help Al-Baluchi ship chemicals and explosives into the United Kingdom. As for the United States, the Court finds that the government has not proven, by a preponderance of the evidence, that Mr. Paracha suggested to Al-Baluchi any particular techniques for smuggling chemicals and explosives into the United States.

## 2. Mr. Paracha's PDA

The government presented evidence about two entries from a Casio Digital Diary, an early Personal Digital Assistant ("PDA") owned and used exclusively by Mr. Paracha. The device cannot send or receive messages, nor is it internet-connected. In short, there is no doubt that Mr. Paracha himself entered the information contained on the PDA. FBI EC 08/11/03, JE 71, at 1011-12. One such entry reads as follows.

> CHEMICAL/BIOLOGICAL
> DIVIDED INTO THREE
> 1ST NURVE AGENT – 5/1-GA/2GB
> 3-GD/4 GF&VX-DISTROY NURV
> SYS/LIFE KILLS
> 2ND – BOILS – 4 KINDS 1 HD 2
> - HN LOCX BONS BODY/BOILS-
> PUSS

---

[38] Moreover, Mr. Paracha was not in a position to provide extensive advice on the mechanics of smuggling. Although he ran an import-export firm, the company did not itself handle or ship products. TRRS 08/01/03, JE 213, at 1594. And Mr. Paracha had no role in shipping the products made by Abson Industries, his industrial bag company. The parties agree that there is no evidence that any of Mr. Paracha's companies actually shipped or smuggled anything on behalf of Al-Qaeda. FBI EC re: USCS 06/19/03, JE 306 at 2422.

95

3RD BREATHING EFFECTX4 LUN
GS-CORD 8 COUNTIRES/N M

FBI EC 08/11/03, JE 71, at 1012. An FBI analysis of the text concluded that the entry contains

"information relating to military chemical warfare agents" that is "not sensitive" and is

"available from multiple sources." TRRS 03-08-1570 Addendum, JE 44, at 315. Specifically,

the entry lists the three main categories of chemical warfare agents, their symptoms, and the two-

letter designators used by the U.S. DoD for such chemical warfare agents as Sarin, VX, Sulfur

Mustard, and Nitrogen Mustard. Id. at 315-16. The government also flagged the following PDA

entry, which appears to make reference to explosives amid a list of names and numbers, possibly

telephone numbers:

TRRS 03 09 1659, JE 45, at 329

Mr. Paracha acknowledged that he made the first PDA entry. He surmised that it

likely referred to chemicals, but "could not explain the numbers" or symbols in the PDA entry

and said he did not know what each line meant. JE 71 at 1012. He "stated that he copied this

from an article that he read, possibly in Newsweek," and explained that "the reason for copying

this down was so that he could talk to different groups when he did public speaking," or possibly

for inclusion in a broadcast program. Id. See also IIR 2/19/04, JE 251, at 1872 (indicating that

the information came from a 2002 article published in the United States).

When questioned about the second entry's reference to "C4/3/TNT," Paracha first

indicated that it reflected an address in Pakistan. The interrogators told Mr. Paracha that the text

did not contain an address and that he was being deliberately naïve. FBI EC 10/13/04, JE 70-30, at 951-52. C-4, C-3, and TNT are commonly known to be explosive materials. See R. Merits Br. at 44, n. 25. The interrogators do not appear to have discussed the second PDA entry with Mr. Paracha again.

The government offers two reasons to doubt Mr. Paracha's explanation for why his PDA contained a list of chemical weapons. First, the entries contain technical information not likely to be found in Newsweek or a similar publication, and they also contain several errors that make it less likely that the text was copied verbatim from a legitimate news article. For example, the entry has "nurv" instead of "nerve" and a category for "boils" instead of blister agents, as they are properly known. Second, Mr. Paracha could not identify the groups he would address about the issues, or explain why he would be speaking publicly about chemical weapons. Respondents believe that these PDA entries demonstrate Mr. Paracha's interest in chemicals and explosives, and contribute to the conclusion that he was supporting Al-Qaeda's chemical weapons program. See R. Merits Br. at 43-44.

While the Court finds petitioner's explanations not credible, the government's arguments do not persuade the Court either. First, the fact that the entries contain spelling and technical errors does not necessarily mean that general information was not copied from a magazine. Newsweek is indeed unlikely to refer to "nurv" instead of "nerve," or "boils" instead of blister agents, but the entry in the PDA could well be a non-verbatim transcription, hastily made. The spelling and synonym errors are consistent with how a non-native English speaker might have recalled or written the information. As the government has pointed out, however, Mr. Paracha has not produced the article from which he allegedly drew this information, which should have been a fairly easy thing to do if the article existed. And the nature of the

97

information is also notable: the Court doubts that a general interest publication would contain the kind of technical information that appears in the PDA entry.

Second, Mr. Paracha's own explanations of the purpose for which he copied this information on chemical weapons are less than convincing. Mr. Paracha could not offer specifics about the speaking engagements or broadcast programs for which he may have used the information on chemical weapons. That is suspicious, but it is also easy to see how that information could have been useful to him. Mr. Paracha owned a media company and was active in political and charitable affairs in the middle east during an era when weapons of mass destruction were being broadly discussed. It is possible that Mr. Paracha might want to give public remarks or produce a television program on current affairs, to which information on chemical weapons might be relevant.

Indeed, there are some entries on the PDA that could be examples of notes identifying topics for later public use. For example, the PDA contains the following entries: moral reflections, TRRS 03 09 1659, JE 45 at 329; figures that appear to show population and voter participation rates in several countries, id. at 331; slogans, id. at 348 ("Saying-poor minds discuss people, average minds discuss [events][,] great minds discuss ideas genius acts in silence"); an indication of the size of the United States' budget, id. at 353; and an apparent list of the states holding veto power at the United Nations Security Council, id. at 353. These entries provide some corroboration, albeit remote, for the idea that the chemical weapons entry was part of a broader catalog of information on matters of public interest that Mr. Paracha maintained in his PDA and elsewhere.

In short, Mr. Paracha has failed to persuasively account for why his PDA contained entries on chemical weapons and explosives, but the government has likewise failed to

explain the import of the PDA entries with relation to its detention authorities – and the burden

of proof is on the government. Respondents are correct that the entries are alarming. Even in the

context of the government's other arguments on the fourth disputed issue of material fact,

however, there is nothing to suggest that these PDA entries reflect any effort by Mr. Paracha to

provide assistance to the chemical program of Al-Qaeda. The other evidence on this claim of

assistance does not cohere with the government's theory about the PDA entries. Neither Mr.

Paracha's conversation with Al-Baluchi nor his interactions with an alleged Al-Qaeda scientist,

which is discussed below, contain any evidence supporting a conclusion that Mr. Paracha

himself may have been involved in the technical specifics of chemical weapons.

### 3. Relationship with Dr. Tariq

The government also asks the Court to draw conclusions from the fact that Mr.

Paracha has admitted to knowing Dr. Tariq, an 80-year-old Pakistani chemist who "develops

infrastructure for industry and consumer items." FBI EC 07/09/03, JE 70-3, at 788.[39] Mr.

Paracha has always denied that Dr. Tariq had any affiliation with Al-Qaeda. Instead, the

government's arguments with reference to Dr. Tariq rely heavily on information that Uzair

Paracha provided to the FBI. Uzair reports that the petitioner introduced him to a Pakistani

chemist working with Al-Qaeda to develop chemical and biological weapons. Uzair Paracha

FD-302, 05/05/03, JE 58, at 448.[40] Uzair was introduced to the man at his father's office, but did

not attend their meetings. Id. See also Uzair Paracha FD-302 03/30/03, JE 55, at 421 ("[Uzair]

---

[39]      The evidence contains only one name for Dr. Tariq.

[40]      Although Uzair Paracha did not identify the scientist by name, his description
matches Mr. Paracha's description of Dr. Tariq.

Paracha stated that it was this person[']s job to develop chemical weapons for Al-Qaeda. He knew this through conversations with [Mr. Paracha]."). Mr. Paracha has specifically denied these accusations.

The Court cannot conclude that it is more likely than not that Paracha's affiliation with Dr. Tariq evidences any support for an Al-Qaeda chemical weapons program. Where the Court has found that Mr. Paracha offered assistance to Al-Qaeda or the Taliban with respect to the *other* disputed issues of material fact, it has done so primarily on the basis of Mr. Paracha's own admissions. The evidence does not afford that measure of confidence for the government's claim about Dr. Tariq, because there are *no* statements from petitioner confirming Dr. Tariq's Al-Qaeda affiliation. Instead, the claim relies heavily on statements from Uzair Paracha. Although the Court has already concluded that Uzair's pre-trial statements are generally reliable and are not the product of coercion, his statements are most probative where they corroborate Mr. Paracha's admissions. Furthermore, in contrast with some of the other matters on which he provided evidence, Uzair was not a direct witness to his father's relationship or conversations with Dr. Tariq. And even if the Court were to grant these statements full weight, they do not meaningfully advance the government's case. Uzair Paracha provides no indication of what Mr. Paracha and Dr. Tariq discussed or whether they collaborated in any way on any project concerning chemical weapons or Al-Qaeda.[41]

A final consideration further diminishes the likelihood that Mr. Paracha provided assistance to Al-Qaeda's chemical weapons program: it is inconsistent with the other kinds of

---

[41]    Moreover, petitioner has offered a credible explanation for his association with Dr. Tariq: he is a doctor of Islamic thinking who "wants to do research and develop things. Tariq wants to get material to be self-sufficient." FBI EC 07/09/03, JE 70-3, at 788. These projects are in line with Mr. Paracha's charitable interests.

support he provided to Al-Qaeda. Mr. Paracha supported Al-Qaeda and the Taliban using his unquestioned expertise as a businessman and his status as a politically and socially connected leader of his community. Mr. Paracha claims to have been motivated by business interests. Indeed, much of the support he rendered conceivably could have led to a business profit and did not require Mr. Paracha to directly engage with the violent tactics which he purports to disdain. The accusation that Mr. Paracha assisted Al-Qaeda's chemical weapons program, however, is a substantial departure from the other allegations of substantial support. This claim requires the Court to conclude that Mr. Paracha was offering not just financial and administrative support to Al-Qaeda, but operational support. It requires the Court to conclude that Mr. Paracha was willing to participate fairly directly in violent hostilities. That is unlikely, in light of the other evidence of Mr. Paracha's motivations and the vagueness of the evidence on this particular category of support.

The government does not simply suggest that Al-Qaeda sought Mr. Paracha's guidance respecting chemical weapons. Rather, the government argues that that Mr. Paracha "provided assistance" to the chemical program (even though Mr. Paracha declined the only requests in the record) and that he "served as a source of advice and a sounding board" for Al-Baluchi's attempts to smuggle weapons (even though Mr. Paracha opined on these matters in response to a hypothetical from a U.S. interrogator). See P. Merits Br. at 41. The evidence does not show any specific and active support for a chemical weapons program.

Accordingly, the Court makes the following Findings of Fact, by a preponderance of the evidence: (i) Mr. Paracha did have a conversation in which Al-Baluchi requested his advice and assistance about shipping chemicals and explosives to the United Kingdom; (ii) Al-Baluchi spoke in coded language, but Mr. Paracha understood its meaning; (iii) Mr. Paracha

declined to identify a shipping agent or to otherwise assist Al-Baluchi in smuggling chemicals and explosives into the United Kingdom; (iv) Mr. Paracha identified potential means of smuggling chemicals into the United States in response to a hypothetical question from an interrogator, not during his conversation with Mr. Al-Baluchi; (v) Mr. Paracha's PDA contains digital entries that discuss chemical weapons, and Mr. Paracha has not adequately explained the purpose of those entries; (vi) Mr. Paracha interacted with Dr. Tariq, but there is no evidence that the two discussed or collaborated on chemical weapons; and (vii) there is no evidence that Mr. Paracha materially or directly assisted any Al-Qaeda chemical weapons program.

### D. Petitioner Knowingly Assisted Al-Qaeda by Helping its Agent Seek Entry into the United States

The government's evidence on the fifth and final material issue of disputed fact concerns whether or not Mr. Paracha helped an Al-Qaeda operative to obtain fraudulent immigration documents and enter the United States with the purpose of establishing an Al-Qaeda cell here. The claims require the Court to assess three questions: whether Majid Khan, the individual in question, was an Al-Qaeda operative; whether Mr. Paracha knew that Majid Khan was an Al-Qaeda operative; and whether Mr. Paracha assisted Majid Khan.

1. Majid Khan was an Al-Qaeda operative with a plan to travel to the United States

Majid Khan is different from some of the other Guantanamo detainees in that he has not only been brought to trial before a military commission but has also been convicted. In February 2012, Majid Khan pled guilty to murder in violation of the law of war, attempted murder in violation of the law of war, and spying. U.S. v. Majid Khan Offer for Pretrial Agreement, JE 102, at 1178. While represented by counsel, Khan "knowingly and voluntarily agreed[d] to enter into [a] stipulation of fact," which he described as a "fair and accurate

102

summary of the facts supporting all charges and specifications to which I am pleading guilty." Id. at 1182. The stipulation itself goes further. It does not merely concede that "the government could prove those facts beyond a reasonable doubt." Id. It affirmatively states, with respect to its entire contents, that "the following facts are true." U.S. v. Majid Khan Stipulation of Fact, JE 103, at 1188.

Majid Khan's stipulation establishes several facts relevant to Mr. Paracha's case. Khan admits that he was a member of Al-Qaeda and undertook to aid that group and other terrorist organizations. U.S. v. Majid Khan Stipulation of Fact, JE 103, at 1190. Khan had legal status in the United States as the minor child of his mother, who received asylum from Pakistan. Id. at 1191. Shortly after the terrorist attacks of 9/11, Khan left the United States and traveled to Pakistan – lying about his destination in order to retain his legal status in the United States – where he offered to work for Al-Qaeda, and met KSM. During the three months he was in Pakistan, Khan assisted with a variety of Al-Qaeda plots, including several attempts to assassinate Pervez Musharraf, the former President of Pakistan. Id. at 1193-95. KSM asked Khan to return to the United States to gather information, which Khan did. Id. at 1190. After five months in the United States, Khan returned to Pakistan; among other work, he delivered money that was used in a terrorist attack that killed 11 people in Indonesia. Id. at 1191. At the time of Khan's capture in 2003, he and KSM had been forming a plan for Khan to "return to the United States [to] serve as an al Qaeda sleeper agent and to recruit others to form a new cell to conduct domestic terrorist operations." Id.

Although petitioner challenges the admission of the stipulation and contests what Mr. Paracha knew about Majid Khan, petitioner's counsel do not dispute the basic facts of Majid Khan's Al Qaeda affiliation and efforts, on which the stipulation is quite clear. Accordingly, the

103

Court makes the following finding of fact, by a preponderance of the evidence: (i) Majid Khan was a member of Al-Qaeda; and (ii) in 2002 and 2003, Majid Khan and KSM had formulated a plan for Khan to return to the United States with the aim of establishing an Al-Qaeda cell in the United States.

2. Mr. Paracha assisted Majid Khan with his plan to return to the United States

It is this plan – Majid Khan's re-entry to the United States – in which Mr. Paracha is accused of playing a part. As with most of the other examples of his support for Al-Qaeda, Mr. Paracha's role in Majid Khan's plan was as a facilitator.

Majid Khan's ability to return to the United States after traveling abroad depended on having a valid I-131 travel document. Khan's I-131 had expired in December 2002, while he was in Pakistan, and he needed to renew the document in order to return to the United States to carry out KSM's directives. U.S. v. Majid Khan Stipulation of Fact, JE 103 at 1201-02. An I-131 must be filed from within the United States, and it cannot be renewed if its holder returns to the country from which asylum was granted: Pakistan, in the case of Khan.

So Khan and another Al-Qaeda agent developed a plan to apply for an I-131 from within the United States and to make it seem to U.S. authorities as though Khan had never left the United States to travel to Pakistan. U.S. v. Majid Khan Stipulation of Fact, JE 103 at 1201-02. They recruited a woman named Aafia Siddiqui to travel from Pakistan to Maryland, pose as Khan's spouse, rent a Post Office Box on behalf of herself and Majid Khan, and mail Majid Khan's I-131 application from a location in Maryland. Siddiqui did each of these things. Id. at 1202. Although Mr. Paracha argues that the Court should not rely on Majid Khan's stipulation at all, he does not dispute any of the foregoing facts about Majid Khan's plan, and the Court has no reason to doubt them.

The evidence of petitioner's role in Majid Khan's plan to return to the United States comes from Khan's stipulation, from Uzair Paracha's early statements to FBI interrogators, and from Mr. Paracha's own admissions. The petitioner told interrogators that Al-Baluchi asked him to assist with a friend's effort to obtain a passport, and he agreed to help. FBI EC 07/09/03, JE 30, at 221. In early 2003, Uzair Paracha was scheduled to travel from Pakistan to New York, so Mr. Paracha and Uzair met with Al-Baluchi, who requested Uzair's assistance with Khan's I-131. Several days later, Majid Khan himself arrived at Mr. Paracha's office and asked Uzair to check on the status of his immigration paperwork in the United States. Id.; Uzair Paracha FD-302, 05/05/03, JE 58, at 437. When Uzair told his father that Majid Khan had asked him to call the INS and impersonate Khan, Mr. Paracha advised Uzair that "it was no problem" to do so. Id.

Both Mr. Paracha and Uzair have stated that they met with Khan and Al-Baluchi at Snoopy's Ice Cream Parlor in Karachi to discuss this plan. While Mr. Paracha and Al-Baluchi discussed an investment in the Cliftonia project, Majid Khan and Uzair sat at a different table to discuss the specifics of how Uzair would impersonate Khan in the United States. See FM40 03/22/06, JE 27, at 206; Uzair Paracha FD-302, 05/05/03, JE 58, at 437.

Evidence from Mr. Paracha, Uzair Paracha, and Majid Khan is largely in accord as to what Uzair would be required to do upon reaching the United States. First, Uzair was to call the INS while impersonating Khan to check on the status of the I-131 application. Uzair Paracha FD-302 03/30/03, JE 55 at 5; Uzair Paracha FD-302 05/01/03, JE 57, at 6; Khan Stipulation, JE 103, at 1202. He was to make the calls using a pay phone, presumably to obscure his location and identity. See Uzair Paracha FD-302, 05/05/03, JE 58, at 437. Second, Uzair was to withdraw and then deposit money from Khan's U.S. Bank account, allegedly to keep the

account open. See FBI EC 07/09/03, JE 70-3, at 788-89; Uzair Paracha FD-302 03/30/03, JE 55 at 5; Khan Stipulation, JE 103, at 1202-03. Third, Uzair was to use Khan's credit card to create a record of financial transactions in the United States. Uzair Paracha FD-302 03/30/03, JE 55 at 5; Uzair Paracha 05/01/03, JE 57, at 433; Khan Stipulation, JE 103, at 1202-03. Fourth, Uzair was to retrieve any immigration papers delivered to Khan's P.O. Box. Khan Stipulation, JE 103, at 1203. The entire plan was designed to create records of transactions establishing that Khan had never left the United States.[42]

To aid in this scheme, Khan gave Uzair a number of personal documents that might enable Uzair to impersonate him: Khan's social security card, driver's license, credit card, school identification cards, and health insurance cards. See Uzair Paracha 05/01/03, JE 57, at 433. Initially, however, Uzair "did not want to do anything," so he gave the documents to his father instead. Id. But Mr. Paracha was persistent: he agreed to hold onto the documents, but asked Uzair to inquire about the travel document upon reaching the United States. Id. Then, Mr. Paracha explained, he took care of transporting these documents to the United States by placing them in an envelope and giving them to an associate named Barkat Mahmood, who was also travelling to the United States. FM40 03/22/06, JE 27, at 206. The FBI later discovered all of these documents in Uzair's possession. Uzair Paracha FD-302 03/29/03, JE 54 (containing images of the items recovered during a consensual search of Uzair Paracha's apartment).

KSM was captured not long after Uzair arrived in the United States, and Mr. Paracha called Uzair to notify him of the arrest. Uzair told his father that he no longer felt comfortable holding Khan's ID documents and asked if he should throw them away. Instead, Mr.

---

[42]     Uzair Paracha did not fulfil all of the elements of the plan, though he did impersonate Khan on a call to the INS to check on the status of the application.

Paracha advised Uzair to secure the documents in a safe location. Uzair Paracha FD-302, 05/05/03, JE 58 at 438; FM40 03/22/06 AM Session, JE 27, at 206.

### 3. Uzair and Saifullah Paracha knew that Majid Khan was an Al-Qaeda operative

Mr. Paracha makes two arguments to defend against the allegations of his involvement in Khan's plans: (i) that Mr. Paracha's role in the scheme was too attenuated to amount to substantial support; and (ii) that he did not know Majid Khan was an Al-Qaeda operative. The first argument is untenable, as described in the Court's Conclusions of Law. See Part V, infra.

Mr. Paracha's second response is similarly improbable. Mr. Paracha claims that he offered to assist Khan as a fellow Muslim, but did not know that Khan was a member of Al-Qaeda. Indeed, by contrast to his statements about KSM and Al-Baluchi, Mr. Paracha has always denied knowing that Majid Khan was a member of Al-Qaeda. This argument is not credible. By the time that Al-Baluchi enlisted Mr. Paracha's aid with respect to Majid Khan, KSM and Al-Baluchi had requested assistance with a number of other projects that Mr. Paracha knew to be connected with Al-Qaeda. During the meeting when Uzair and Saifullah Paracha met with Khan and Al-Baluchi, Al-Baluchi also discussed other Al-Qaeda business with Mr. Paracha. He is not likely to have exposed such plans to Majid Khan if Khan were not a member of Al-Qaeda. And it was Al-Baluchi, not Khan, who followed up with Mr. Paracha and Uzair about the progress of the efforts.

Majid Khan also made his association with Al-Qaeda explicit to Uzair Paracha and, through him, to Mr. Paracha. Several sources confirm that, during the meeting at Snoopy's Ice Cream Parlor in Karachi, Khan tried to recruit Uzair to work for Al-Qaida. Khan Stipulation, JE 103, at 1202. Uzair told the FBI that Khan told Uzair that he needed "brothers" like Uzair, and that there were "different levels of how people were with us." Uzair Paracha FD-302

03/30/03, JE 55, at 419; Uzair Paracha FD-302 05/05/03, JE 58, at 437. Uzair acknowledged that he knew Khan was Al-Qaeda, and that he took these words to be a solicitation to join Al-Qaeda. JE 55 at 419; JE 58 at 437. Importantly, the evidence is clear that Uzair relayed the substance of this conversation to Mr. Paracha. Uzair Paracha FD-302 06/10/03, JE 61, at 451.

Mr. Paracha's knowledge of Khan's Al-Qaeda status did not dissuade him from encouraging the scheme. Uzair told interrogators that Mr. Paracha himself advised his son to assist Khan, and that he "received calls from [Mr. Paracha] pressuring him to complete Khan's business." JE 58 at 437. Mr. Paracha also called Uzair shortly after the news of KSM's capture became public to discuss precautions about *Khan's* materials: an indication that Mr. Paracha knew that Khan was connected with KSM, and that their affiliation with both was problematic. Id. Finally, Uzair admitted that both he and Paracha regarded their overall efforts to be a favor to Al-Qaeda: they were motivated to assist Al-Qaeda by money, but would have done so even without remuneration. JE 55 at 421.

Accordingly, the Court makes the following Findings of Fact by a preponderance of the evidence: (i) Mr. Paracha understood that Majid Khan was working on behalf of Al-Qaeda; (ii) Mr. Paracha provided important support to facilitate Majid Khan's plan, to include making it possible for his son to assist Khan; and (iii) Mr. Paracha contributed to Al-Qaeda's plan to place one of its agents, Majid Khan, in the United States.

## V. CONCLUSIONS OF LAW

Having found by a preponderance of the evidence that Mr. Paracha provided a wide range of assistance to the Taliban and Al-Qaeda, the Court must now determine whether this assistance rises to the level of "substantial support" of the Taliban or Al-Qaeda under the AUMF and NDAA.

The nature and quantity of the assistance that a detainee provided – and the effects or benefits it conferred on the Taliban and Al-Qaeda – are all relevant to the question of whether a particular course of conduct amounts to substantial support as a matter of law. In assessing the nature of the assistance, the Court is mindful of Judge Lamberth's conclusion that the criminal material support statute is a reasonable guide to what conduct might amount to substantial support in this context:

> any property, tangible or intangible, or service, including currency
> or monetary instruments or financial securities, financial services,
> lodging, training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment,
> facilities, weapons, lethal substances, explosives, personnel ([one]
> or more individuals who may be or include oneself), and
> transportation, except medicine or religious materials.

Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *12 (citing 18 U.S.C. § 2339A(b).

Ultimately, however, this Court's assessment of the government's detention authority under the AUMF "must be made on a case-by-case basis by using a functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization." Al-Madhwani v. Obama, 642 F.3d at 1074; see also Uthman v. Obama, 637 F.3d at 403; Salahi v. Obama, 625 F.3d at 751-52.

Applying this functional analysis, the Court concludes that Mr. Paracha rendered substantial support both to the Taliban and to Al-Qaeda. The Court also concludes that Mr. Paracha's due process arguments do not afford an independent basis for relief.

### A. Petitioner Provided Substantial Support to the Taliban

The Court has found by a preponderance of the evidence that Mr. Paracha assisted Taliban fighters by helping them to secure equipment and by providing direct financial support.

See Part IV.A. supra. Both of these acts have clear legal implications for respondents' legal authority to detain Mr. Paracha.

First, the Court has found by a preponderance of the evidence that Mr. Paracha organized donations to Taliban fighters to purchase a four-wheel drive vehicle that may have been used in fighting against the United States. Mr. Paracha argues that the purpose of the trip during which he facilitated the donations was "to help rebuild the country after the war against Russia . . . to provide medicine, supplies, and potentially funding to those affected by the war," and "not to provide material support to the Taliban fighters." P. Merits Br. at 14. But supporting the Taliban fighters is just what Mr. Paracha did, regardless of how he viewed the purpose of the trip. Noble and charitable goals may be incongruous in one who substantially supports the Taliban, but the aims are not mutually exclusive.

Petitioner further argues that a "one-time, small financial donation by a Pakistani charitable group of which Mr. Paracha was a part is hardly the kind of material support the law of detention requires." P. Merits Br. at 14. For one matter, the contribution was hardly small, either in volume or in outcome, nor was it disconnected from Mr. Paracha. The petitioner spearheaded fundraising, and it netted thousands of dollars for fighting men who used it to purchase a fighting vehicle. For another matter, neither the AUMF, the NDAA, nor the cases interpreting them provide any kind of minimum dollar threshold on substantial support.

Moreover, the vehicle contribution was not a "one-time" gesture. The Court has also found by a preponderance of the evidence that Mr. Paracha provided medicine and supplies to Taliban fighters and provided $600, purportedly for construction of a mosque. See, e.g., FBI EC 10/26/2004, JE70-33, at 972. Petitioner is correct that the definition of material support of terrorism in the analogous criminal statute – which the Court has identified as a relevant source

110

of authority – specifically excludes "medicine or religious materials." Accordingly, Mr. Paracha's provision of *medicine* does not amount to substantial support. Money, however, is fungible: any money that Taliban fighters did not have to spend on food or supplies, or to construct a mosque, is money that they could use to fight the United States. The definition of material support in the analogous statute explicitly includes "currency or monetary instruments or financial securities." 18 U.S.C. § 2339A(b). Accordingly, the Court concludes as a matter of law that the $600 amounts to a contribution to the Taliban itself, even if it went to the cement company for a mosque project.

Mr. Paracha warns that, "if minor financial support by charitable organizations to the Taliban is enough to qualify as substantial support of terrorism . . . almost all Pakistani citizens would be subject to perpetual detention at Guantanamo Bay." P. Merits Br. at 15. This alarming supposition is inapposite: the Court presumes that most Pakistanis have not directly helped to arm soldiers who fought against the United States. The Court also need not decide whether any one of Mr. Paracha's acts, in isolation, amounts to substantial support. A particular fact that is itself insufficient to establish the ultimate proposition may, nevertheless, increase the probability that Mr. Paracha provided substantial support. The Court views the evidence collectively, looking to understand the relationship of the detainee and Al-Qaeda. See, e.g., Al-Madhwani v. Obama, 642 F.3d at 1074. Here, the facts proven by a preponderance of the evidence amount to a sustained course of conduct in which Mr. Paracha engaged with and substantially assisted the Taliban.

Accordingly, in the context of Mr. Paracha's embrace of the Taliban and his affiliation with its leadership, the Court concludes as a matter of law that Mr. Paracha provided substantial support to the Taliban by (i) leading an effort to provide Taliban fighters with money

for purchase of a vehicle that was used in fighting with the United States; and (ii) providing a financial contribution to the Taliban during a period of substantial military need.

### B. Petitioner Provided Substantial Support to Al-Qaeda

Mr. Paracha's support for the Taliban is not the only basis for his detention: his support for Al-Qaeda was far more varied. The Court has made Findings of Fact that Mr. Paracha was eager to work with Al-Qaeda; that he helped Al-Qaeda to spread its message with video recordings and a press release; that he provided a variety of other assistance to KSM and Al-Baluchi; that he safeguarded substantial sums of Al-Qaeda money on two occasions; and that he helped Al-Qaeda's plan to bring one of its agents to the United States. Relatedly, the Court also found, by a preponderance of the evidence, that KSM, Al-Baluchi, and Majid Khan were members of Al-Qaeda at the time he was assisting them, and that Mr. Paracha was aware of this. See Part IV.B-D, supra. The Court notes that its Findings of Fact do *not* include any finding that Mr. Paracha participated in or directly supported any particular act of violence or force against the United States.

Mr. Paracha's primary defense to the charge that he provided substantial support is not legal, but factual: he alleges that he simply did not know that he was dealing with Al-Qaeda. The Court's factual findings respecting Mr. Paracha's assistance to Al-Qaeda – which roundly reject the knowledge defense – are, in themselves, almost entirely conclusive of this habeas corpus petition. It is very difficult to see how the financial and administrative assistance of the scope that Mr. Paracha knowingly rendered to Al-Qaeda would not amount to substantial support of Al-Qaeda. Mr. Paracha's able counsel, however, are persistent. They argue that, even if Mr. Paracha did provide the alleged assistance as a matter of fact, the efforts do not, as a

matter of law, amount to "substantial support" for purposes of detention under the AUMF and the NDAA.

For the reasons that follow, the Court rejects these arguments and concludes as a matter of law that Mr. Paracha provided substantial support to Al-Qaeda by helping Al-Qaeda spread its message, see Part V.B.1, infra; by providing financial support, see Part V.B.2, infra; by providing other support to KSM and Al-Baluchi, see Part V.B.3, infra; and by helping an Al-Qaeda agent's effort to come to the United States, see Part V.B.4, infra.

1. Mr. Paracha's assistance spreading Al-Qaeda's message constitutes substantial support

The Court has already made factual findings that Mr. Paracha (i) took substantial steps toward recording a video program for Bin Laden, including the purchase of equipment and the construction of a soundproof recording facility; (ii) provided free recording and editing services for Al-Baluchi to record a video containing Al-Qaeda's message; and (iii) helped to distribute an Al-Qaeda press release. In making these findings, the Court rejected the argument that Mr. Paracha did not know or endorse the content of the videos or the press release: Mr. Paracha was veritably *eager* to do business with Al-Qaeda, and it is more likely than not that he *did* know that the planned Bin Laden video and the other materials espoused some version of Al-Qaeda's violent message.

Mr. Paracha also makes two arguments that affect the Court's legal conclusions about the import of his communications support. First, Mr. Paracha notes that he did not provide substantial support to Al-Qaeda because he was attempting to promote Christian-Islamic unity, and would not have supported any violent messages. P. Merits Br. at 20. But Mr. Paracha's own assessment of the communications he facilitated does not affect the government's authority to detain him: what matters is *whether* he provided support, not *why* he may have done so. The law

of this circuit creates no requirement that the United States may detain only those who embrace Al-Qaeda's ideology. See Awad v. Obama, 608 F.3d at 11-12; see also Hussain v. Obama, 718 F.3d at 967-68; Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *10-13.

Second, Mr. Paracha argues that his assistance in spreading Al-Qaeda's message does not legally amount to substantial support of Al-Qaeda because the government has not demonstrated that his assistance had any substantial effect. P. Merits Br. at 25. For example, the video starring Bin Laden was never produced or distributed, the extent of the circulation of the Al-Baluchi videos is unknown, and distribution of a single press release (whose reach and precise content are unknown) have not been shown to provide any substantial benefit to Al-Qaeda.

The Court's analysis of substantial support, however, does not turn on the reach or effect of any *one* of these efforts, but on a case-by-case functional approach that assesses the actions of Mr. Paracha in relation to Al-Qaeda. See Al-Madhwani v. Obama, 642 F.3d at 1074. Here, the facts proven by a preponderance of the evidence amount to a sustained consulting relationship between Mr. Paracha and Al-Qaeda. On several occasions, beginning with the day Mr. Paracha provided his business card to Osama Bin Laden and continuing to the time of Mr. Paracha's capture, Mr. Paracha offered his advice and his services to Al-Qaeda – advice that certainly included the public communication of Al-Qaeda's message. Furthermore, substantial assistance is assessed not just in terms of its measurable impact but in terms of the relationship between the detainee and Al-Qaeda. Mr. Paracha was an experienced businessman with knowledge of the international scene and substantial experience in the media, and he shared these assets freely with KSM and Al-Baluchi. Those consultations themselves are substantial support because they amount to "expert advice" on public relations – advice given to an

114

organization that was eager to reach new recruits and wage a war of public information. See Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *11-13 (citing 18 U.S.C. § 2339A(b)).[43]

        Moreover, Mr. Paracha's support went beyond consultation: even when he did not have a direct role in creating a video or distributing a message, he provided the equipment, facilities, personnel, and professional network of his company for the use Al-Qaeda. Al-Qaeda, in turn, used these assets to produce (at least) two videos and distribute a press release. Mr. Paracha made a living providing these services to other people. In the normal course, Al-Qaeda might otherwise have had to pay for video production services, or recruit someone else to do this work. But Mr. Paracha provided these services to Al-Qaeda at no charge. Accordingly, these benefits amount to substantial support because they are "communications equipment, facilities" or "service." See Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *11-13 (citing 18 U.S.C. § 2339A(b)). The Court concludes as a matter of law that Mr. Paracha's assistance spreading Al-Qaeda's message was, in both its nature and its scope, substantial support to Al-Qaeda.

    2. Mr. Paracha's provision of financial services constitutes substantial support

        The Court has already found by a preponderance of the evidence that, on at least two occasions, Mr. Paracha held substantial deposits of Al-Qaeda funds for safekeeping. Most

---

[43]    The Court has already made a factual finding that it is more likely than not that Mr. Paracha knew that the "message" he offered to spread – and did help spread – was a message of violent jihad. But the content of the message is not necessary to the Court's legal conclusion that Mr. Paracha provided substantial support to Al-Qaeda. Congress has proscribed *any* substantial support to Al-Qaeda. NDAA § 1021(b). In 2002 and 2003, Al-Qaeda was engaged in a political and public relations battle to win new followers and protect its bases of support. In this context, assistance communicating even a message like the one Mr. Paracha *says* he envisioned – a message in English, communicating harmony – could amount to substantial support by helping Al-Qaeda to broaden its appeal and defuse some of the criticisms against it.

of petitioner's defenses on this score are factual arguments about what occurred. Mr. Paracha has argued – without success – that he did not know KSM and Al-Baluchi were Al-Qaeda, that he did not know that they were providing money that belonged to Al-Qaeda, and that Mr. Paracha's purpose was business, rather than to safeguard Al-Qaeda funds. And Mr. Paracha has argued – again, unpersuasively – that only support rendered in connection with combat hostilities can amount to substantial support for purposes of the NDAA.

If these factual questions related to the financial services claims were complicated, the legal questions are not. Aside from disputing the definition of detention authority itself, petitioner's counsel make little attempt to deny that knowingly holding $500,000 or €240,000 in Al-Qaeda funds amounts to substantial support as a matter of law. In its nature, its scale, and its impact, such assistance is substantial support manifest.

At a time when Al-Qaeda was being pursued by the United States military and its allies, Mr. Paracha made sure that the terrorist organization could continue to have access to much-needed funds, funds that Al-Qaeda has used to kill many Americans. This kind of assistance is substantial support of the most obvious and pronounced kind because it is the provision of "currency or monetary instruments or . . . financial services." Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *12 (citing 18 U.S.C. § 2339A(b). See also Mousovi v. Obama, Civ. No. 05-1124 (RMC), 2016 WL 3771240 at *1-3, *9 (D.D.C. July 11, 2016) (concerning a detainee accused of "money changing" services for the Taliban's leaders). Furthermore, these aspects of petitioner's financial services were fully consummated: he agreed to accept Al-Qaeda funds, he took control of actual currency, he moved it around in various bank accounts to avoid detection, and (with respect to the $500,000 provided by KSM) he returned the funds he had received from Al-Qaeda.

In the context of Mr. Paracha's avowed pride in working with Al-Qaeda and the extensive services he provided for its leadership, the Court concludes as a matter of law that Mr. Paracha provided substantial support to Al-Qaeda by (i) knowingly accepting Al-Qaeda funds for safekeeping on two occasions, including receipt of $500,000 from KSM and €240,000 from Al-Baluchi; and (ii) returning to Al-Qaeda the full sum of the $500,000 Mr. Paracha received from KSM, having successfully secured the money for approximately six months.

 3. Mr. Paracha's provision of other assistance constitutes substantial support

In addition to providing financial and media services to Al-Qaeda, Mr. Paracha performed a number of smaller services for Al-Baluchi and KSM. Mr. Paracha helped KSM and Al-Baluchi to search for personal residences, though they were not successful. FBI EC 01/24/04, JE 32, at 231. He advised KSM on financial arrangements, including sending an email containing information on off-shore companies, IIR 10/21/04, JE 18, at 145, and helping KSM to open a personal account at a bank in which Mr. Paracha was a member, DoD Interrogator Notes, 07/11/03, JE 9, at 90. Mr. Paracha even loaned his vehicle to KSM on a number of occasions. FBI EC 07/10/03, JE 70-5, at 815; FBI EC 12/08/04, JE 70-38, at 1003. In addition to these services to KSM, Mr. Paracha also attempted to find housing for the widows and children of Al-Qaeda fighters. See JE 70-5, at 815. KSM and Al-Baluchi also requested Mr. Paracha's assistance with providing Pakistani ID cards, although Mr. Paracha declined to do so. Id. at 816.

Taken collectively – and even accounting for the fact that Mr. Paracha declined at least one of these requests – it is clear that Al-Qaeda leadership sought and received Mr. Paracha's advice and assistance in a number of ways. Indeed, Mr. Paracha was not able to attain Al-Qaeda's goals (for example, Mr. Paracha did not successfully locate housing, either for KSM, Al-Baluchi, or AQ families). Nevertheless, in assisting KSM and Al-Baluchi in these and

117

other ways, Mr. Paracha drew upon his extensive connections and his knowledge of Pakistan's political and social dynamics. Accordingly, Mr. Paracha's help with these matters is analogous to "expert advice and assistance" under the material support statute that the Court has found informative in analyzing the government's detention authority under the AUMF and NDAA. See 18 U.S.C. § 2339A(b).

The personal nature of some of the assistance that Mr. Paracha provided to KSM does not diminish its utility to Al-Qaeda, in light of KSM's role and the challenges Al-Qaeda was facing at the time. While KSM was planning the 9/11 attacks and then fleeing capture, he relied on Mr. Paracha to take care of a number of the details of daily living: transport, housing, and financial management. This assistance is smaller in scale and more attenuated in impact than some of the other assistance that Mr. Paracha rendered to Al-Qaeda. But the Court must consider the totality of the evidence. See Al-Madhwani v. Obama, 642 F.3d at 1074. In the context of all the evidence, Mr. Paracha's assistance is clearly part of a broader willingness to assist Al-Qaeda across a wide range of matters.

Mr. Paracha himself has tellingly described this dynamic. When an interrogator asked Mr. Paracha why Al-Qaeda repeatedly sought his assistance, he said that, because of his connections in the Ministry of Welfare, he was able to bail Al-Qaeda members out of jail if they were arrested in Pakistan. Mr. Paracha agreed that he was Al-Qaeda's "insurance policy." FBI Intelligence Report July 2003, JE 40, at 297.

Accordingly, in the context of Mr. Paracha's broader relationship with Al-Qaeda, the Court concludes as a matter of law that Mr. Paracha substantially supported Al-Qaeda by providing assorted assistance, including: (i) provision of transport and banking services to KSM

and helping him search for a residence, enabling KSM to spend more time on Al-Qaeda work; and (ii) searching for housing for Al-Qaeda members' families.

### 4. Mr. Paracha's assistance to Majid Khan constitutes substantial support

The Court has made a factual finding that Mr. Paracha assisted Majid Khan, an Al-Qaeda agent, with his plan to gain re-entry into the United States; the Court has also found that Majid Khan was attempting to reenter the United States for the purpose of establishing an Al-Qaeda sleeper cell. One of Mr. Paracha's primary defenses to this charge is the factual argument that he simply did not know Majid Khan was an Al-Qaeda operative. For the reasons described earlier, this defense strains belief.

Mr. Paracha also makes a legal argument: that his role in the scheme was too attenuated to amount to substantial support. See P. Merits Br. at 31 (arguing that, if the Court sets asides Uzair's statements, "there is no evidence to conclude . . . that [Mr. Paracha] provided any assistance to Khan"). It is true that Uzair Paracha, and not the petitioner, is the person who travelled to the United States, contacted the INS to impersonate Khan, and received instruction from Khan on engaging in fraudulent financial transactions in the United States.

Nevertheless, Mr. Paracha played an instrumental role in facilitating Majid Khan's plan. For example the Court has found that: (i) the petitioner agreed to assist Al-Baluchi's friend, volunteered Uzair for participation in the project, and introduced Al-Baluchi and Khan to Uzair, see FBI EC 07/09/03, JE 30, at 221; (ii) the petitioner granted his assent for Uzair to participate, even knowing the fraud and risk involved with the plan, FD-302 05/05/03, JE 58, at 437;[44] (iii) the petitioner arranged for Majid Khan's documents to be transported to the

---

[44] Petitioner insists that the nature of the request did not seem suspicious at the time because it was common in Pakistan to conduct transactions for the purpose of keeping an

United States after Uzair expressed concern about the risks of detection, see

███████████ JE 51, at 451; FM40 03/22/06 AM, JE 27, at 206; (iv) the petitioner called Uzair

to encourage him to continue with the plan, see JE 58, 438; (v) the petitioner provided Uzair's

phone number to Al-Baluchi, which enabled Majid Khan to call Uzair to check on his progress,

see IIR 10/08/04, JE 15, at 123; Uzair Paracha FD-302 06/10/03, JE 61, at 452; and (vi) the

petitioner advised Uzair on how to avoid detection after KSM's arrest made it clear that

authorities were pursuing some of the Parachas' affiliates, see JE 61 at 452. Mr. Paracha was

active in all phases of the plan, from its beginning, to its operation, to its concealment.

Collectively, the Court finds that this engagement amounts to an active and indispensable role in

assisting the Al-Qaeda operative Majid Khan with his plan to reenter the United States.

Mr. Paracha also argues that "there is no causal link between the INS check-in or

the bank account activity and any acts of terrorism." P. Merits Br. at 33. Relatedly, petitioner's

counsel point out that the plan would have been ineffectual at creating the desired paper trail

because the INS would not have been capable of tracking financial transactions as part of the

I-131 review process. Accordingly, Mr. Paracha claims that his conduct with reference to Khan

is "not support for detention" because "the alleged actions did not support terrorism." Id.

Under the NDAA, however, the question is not whether Mr. Paracha supported

*terrorism* – the question is whether he supported *terrorists*. 2012 NDAA §1021(b)(2); see also

---

account open. Even assuming that petitioner's assessment of the legitimacy of Al-Qaeda's
request is relevant to the analysis, this defense is suspect. When asked if Mr. Paracha would ever
grant full access to his financial assets and affairs to a relative stranger – as Majid Khan granted
to Uzair – Mr. Paracha conceded that he would not. See ISN 1094 SIR 10/28/2004, JE 119
at 1445. And, when asked if he had ever taken money out of an account and re-deposited it, he
conceded that he had not. Id. The odd nature of the request – and the misrepresentation it
required – would more likely than not have been apparent to Mr. Paracha.

Hussain v. Obama, 718 F.3d at 967-68. The causation defenses identified by Mr. Paracha are not relevant here. The government has the legal authority to detain Mr. Paracha because he helped Al-Qaeda, the organization. Specifically, he helped with respect to the movement and placement of one of its operatives. Whether that operative was able to return to the United States or launch a terrorist attack is not relevant to the substantial support analysis of Mr. Paracha's conduct.

In short, the Court concludes as a matter of law that Mr. Paracha played a central role in facilitating and enabling an Al-Qaeda operative's plan to enter the United States. Not only did Mr. Paracha contribute to the travel and movement of an Al-Qaeda agent, he also recruited and made available his own son in aid of Al-Qaeda's plan. The Court concludes that these services amount to substantial support to Al-Qaeda. See Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *12 (citing 18 U.S.C. § 2339A(b) (indicating that material support includes provision of "personnel").

\*\*\*

Collectively, the import of these four kinds of assistance – financial assistance, assistance spreading Al-Qaeda's message, assistance to Majid Khan, and the other assistance Mr. Paracha provided to KSM and Al-Qaeda – is quite clear. Mr. Paracha has claimed that his "motivation for helping AQ" was mere "business greed." DoD Interrogator Notes July 22, 2003, JE 13, at 109. Even if that is true, Mr. Paracha did business with a deadly terrorist organization. Whatever his personal motivations, Mr. Paracha rendered substantial support – across a range of enterprises, and over a period of years – to Al-Qaeda.[45] Under the AUMF and the NDAA, that is

---

[45] With respect to detention of an individual who has been accused of being *part of* Al-Qaeda or the Taliban, Judge Lamberth has opined that "the government lacks the authority to detain someone whose ties with [the proscribed group] have been sufficiently vitiated by the passage of time, interven[ing] events, or both." Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717,

enough to establish the government's legal authority to detain Mr. Paracha. See Awad v. Obama, 608 F.3d at 11-12; see also Hussain v. Obama, 718 F.3d at 967-68; Al-Hela v. Trump, 2019 U.S. Dist. Lexis 42717 at *10-13.

### C. Due Process does not Provide an Independent Basis for Relief

In addition to challenging the sufficiency of the evidence for the government's detention authority under the NDAA and the AUMF, petitioner also advances a variety of constitutional due process arguments. Mr. Paracha believes that case law in this circuit has "eviscerated" and "effectively nullified" Guantanamo detainees' right to a meaningful opportunity to contest the basis for their detention – a right recognized by the Supreme Court in Boumediene v. Bush, 553 U.S. at 779, 795. See P. Am. Traverse at 18, 20. Petitioner therefore urges the Court to "apply Supreme Court precedent and grant habeas relief here." Id. at 18. The petitioner takes exception to two lines of cases from this circuit, arguments concerning one of which the Court has already resolved.[46] The remaining due process argument cannot alter the

---

at *19 (citing Al-Ginco v. Obama, 626 F. Supp. 2d 123, 128 (D.D.C. 2009)). Even if the Court assumes that this is the law with respect to detention authority for those who are "part of" Al-Qaeda or the Taliban, no court has said that this consideration also applies to substantial support detention authority. In any event, it would not alter the Court's analysis. Petitioner has argued that the government lacks authority to detain Mr. Paracha because he poses no future danger to the United States. See P. Merits Br. at 2-3. But this argument (which the Court has rejected, see Part II.A.2.c, supra) attacks the very notion that respondents possess any authority to detain this petitioner. Any argument in this case that the government's valid detention authority has been vitiated by the passage of time would fail. Mr. Paracha met with Al-Baluchi even after Mr. Paracha learned of KSM's capture and his role in the 9/11 attacks. ▮▮▮▮▮
▮▮▮▮▮ JE 89, at 1091. Mr. Paracha and Al-Baluchi were each apprehended shortly thereafter. The evidence does not show that Mr. Paracha ever meaningfully attempted to terminate his support for Al-Qaeda, or to provide relevant information to authorities, before he was captured by the United States.

46      Mr. Paracha argues that a line of cases from this Circuit, culminating in Latif v. Obama, 677 F.3d 1175 (D.C. Cir. 2011), "establish[es] conclusive evidentiary presumptions that allow indefinite detention based on unreliable, untested information," which vitiates any

Court's conclusion that, under the current law of this circuit, the government has the legal authority to detain the petitioner.

        Petitioner argues that Guantanamo detainees are entitled to due process rights, and that this Court therefore should reject the D.C. Circuit's holdings to the contrary in Al-Bihani v. Obama, 590 F.3d 866 (D.C. Cir. 2010) and Kiyemba v. Obama, 555 F.3d 1022 (D.C. Cir. 2010). P. Merits Br. at 7. See also P. Am. Traverse at 21 (quoting Kiyemba v. Obama, 555 F.3d at 1026) ("[T]he due process clause does not apply to aliens without property or presence in the United States.")). Specifically, Mr. Paracha argues that the Court should "decline to follow" Kiyemba by ensuring that these habeas proceedings take account of "the fundamental notions of fair play demanded by due process." P. Am. Traverse at 23. Counsel argue that Mr. Paracha's "continued deprivation of liberty" is impermissibly punitive because it is excessive in relation to any legitimate military necessity. Id. at 32. Mr. Paracha has not been charged or accused of a crime, yet he has been detained for almost sixteen years – longer even than the fifteen-year maximum sentence under the federal material support of terrorism statute. Id. at 33-34.

        Petitioner relies in part on a recent case from the D.C. Circuit, Qassim v. Trump, 927 F.3d 522 (D.C. Cir. 2019), in which the court of appeals clarified certain aspects of its ruling in Kiyemba. The court of appeals explained that it has not "adopted a categorical prohibition on affording detainees seeking habeas relief any constitutional *procedural* protections." Id. at 524

---

meaningful opportunity to contest detention. P. Am. Traverse at 18-19. In light of the nature of the government records that provide the bulk of the evidence in Guantanamo cases, the presumption of regularity "effectively strip[s] the district courts of their traditional role in reviewing the evidence and finding the facts." Id. at 27. The thrust of these due process arguments is that the Court should "hold that Mr. Paracha is entitled to [procedural] due process and decline to afford the government's documents any presumption of regularity and accuracy." Id. at 29. The Court has already ruled, however, that Latif is binding and that the presumption of regularity applies. See Part III.B, supra. Petitioner's objection is preserved for any appeal.

(emphasis added). But this holding does not alter the Court's analysis. In Qassim, the court of appeals confirmed that Kiyemba's holding on the unavailability of due process *does* apply to "substantive due process claim[s] concerning the scope of the habeas remedy." Qassim v. Trump, 927 F.3d at 528. Mr. Paracha's argument – that this Court's habeas inquiry should incorporate "fundamental notions of fair play" and that Mr. Paracha's should be released on those bases, see P. Am. Traverse at 23 – is a substantive due process claim. Kiyemba places such claims beyond this Court's consideration. See Qassim v. Trump, 927 F.3d at 528-29.

Whatever the weight of Mr. Paracha's arguments that this circuit's decisions barring substantive due process claims have had the effect of abrogating the protections guaranteed by Boumediene, see P. Am. Traverse at 18-25, Kiyemba and Al-Bihani remain the law of this circuit. This Court must apply controlling precedent from the court of appeals until it is overruled by the court of appeals en banc or by the Supreme Court. See United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997).

## VI. CONCLUSION

For the foregoing reasons, the Court will deny Saifullah Paracha's amended petition for habeas corpus [Dkt. No. 11]. An Order to this effect and consistent with this Opinion has been issued.

DATE: 1/23/20

PAUL L. FRIEDMAN
United States District Judge